**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Edward O. Sassower, P.C.
Steven N. Serajeddini, P.C. (*pro hac vice* pending)
601 Lexington Avenue
New York, New York 10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

-and-

John R. Luze (*pro hac vice* pending)
300 North LaSalle
Chicago, Illinois 60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

**COOLEY LLP**
Cullen D. Speckhart (VSB 79096)
*Admitted to practice in New York, Virginia, Missouri and Texas; Not admitted to practice in DC, supervised by members of DC bar*
Olya Antle (VSB 83153)
*Admitted to practice in Virginia; Not admitted to practice in DC, supervised by members of DC bar*
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
Telephone:        (202) 842-7800
Facsimile:        (202) 842-7899

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| ASCENA RETAIL GROUP, INC., *et al.*,[1] | ) | Case No. 20-33113 (KRH) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

## DECLARATION OF CARRIE W. TEFFNER, INTERIM
## EXECUTIVE CHAIR OF ASCENA RETAIL GROUP, INC., IN
## SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Carrie W. Teffner, hereby declare under penalty of perjury:

1.        I have served as a director on the board of directors (the "Board") for Ascena Retail

Group, Inc. (together with the other above-captioned debtors and debtors in possession,

the "Debtors," and, together with their non-Debtor affiliates, "Ascena" or the "Company") since

2018 and as Interim Executive Chair since May 2019.  Prior to joining Ascena, I served in Chief

---

[1]        A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://cases.primeclerk.com/ascena.  The location of Debtor Ascena Retail Group, Inc.'s principal place of business and the Debtors' service address in these chapter 11 cases is 933 MacArthur Boulevard, Mahwah, New Jersey 07430.

Financial Officer roles for nearly a decade at Crocs (from 2015 to 2018), PetSmart (from 2013 to 2015), Weber Stephen Products (from 2011 to 2013), and The Timberland Company (from 2009 to 2011). Prior to these roles, I spent more than 21 years with Sara Lee Corporation serving in various domestic and international positions, including divisional and segment Chief Financial Officer and Corporate Treasurer.

2.      Each of the Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>") with the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Court</u>") on July 22, 2020. To minimize the adverse effects on their business, the Debtors have filed motions and pleadings seeking various types of "first day" relief (collectively, the "<u>First Day Motions</u>").

3.      I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration to assist the Court and parties in interest in understanding the circumstances leading to the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and First Day Motions filed today.

4.      Except as otherwise indicated herein, all facts set forth in this declaration are based upon my personal knowledge, input by the Debtors' management team, employees, and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I could and would testify competently to the facts set forth herein.

**<u>Introduction</u>**

5.      Ascena is a leading specialty retailer for women and girls. Tracing its roots back to a single Dressbarn store built in 1962, today Ascena operates a portfolio of recognizable brands, including Ann Taylor, LOFT, Lane Bryant, Catherines, Justice, Lou & Grey, and Cacique, with

approximately 2,800 stores in the United States, Canada, and Puerto Rico, more than 12.5 million active customers, and nearly 40,000 employees.    As of the date hereof, the Ascena has approximately $1.60 billion in funded debt obligations, including approximately $330 million in outstanding obligations under the its $500 million senior secured asset based lending facility (the "ABL Facility," and the lender thereunder, the "ABL Lenders") and approximately $1.27 billion in senior secured term loan obligations (the "Term Loans," and the lenders thereunder, the "Term Lenders").

6.    As is the case with brick and mortar retailers across the United States and the rest of the world, Ascena's businesses have been drastically affected by the COVID-19 pandemic.  On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic.  As global markets grappled with the escalating spread of the virus, national, state, and local governments across the United States and throughout the world imposed curfews, social distancing protocols, and shelter-in-place orders.  In compliance with these mandates, and to protect the health and safety of Ascena's customers and employees, on March 17, 2020, Ascena implemented temporary closures of all retail stores, which then necessitated the difficult decision to furlough nearly all of its store-level workforce and a substantial portion of its corporate workforce.  Notwithstanding Ascena's efforts to preserve liquidity over the past several months, these circumstances, coupled with the Company's already highly leveraged balance sheet, accelerated the need for a long-term strategic solution—a solution the Company ultimately determined to implement through these chapter 11 cases.

7.    Over the past several years, Ascena has been proactive in developing structural and strategic transformations to refine the Company's operating model to center on key customer segments, implement initiatives designed to optimize product flow through the Company's

distribution channels, and to optimize its store fleet by reducing the number of underperforming stores and obtaining rent relief.  In doing so, Ascena has realized significant costs savings.  Among other things, over the past several months, Ascena has taken decisive action to address its capital structure and implement a strategic plan (the "Strategic Plan") aimed at rationalizing Ascena's brand and store fleet portfolio, realigning distribution capabilities, and implementing various other cost-saving measures.  The Strategic Plan represents a continuation of already existing initiatives, described herein, to address the existing macro-economic challenges of the brick and mortar retail industry.

8.      Moreover, to proactively address the August 21, 2022 maturity of the Term Loans, the Board, including a special committee of disinterested directors (the "Special Committee"), began reviewing strategic alternatives to address the Company's capital structure in Fall 2019.  But the effects of the COVID-19 pandemic on Ascena's businesses has accelerated the need to realize the benefits of these strategies and settle on the necessary path forward.

9.      Accordingly, over the past several months, Ascena has been actively exploring financing and other alternatives and has been engaged with an ad hoc group of Term Lenders. After an extensive review, the Board and Special Committee ultimately determined that there were no financing or other out-of-court alternatives that provided a viable path forward.  Through extensive negotiations, though, Ascena and its secured lenders have agreed to the terms of a crucial and comprehensive recapitalization, the terms of which are embodied in the Restructuring Support Agreement (such agreement, the "Restructuring Support Agreement"), dated as of July 23, 2020 and attached hereto as **Exhibit A**.  The Restructuring Support Agreement is supported by approximately 68% of the Term Lenders and will be implemented through a chapter 11 plan of reorganization (the "Plan").

10.    Under the terms of the Restructuring Support Agreement and Plan, certain of the Term Lenders have agreed to substantially equitize the Term Loans and fully backstop $150 million in new money financing (the "New Term Loan Financing") to fund the Strategic Plan and the Debtors' emergence from these chapter 11 cases.  More specifically, the Restructuring Support Agreement and Plan provide that:

- all Term Lenders will receive the opportunity to participate in the $75 million New Term Loan Financing, which will be funded initially in the form of a debtor-in-possession financing facility to be syndicated following the "first day" hearing in these chapter 11 cases and that the Debtors will seek approval of at the "second day" hearing;

- the Term Lenders that have agreed to backstop the New Term Loan Financing will fund the remaining $75 million of the New Term Loan Financing on the same economic terms;

- all Term Lenders that participate in the New Term Loan Financing will: (a) have certain of their prepetition Term Loans rolled up into the debtor-in-possession financing, and the aggregate $311.8 million in loans (including the $150 million in new money loans) will be converted to a new first-out term loan facility upon emergence from these chapter 11 cases; and (b) receive their pro rata share of 44.9% of the equity in reorganized Ascena upon emergence from these chapter 11 cases;

- all Term Lenders will also receive their pro rata share of: (a) 55.1% of the equity in reorganized Ascena; and (b) $88.2 million in new second-out term loans;

- the ABL Lenders will be paid in full from cash on hand or proceeds from a new asset-based lending exit credit facility (the "ABL Exit Facility");

- holders of general unsecured claims will receive their pro rata share of $500,000, provided that holders of general unsecured claims vote as a class; and

- existing common equity in Ascena will be cancelled.

11.    Additionally, the Debtors are in discussions with the ABL Lenders regarding providing a $400 million ABL Exit Facility, which may be made available as part of a debtor-in-possession financing facility that would automatically convert to a $400 million ABL Exit Facility

upon satisfaction of certain conditions and emergence from these chapter 11 cases or, in any event, ahead of emergence from these chapter 11 cases.

12.     After many months of reviewing alternatives both before and after the COVID-19 pandemic, the Debtors determined that the Restructuring Support Agreement represents the best option available to the Debtors.  The commitment of the Term Lenders to the transactions embodied in the Restructuring Support Agreement, including funding the New Term Loan Financing, provide Ascena with substantial certainty that it will have the liquidity necessary to continue to provide a best-in-class experience for its customers and achieve its Strategic Plan both during and after emergence from these chapter 11 cases.  Implementing the transactions contemplated by the Restructuring Support Agreement will also substantially deleverage the Debtors' balance sheet, positioning Ascena for long-term success.

13.     To preserve the benefits of the Restructuring Support Agreement, the Debtors must move swiftly through these chapter 11 cases.  The Restructuring Support Agreement includes, among other milestones, a 110-day milestone to achieve confirmation of the Plan and a 130-day milestone to emerge from these chapter 11 cases.

14.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this declaration into five sections.  The *first* section provides background information on the Debtors' corporate history and operations.  The *second* section offers detailed information on the Debtors' prepetition capital structure.  The *third* section describes the circumstances leading to the filing of these chapter 11 cases.  The *fourth* section describes the Debtors' Restructuring Support Agreement.  The *fifth* section summarizes the relief requested in, and the legal and factual basis supporting, the First Day Motions.

## I.      Corporate History and Operations.

### A.      Corporate History.

15.      An entrepreneur and innovator, Roslyn S. Jaffe saw the opportunity to provide wear-to-work dresses and clothing for the working woman during the sixties—a time in the United States when women were entering the workforce in greater numbers, with few options available for buying more stylish and affordable workplace women's clothing.  Roslyn, alongside her husband Elliot, opened the first "Dressbarn" store in 1962.  What started as a family-run, single-store retailer quickly transformed into a nationally-recognized, publicly-traded specialty retailer for fashion apparel and accessories for women.  Following its public listing in 1982, The Dressbarn, Inc. ("Dressbarn") grew rapidly to over 800 stores across 49 states by the early-2000s.

16.      Over the years, Ascena has grown its portfolio of retail brands through synergistic and selective acquisition, broadening its specialty offerings and expanding its retail footprint throughout North America.



17.     In 2004, Dressbarn acquired Maurices Incorporated ("Maurices") for $320 million (the "Maurices Acquisition").   Maurices, a specialty retailer offering a broad assortment of fashionable, high quality apparel and accessories to women and men ages 17 to 34, broadened Dressbarn's demographic reach and diversified its retail base (Maurices subsequently exited men's apparel).  The Maurices Acquisition added 464 stores across 38 states, located in strip centers and malls, and reflected a combined enterprise with sales exceeding $1.1 billion.  In 2009, Dressbarn expanded into the girls' clothing market by purchasing Tween Brands, Inc., the owner of the Justice chain, a leading retailer of trendy and value fashion for tween girls between ages seven and fourteen (the "Tween Acquisition").   In a stock-swap deal valued at $157 million, the Tween Acquisition expanded Ascena's addressable market for clothing to young and teenage girls, adding 908 Justice stores.  The combined enterprise encompassed 2,465 locations, with expected sales to reach $2.4 billion.

18.     On January 1, 2011, to reflect its broader holdings and provide the Company with strategic, operational, and financial flexibility, Elliot and Roslyn Jaffee reorganized Dressbarn as a new Delaware corporation under the name "Ascena Retail Group, Inc.," with each of its retail operating brands becoming wholly-owned subsidiaries of Ascena.  In conjunction with this, on January 3, 2011, shares of Ascena's common stock commenced trading on the NASDAQ under the ticker symbol "ASNA."

19.     Following the reorganization, Ascena continued its growth through selective and accretive acquisitions.  In 2012, Ascena ventured into the plus-sized women's clothing market by acquiring Charming Shoppes Inc. ("Charming Shoppes"), the parent company of three distinct brands: Lane Bryant, Inc. ("Lane Bryant"), Catherines Plus Sizes ("Catherines"), and Fashion Bug, for approximately $890 million (the "Charming Shoppes Acquisition").  The acquisition added

approximately 1,800 retail stores across 48 states.  With Charming Shoppes now operating as an independent, wholly-owned subsidiary of Ascena, the combined enterprise operated approximately 3,800 locations.  Shortly following the Charming Shoppes Acquisition, Ascena ceased operations of the Fashion Bug business, closing 124 stores.

20.      In 2015, in perhaps the most significant transaction since its inception, Ascena acquired ANN INC. ("ANN"), the parent company of retail brands Ann Taylor, LOFT, and Lou & Grey, for approximately $2.16 billion (the "ANN Acquisition").  To finance the ANN Acquisition, Ascena raised new secured debt through a first lien term loan facility in the aggregate amount of $1.8 billion (approximately $1.27 billion of which are the Term Loans outstanding today).  Through the ANN Acquisition, Ascena added two of the leading women's specialty retail fashion brands in North America and solidified itself as one of nation's largest and most diversified specialty apparel retailers.  The ANN Acquisition added more than 1,000 store locations across 47 states, the District of Columbia, Puerto Rico, and Canada.  Further, the Ann Taylor and LOFT brands enhanced the Company's "omnichannel" presence by providing two store-related e-commerce websites that were available online in more than 100 countries.  Following the ANN Acquisition, the store fleet of the Ascena enterprise totaled 4,930 stores, a number significantly reduced in the following years as part of the Company's rationalization efforts.

B.      **Business Operations.**

21.      Today, Ascena operates through seven well-known brands with approximately 2,800 stores in 49 states, Canada, and Puerto Rico and revenues surpassing $5.5 billion annually.  The Company's operations consist of its direct channel operations, wholesale

operations, retail store locations, and franchised store locations. The Company's brands are organized into three reportable segments: (i) Premium Fashion; (ii) Plus Fashion; and (iii) Kids Fashion.

22. ***Premium Fashion***. The Premium Fashion segment consists of the Ann Taylor, LOFT, and Lou & Grey brands. Ann Taylor has 291 specialty retail and outlet locations and direct channel operations, accounted for approximately $752 million in fiscal year 2019 sales, and has approximately three million active customers. LOFT has 666 specialty retail and outlet stores, accounted for approximately $1.7 billion in fiscal year 2019 sales, and has approximately 6.7 million active customers. Lou & Grey operates out of certain specialty retail and outlet stores with direct channel operations as well. As of the Petition Date, the Premium Fashion segment accounts for approximately 51 percent of the enterprise's gross sales, and operated out of 957 store locations.

23. ***Plus Fashion***. The Debtors' Plus Fashion segment consists of the Lane Bryant and Catherines brands. Lane Bryant has 688 specialty retail and outlet stores, accounted for approximately $969 million in fiscal year 2019 sales, and has approximately 4.1 million active customers. Catherines includes 320 specialty retail stores. As of the Petition Date, the Plus Fashion segment accounts for 26 percent of the enterprise's gross sales, and operated out of 1,008 store locations

24. ***Kids Fashion***. The Debtors' Kids Fashion segment consists of the Justice brand, and includes 826 specialty retail and outlet stores. As of the Petition Date, the Kids Fashion segment accounts for 23 percent of the enterprise's gross sales

      **C.**     **The Debtors' Sourcing, Procurement, and Distribution Procedures.**

25. The Debtors maintain control over each of their brands by designing and merchandising in-house to drive sales, margin, and traffic. The design and merchandising process

operates on a ten-month design-to-store cycle to allow management to create and source the best quality at the lowest cost, while also providing ample time for development and execution of product strategy, concept, costs, product review, inventory strategy, and logistics, among others.

26.      The Debtors' brands source products through one of three channels:  (i) an internal sourcing group; (ii) third-party buying agents; or (iii) direct from market vendors.   Various factors affect the selection of sourcing channels, including cost, speed to market, merchandise selection, vendor capacity, and fashion trends.   Operating through offices located in Hong Kong, South Korea, China, India, and Bangladesh, the Debtors maintain direct relationships with manufacturing partners, which enables desired product quality control and speed to market, along with favorable pricing as compared to market vendors.  The Debtors purchase merchandise from many domestic and foreign suppliers.  The Debtors do not maintain long-term contracts or arrangements with suppliers and typically transact business on an order-by-order basis.

27.      Ascena owns and maintains a fulfillment center in Greencastle, Indiana, which serves as the Debtors' primary direct channel fulfillment center, a distribution center in Etna, Ohio, serving as the primary brick-and-mortar store distribution center, and a distribution center in Riverside, California which serves as the west coast distribution hub for the Debtors' merchandise sourced from Asia as well as an additional brick-and-mortar store distribution and e-commerce distribution center.  Taken together, the Debtors maintain integrated distribution systems and inventory across more than 2.3 million square feet of distribution capacity, shipping nearly 300 million units annually.

### D.      Recent Corporate and Brand Initiatives.

#### 1.      Customer First Approach.

28.      The Debtors operate a multi-faceted marketing and advertising strategy to reach the target audience for each brand.  Over the past decade, the Debtors have expanded from in-store

only marketing to direct mail, partnerships, print, digital, and social platforms.  The Debtors'
current marketing strategy marks a shift toward an integrated, more advanced advertising structure,
which taps into online prospecting to supplement grassroots, social networking, and blogger
outreach programs, while continuing to capitalize on the Debtors' historical marketing strategies.
The Debtors' customer insights team is constantly engaging with customers to obtain feedback on
products and experiences that drive brand and product strategy.  By leveraging their unique data
analytics capabilities to understand customers, the Debtors are able to implement targeted
Facebook and Instagram campaigns and deliver more personalized and seamless end-to-end
experiences within the portfolio of brands.  The Debtors focus on customer engagement is best
reflected by their highly personalized shopping experience, illustrated in the below "journey map."

### **Customer Journey Map**



### 2.      The Debtors' Omni-Channel Strategy.

29.      The goal of the Debtors' omnichannel strategy is to optimize Ascena's customer
experience across all possible brand interactions through technology, whether the customer is in
store or online.  Through integration of online and in-store technology-enabled initiatives, Ascena
services customers with a single, channel-agnostic view of inventory and customer-specific
preference.

30.     Over 50 percent of Ascena's customers prefer to shop online or through multiple channels.  Ascena's omnichannel capabilities are wide-ranging, including:  (i) in-store demand and out-of-stock fulfillment; (ii) online purchasing with in-store returns as well as in-store and curbside pick-up; (iii) online demand and ship-from-store fulfillment; (iv) alternative payments allow one-click checkout; (v) private label credit card and loyalty programs; (vi) cross-channel returns; (vii) online find in store; (viii) fit prediction technology; (ix) clienteling applications; and (x) responsive and adaptive mobile design and store detail pages.  The Debtors' omnichannel platform ensures that customers can buy and return product anywhere and at any time.

31.     The Debtors continue to invest in initiatives to support their omnichannel platform. Over the last several years, the Debtors continued to develop technological solutions to enable their brands to provide customers a seamless omnichannel shopping experience in-store and online, and to integrate marketing efforts to drive in-store and online traffic.  The Debtors have committed to enhancing product availability and fulfillment efficiency as well as their capability to analyze transaction data to support strategic decisions.  These efforts have increased the Debtors' ecommerce penetration from 19 percent in 2016 to 44 percent in 2020, and expected to grow to 60 percent by 2024.

### 3.     Exiting the Value Fashion Segment.

32.     In response to the challenges facing the retail industry over the past several years, in early 2019, Ascena determined to exit its underperforming value fashion segment.  This ultimately include the going concern sale of the Maurices business and complete wind down of the Dressbarn business.

33.     ***Sale of Maurices***.  On March 25, 2019, Ascena announced the sale of a majority interest in the Maurices business (the "Maurices Sale") to a third party purchaser, which, at the time, represented 15 percent of the enterprise's overall revenue and had generated substantial

losses over the past two fiscal years.  Valued at about $300 million, Ascena received $210 million

in cash and an approximately 49.6 percent stake in the new ownership vehicle.  The proceeds from

the Maurices Sale were used to purchase inventory and reinvest in incremental business initiatives.

Ascena continues to support the Maurices brand through a management services agreement,

including support for IT, supply chain, sourcing, and certain back office functions.  The sale of

Maurices, which had reported declining EBITDA numbers and net sales number since 2016,

allowed Ascena to focus on its core brands and promised a leaner operating model with significant

anticipated cost-savings.

34.    *Dressbarn Wind Down*.  In conjunction with the Maurices Sale, and in an effort to

restructure the enterprise along its most profitable brands, in May 2019, Ascena commenced a

wind down of its Dressbarn brand (the "Dressbarn Wind Down").  The Dressbarn Wind Down

included the eventual closure of approximately 660 Dressbarn locations.  The Dressbarn Wind

Down was completed in the second quarter of 2020, with all store closures effectuated in or about

January of 2020.  Through the liquidation, Ascena shed over $300 million of lease liability and

sold the e-commerce rights of Dressbarn to a third-party purchaser for approximately $5 million.

## II.    The Company's Prepetition Corporate and Capital Structure.

35.    The Company's current corporate structure reflects the various strategic

acquisitions that Ascena has executed over the years, including, most recently, the ANN

Acquisition.  The corporate structure is reflected in the corporate organizational chart attached

hereto as **Exhibit B**.  Each Debtor is a direct or indirectly wholly-owned subsidiary of Ascena

Retail Group, Inc.  As of the Petition Date, the Debtors have approximately $1.60 billion in total

funded debt obligations, consisting of approximately $1.27 billion in Term Loans and $330 million

outstanding under the ABL Facility.  The following table depicts the Debtors' prepetition capital

structure, exclusive of accrued but unpaid interest and fees:

| Debt Instrument | Maturity | Rate | Outstanding Amount |
|---|---|---|---|
| ABL Facility | February 2023 | L + 1.25% | $333.0 million[2] |
| Term Loan Facility | August 2022 | L + 4.50% | $1.27 billion |
| **Total Funded Debt:** | | | **$1.60 billion** |

A.    **ABL Facility.**

36.    Ascena Retail Group, Inc., as parent borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "ABL Administrative Agent") and swingline lender, are parties to that certain Amended and Restated Credit Agreement, dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Restatement Agreement dated as of February 27, 2018, and as may otherwise be amended, restated, supplemented, or otherwise modified from time to time (the "ABL Credit Agreement").[3]    The ABL Credit Agreement provides for a senior secured asset-based revolving credit facility, with a maximum availability of $500 million, subject to a borrowing base. As of the Petition Date, the aggregate borrowing base (*i.e.*, the effective maximum availability) was $500 million.    The obligations under the ABL Facility are secured, subject to certain exceptions, by a first priority lien on certain of the Debtors' assets, including, without limitation, accounts receivable, inventory, cash, cash equivalents, and a second priority lien on the Debtors' real property, capital stock, and other personal property, including the Debtors' intellectual

---

[2]    This total includes approximately $103 million in outstanding letters of credit issued under the ABL Facility.

[3]    The guarantors under the ABL Revolver Facility are Ascena's domestic subsidiaries, subject to customary exclusions and exceptions (collectively, the "ABL Guarantors").

property and investment contracts.  As of the Petition Date, approximately $230 million in borrowings and approximately $103 million of letters of credit are outstanding under the ABL Facility.

### B.   Term Loan Facility.

37.   In connection with the ANN Acquisition, on August 21, 2015, Ascena Retail Group, Inc., AnnTaylor Retail Inc., as subsidiary borrower, lenders party thereto, and Goldman Sachs Bank USA, as administrative agent (in such capacity, the "Term Loan Agent") entered into that certain Term Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time, the "Term Credit Agreement").  The Term Credit Agreement provides for a senior secured term loan facility, issued in the original aggregate principal amount of $1.8 billion at an interest rate based on either the alternate base rate or the adjusted LIBO rate plus a margin (the "Term Loan Facility").  The Term Loan Facility matures on August 21, 2022, and requires quarterly repayments of $4.5 million prior to the first half of the 2017 fiscal year and $22.5 million thereafter, with a remaining balloon payment of approximately $1.26 billion at maturity.  In 2018, the Company made repayments totaling $225 million of which $180 million was applied to future quarterly scheduled payments, extending the next required quarterly payment of $22.5 million to November 2020.

38.   The obligations under the Term Loan Facility are secured, subject to certain exceptions, by a first priority lien on the Debtors' real property, capital stock, and other personal property, including the Debtors' intellectual property and investment contracts, and a second priority lien on certain of the Debtors' assets, including, without limitation, accounts receivable, inventory, cash, and cash equivalents.  As of the Petition Date, approximately $1.27 billion in aggregate principal amount remained outstanding under the Term Loan Facility.

C.      **Common Stock.**

39.      Shares of Ascena Retail Group, Inc.'s common stock have traded on the New York

Stock Exchange under the symbol "ASNA."  As of the Petition Date, approximately 9,986,423

shares of voting common shares were outstanding.

III.    **Events Leading to these Chapter 11 Cases and Restructuring Initiatives.**

A.      **Challenging Operating Environment.**

40.      In addition to the effects of the COVID-19 pandemic, Ascena faces the same

macro-trends that have crippled many apparel and retail companies in recent years.  These factors

include the general downturn in the retail industry and the marked shift away from

brick-and-mortar retail to online channels.  Given the Debtors' substantial brick-and-mortar

presence and associated expenses, the Debtors' businesses have been heavily dependent on store

traffic and resulting sales conversions to meet sales and profitability targets.  The retail apparel

industry, however, has undergone a permanent shift towards a more online-centric format, in

which retailers sell more product through company websites or larger online retailers.

Recognizing this, in recent years the Debtors have implemented a series of cost-saving and cash

conservation initiatives to grow their profit margins and address their debt obligations and have

made significant investment into their omnichannel strategy to fuel online sales growth.

B.      **COVID-19, Store Closures, Furlough Program, and Liquidity Preservation.**

41.      Beginning in March 2020, as a result of the COVID-19 pandemic,

government-mandated lockdowns, and the subsequent shuttering of the global economy, Ascena,

like the rest of the retail world, experienced a significant and precipitous decline in already-

challenged store traffic and related consumer spending.  Following the recommendations and

mandates of state and local governments, on March 17, 2020, Ascena temporarily closed all

Company-operated retail stores indefinitely, while distributions centers remained open, operating

at limited capacity.  Store closures have significantly contributed to missed sales targets, unsold inventory, and depressed profit margins.

42.     In response, Ascena took decisive action to preserve liquidity, evaluating all options available to conserve cash and maintain ongoing operations.  To that end, the Company materially reduced costs, capital expenditures, inventory commitments, and modified vendor payment terms.  Moreover, on March 30, 2020, the Debtors announced the implementation of temporary salary reductions and furloughs affecting all store associates and nearly half of its corporate associate workforce (the "Furlough Program").  In addition to the Furlough Program, the Debtors implemented temporary reductions in the base salaries of all corporate associates, excluding Distributions Center associates,  above a certain threshold, and reduced the base salaries of certain senior management positions by 50 percent.  Reductions for other executives and corporate associates above a certain threshold ranged from 10 percent to 45 percent depending on base pay.

43.     Recently, in accordance with state and local orders, the Company has reopened stores in a phased approach, with a sharp focus on employee and customer safety.  As of the Petition Date, substantially all of the Company's stores had reopened.  The Company is taking exceptional measures to ensure that its associates and customers remain safe in its stores.  Specifically, the Company is performing diligent nightly cleaning of its stores, offering contact-free curbside pickup, providing training to its associates on safety practices, and provides masks to each associate, among other measures.

44.     Even with stores open, the brick and mortar retail operating environment continues to be challenging and uncertain.  Certain states have implemented or indicated they are considering social distancing measures that may require that Ascena re-close certain of its stores.  Moreover, it is unclear when store traffic will return to pre-COVID-19 levels.  In light of this uncertainty, the

Company has determined to implement the Strategic Plan to ensure that Ascena's operating model appropriately reflects current operating conditions.

### C.     Development of Revised Strategic Business Plan.

45.     The effects of COVID-19, taken together with the macroeconomic trends already affecting the retail industry, accelerated the need for Ascena to reassess its go-forward business model.   In the months preceding the COVID-19 outbreak, the Debtors' management team ("Management"), the Special Committee, and the Board had been developing a revised, comprehensive transformation strategy focused on addressing the following:   (i) closure of under-performing brands; (ii) right-sizing the store fleet for go-forward brands to ensure remaining stores deliver healthy EBITDA results; (iii) simplifying the organizational structure and operating model to drive aggressive cost reduction; (iv) rationalizing real estate portfolio; and (v) rationalizing go-forward supply chain.   In light of the effects of COVID-19, Management, the Special Committee, and the Board accelerated and refocused these efforts to build a plan that would allow the Company to remain viable in the new COVID-19 operating environment.

46.     ***Brand Portfolio Rationalization***.   As part of the revised strategy, Ascena determined that it is in the best interests of the Company to implement the wind down of certain under-performing brands while retaining and focusing on core brands that drive customer engagement and loyalty.  The Company, with the help of its advisors, determined that a challenging M&A market coupled with recent brand performance and associated liabilities meant that a going-concern sale was not viable.  Accordingly, during these chapter 11 cases, Ascena intends to wind down the brick-and mortar operations of Catherines, and Lou & Grey, and restructure Justice, including winding down the majority, or all, of the brick and mortar operations.  Ascena intends to transition Justice to a primarily online platform and continue Lou & Grey within go-forward LOFT stores.  At the conclusion of the wind-down of the Catherines brick and mortar stores,

Ascena intends to complete a sale of the Catherines-related intellectual property in accordance with the related motion filed contemporaneously herewith.  The aggregate effect will be an elimination of approximately 1,000 store locations.

47.     ***Real Estate Rationalization***.  The Debtors plan to continue their real estate rationalization efforts by closing unprofitable and marginally profitable stores, and attaining rent relief through renegotiations.  By the conclusion of these chapter 11 cases, the Debtors intend to reduce their store fleet from approximately 2,800 stores to approximately 1,200 stores, representing a 56 percent reduction in the total store fleet.  This is the culmination of a comprehensive, store-by-store performance analysis to identify stores not delivering adequate levels of profitability to justify keeping the store in the Company's real estate portfolio. Approximately 1,000 of the closing stores are related to the Catherines and Justice brands, but the Debtors intend to exit certain stores related to the core, go-forward brands as well, pending discussions with landlords regarding rent concessions, through which discussions the Debtors expect to achieve significant rent savings.

**D.     Exploration of Strategic Alternatives.**

48.     Recognizing the need to explore strategic alternatives to address Ascena's 2022 term loan maturity, in July 2019, the Debtors retained Kirkland & Ellis LLP, as legal advisor, and Guggenheim Partners, LLC, as investment banker.  Together, the Debtors and their advisors analyzed the Debtors' capital structure and potential out-of-court strategies to extend runway.  On September 30, 2019, in connection with the Board's ongoing review of strategic alternatives, the Board appointed two independent and disinterested directors, Gary D. Begeman and Paul Keglevic, who together comprise the Special Committee.  The Board delegated to the new directors the authority to, among other things, review and act upon strategic transactions.

49.     In the midst of the Board's and Special Committee's review of strategic alternatives, the COVID-19 pandemic hit.  The Board's focus immediately shifted to protecting Ascena's business, preserving liquidity, and ensuring the safety of Ascena's employees and customers.  In parallel with stabilizing Ascena's business and cash position, the Board and Special Committee focused on addressing the effect of COVID-19 on Ascena's business, including refining and accelerating certain actions in the Company's existing business plan, ultimately embodied in the Strategic Plan, and exploration of options to extend runway.  The Board explored the viability of a number of out-of-court alternatives, including various out-of-court financing structures, the sale of all or a portion of the business, and other alternatives.  Eventually it became clear that the out-of-court alternatives reviewed by the Board and short-term liquidity saving measures implemented by the Company would not be sufficient to address the effects of the COVID-19 pandemic.

50.     In addition to an already highly leveraged balance sheet, to weather the storm caused by the COVID-19 pandemic, the Company was forced to accumulate additional obligations to preserve cash, including additional drawings under the ABL Facility and vendor and landlord facing claims.  The accumulation of these additional obligations, coupled with the challenging market conditions, made it impossible to structure an out-of-court transaction that would allow Ascena to achieve its long-term strategic plan.  In April 2020, Ascena retained Alvarez & Marsal North America, LLC as restructuring advisor to assist in Ascena's review of strategic alternatives.

51.     To facilitate a restructuring transaction to address the Company's capital structure and other outstanding liabilities in a more comprehensive manner, in early 2020, the Company began engagement with the ad hoc group of term lenders and the administrative agent under the ABL Facility.  Several months of discussions and negotiations ultimately resulted in the

Restructuring Support Agreement, which contemplates a transformative restructuring and is supported by more than 68% of the Term Lenders. The Company is also in continuing discussions with its ABL Lenders to provide the ABL Exit Financing, and expects to secure a commitment in the near term.

52.     The decision to enter into the Restructuring Support Agreement and commence these chapter 11 cases is the culmination of nearly a year of strategic review, including weekly meetings of the Board and weekly meetings of the Special Committee since August 2019. Ultimately, the Board and Special Committee determined that the Restructuring Support Agreement and these chapter 11 cases represent the value-maximizing path forward. On July 23, 2020, the Board authorized entry into the Restructuring Support Agreement and the Debtors commenced these chapter 11 cases shortly thereafter.

**IV.     The Restructuring Support Agreement, Chapter 11 Plan, and New Financing.**

53.     The Restructuring Support Agreement contemplates a comprehensive reorganization that will be implemented through a chapter 11 plan of reorganization and that will result in a substantial deleveraging of the Debtors' balance sheet and an infusion of new capital to fund the Strategic Plan and Ascena's emergence from these chapter 11 cases. Under the Restructuring Support Agreement, certain of the Term Lenders have agreed to backstop a $150 million new money investment and substantially equitize the $1.27 billion in outstanding Term Loans. Upon emergence from chapter 11, in addition to any outstanding borrowings under the Exit ABL Facility, the Company's secured term loan obligations will be reduced to $400 million and the Company will have discharged substantial unsecured obligations that have accumulated (in significant part) as a result of the COVID-19 pandemic (and that the Company would not have otherwise been able to address on an out-of-court basis).

54.     To effectuate this comprehensive restructuring, and ensure the Debtors' emergence from chapter 11, it is imperative that the Debtors meet the following milestones contained in the Restructuring Support Agreement:

- no later than three business days from the Petition Date, the Court shall have entered an interim order approving the Company's use of cash collateral;

- no later than thirty-five business days from the Petition Date, the Court shall have entered into a final order approving the DIP Facility;

- no later than sixty  days from the Petition Date, the Court shall have approved the Disclosure Statement;

- no later than 110 days after the Petition Date, the Court shall have confirmed the Plan; and

- no later than 130 days after the Petition Date, the effective date of the Plan shall have occurred.

55.     The New Money Term Loan Financing will be funded initially as a debtor-in-possession financing, $75 million of which the Company will make available to all Term Lenders through a syndication process to be completed prior to the second day hearing in these chapter 11 cases.  The remaining $75 million of the New Money Term Loan Financing will be funded by the initial Term Lenders party to the Restructuring Support Agreement (which lenders are also backstopping the syndicated portion of the New Money Term Loan Financing).  Provided that certain conditions are satisfied, the New Money Term Loan Financing will (along with $161.8 million in rolled up Term Loans) automatically convert to a "first out" exit term loan.

56.     In addition to the New Money Term Loan Financing, as of the Petition Date, the company has approximately $433.7 million in cash on hand.  As set forth in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection to the*

*Prepetition Lenders, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII)*

*Granting Related Relief*, the Debtors, the Term Lenders, and the ABL Lenders have agreed to the

terms of consensual use of cash collateral to help fund these chapter 11 cases.  Finally, the Debtors

are in continuing discussions with the ABL Lenders regarding providing a new asset-based lending

facility that would be funded initially as a $400 million debtor-in-possession financing and, upon

the satisfaction of certain conditions, convert to the Exit ABL Facility.  All of this taken together

will provide the Company will substantial liquidity to administer these chapter 11 cases and

continue to meet their ongoing operational obligations, thereby providing certainty to and

maximizing value for all stakeholders.

57.      Implementation of the transactions contemplated by the Restructuring Support

Agreement will position Ascena for long-term success, save thousands of jobs, and ensure that the

Company's key landlords and vendors continue to have a viable go-forward business partner.

Without the certainty of outcome provided by the Restructuring Support Agreement, it is unlikely

that the Company would be able to secure favorable (if any) trade terms, which would have a

substantial, deteriorative effect on the company.  Moreover, without the clear path to emergence

from chapter 11 provided by the Restructuring Support Agreement, certain of the Company's key

counterparties may decline to transact with Ascena altogether.  After an extensive review process,

the Restructuring Support Agreement is the only viable path forward that results in Ascena's

business continuing as a going concern.  For these reasons and the other reasons described in this

declaration I believe that the Restructuring Support Agreement represents the value-maximizing

path forward.

V.      **Evidentiary Support for First Day Motions.**

A.      **Debtor-in-Possession Financing and Cash Collateral Use.**[4]

58.      I am familiar with the DIP Facilities, the material terms thereof, as well as the

Debtors' liquidity needs.  The Debtors request approval of the DIP Facilities on a final basis only

and approval of consensual use of Cash Collateral (with the support of the Debtors' secured

lenders).  The use of Cash Collateral during the interim period will be critical to the Debtors'

ability to continue operating and to restructure successfully.  As of the Petition Date, the Debtors

have approximately $433.7 million of cash on hand.  Without the authority to use Cash Collateral,

the Debtors would not have access to sufficient cash to fund their day-to-day operations, including

purchase new inventory, honor employee wages and benefits, fund operational expenses, or

maintain valuable long-term relationships with their vendors, suppliers, employees, and customers.

I believe that restricted access to this Cash Collateral would result in irreparable harm to the

Debtors and their reorganization efforts.

59.      The DIP Facilities also provide material value to the Debtors' chapter 11 estates by

sending a strong message to the Debtors' stakeholder that the Debtors will have sufficient liquidity

to meet their cash needs and will continue to have sufficient access to capital after emergence from

chapter 11 in light of the automatic exit conversion feature contained in the DIP Facilities.

60.      The Debtors, with the assistance of A&M, evaluated the amount of funding that the

Debtors will require in these chapter 11 cases and prepared a 13-week budget (the "Budget").  The

amount was derived from a cash-flow projection that the Debtors' and A&M developed from an

---

[4]    Defined terms used but not defined in this subsection have the meanings given to them in *Debtors' Motion for
Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing
the Debtors to Use Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense
Status, (IV) Granting Adequate Protection to the Prepetition Lenders, (V) Modifying the Automatic Stay, (VI)
Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion"), filed contemporaneously
herewith.

analysis of the Debtors' receipts and disbursements.  I have reviewed the Budget and concluded that it is reasonable in light of the Debtors' circumstances.  I have further concluded that the amounts available under the DIP Facilities, together with the Debtors' cash on hand and revenue from the operation of their business, are sufficient to fund all payments contemplated by the First Day Motions and fund the Debtors' postpetition operating and restructuring-related expenses. Accordingly, the Debtors should have sufficient available liquidity at the end of the Budget projection period in the form of both cash on hand and availability under the DIP Facilities to fund ongoing operations after the payment of all amounts contemplated by the First Day Motions. Based on my experience and extensive discussions with the Debtors' management team and advisors, I believe the Budget presents a reasonable estimate of the Debtors' cash sources and needs during these chapter 11 cases.

61.     The DIP Facilities would provide the Debtors sufficient liquidity to demonstrate to the market that they will be able to meet their operating obligations during these chapter 11 cases, as the Debtors implement the restructuring contemplated by the Restructuring Support Agreement. The DIP Facilities would also provide a reasonable liquidity buffer to the Debtors in the event they underperform their projections, or in case the restructuring takes longer than anticipated.

62.     Moreover, demonstrating that the Debtors have access to financing will allow them to maintain favorable trade terms with vendors.  Loss of trade terms (whether on account of demands for cash in advance, cash on delivery, or otherwise) would materially impair the value of the Debtors' estates.  Finally, increased liquidity will send positive signals to the Debtors' other stakeholders, including landlords, customers, and employees, that the Debtors' business is on the path to improved operational results, encouraging them to work cooperatively with the Debtors

through the restructuring.  Accordingly, on behalf of the Debtors, I respectfully submit the Court

should grant the relief requested in the DIP Motion.

**B.    Other First Day Motions.**

63.    Contemporaneously herewith, the Debtors filed a number of First Day Motions and

is seeking orders granting various forms of relief intended to stabilize Ascena's business operations

and facilitate the efficient administration of these chapter 11 cases.  The First Day Motions seek

authority to, among other things, ensure sufficient liquidity to run Ascena's business, ensure the

continuation of Ascena's cash management systems, and allow for other business operations

without interruption.  I believe that the relief requested in the First Day Motions is necessary to

give Ascena an opportunity to work towards successful chapter 11 cases that will benefit all of

Ascena's stakeholders.

64.    The First Day Motions request authority to pay certain prepetition claims.  I

understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part,

that the Court shall not consider motions to pay prepetition claims during the first 21 days

following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid

immediate and irreparable harm."  In light of this requirement, Ascena has narrowly tailored its

requests for immediate authority to pay certain prepetition claims to those circumstances where

the failure to pay such claims would cause immediate and irreparable harm to Ascena and its

estates.  Other relief will be deferred for consideration at a later hearing.

65.    I am familiar with the content and substance of the First Day Motions.  The facts

stated therein are true and correct to the best of my knowledge, information, and belief, and I

believe that the relief sought in each of the First Day Motions is necessary to enable Ascena to

operate in chapter 11 with minimal disruption to its business operations and constitutes a critical

element in successfully implementing a chapter 11 strategy.  A description of the relief requested

and the facts supporting each of the First Day Motions is detailed in **<u>Exhibit C</u>**.


*[Remainder of Page Left Intentionally Blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  July 23, 2020                    */s/ Carrie W. Teffner*
_____
                                         Carrie W. Teffner
                                         Interim Executive Chair
                                         Ascena Retail Group, Inc.

## Exhibit A

**Restructuring Support Agreement**

*Execution Version*

THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.

## *RESTRUCTURING SUPPORT AGREEMENT*

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 13.03, this "**Agreement**") is made and entered into as of July 23, 2020 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) and (ii) of this preamble, collectively, the "**Parties**"):[1]

    i.    Ascena Retail Group, Inc. a company incorporated under the Laws of the State of Delaware ("**Ascena Topco**"), and each of its affiliates listed on **Exhibit A** to this Agreement that have executed and delivered counterpart signature pages to this Agreement to counsel to the Consenting Stakeholders (the Entities in this clause (i), collectively, the "**Company Parties**"); and

    ii.    the undersigned holders of, or investment advisors, sub-advisors, or managers of discretionary accounts that hold, Term Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Joinder, or a Transfer Agreement to counsel to the Company Parties (collectively, the "**Consenting Stakeholders**").

## *RECITALS*

**WHEREAS**, the Company Parties and the Consenting Stakeholders have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms set forth in this Agreement and as specified in the Restructuring Term Sheet (such transactions as described in this Agreement, the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions, including through the commencement by the Debtors of voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Eastern District of Virginia (the "**Bankruptcy Court**");

**WHEREAS**, certain of the Consenting Stakeholders or their affiliates that are parties to that certain Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings given to them in Section 1 of this Agreement or the Restructuring Term Sheet attached as **Exhibit B** hereto (the "**Restructuring Term Sheet**").

Backstop Commitment Letter attached as **Exhibit C** hereto (the "**Backstop Commitment Letter**") have agreed to provide the DIP Term Loans on the terms set forth in the Backstop Commitment Letter;

**WHEREAS**, the DIP Term Loans will be converted into loans under the First Out Exit Term Loan Facility on the Plan Effective Date on the terms set forth in the Restructuring Term Sheet and that certain exit facility term sheet attached as **Exhibit D** hereto (the "**Exit Facility Term Sheet**"); and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Plan;

**NOW, THEREFORE**, in consideration of the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

**Section 1.**     *Definitions and Interpretation*.

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"**ABL Claims**" means any Claims arising under, related to, or on account of the ABL Credit Agreement.

"**ABL Credit Agreement**" means that certain Amended and Restated Credit Agreement dated as of January 3, 2011, as amended and restated by the Second Restatement Agreement dated as of June 14, 2012, by the Third Restatement Agreement dated as of March 13, 2013, by the Fourth Restatement Agreement dated as of July 24, 2015, by the Fifth Amendment and Restatement Agreement dated as of February 27, 2018 and as may otherwise be amended, restated, supplemented or otherwise modified, among Ascena TopCo, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto, the issuing banks party thereto, and JPMorgan Chase Bank, N.A., as administrative agent and swingline lender.

"**Agent**" or "**Agents**" means, individually or collectively, any administrative agent, collateral agent, or similar Entity under the ABL Credit Agreement and/or the Term Credit Agreement, including any successors thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules hereto in accordance with Section 13.03 (including the Restructuring Term Sheet, the Exit Facility Term Sheet and the Backstop Commitment Letter).

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Ascena Topco**" has the meaning set forth in the preamble to this Agreement.

"**Backstop Commitment Letter**" has the meaning set forth in the preamble to this Agreement.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cash Collateral Order**" means any order of the Bankruptcy Court granting the authorization to use cash collateral on an interim basis on terms acceptable to the Company Parties and the Required Consenting Stakeholders.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" has the meaning given to it in section 101(5) of the Bankruptcy Code with respect to a Debtor.

"**Company Claims/Interests**" means any Claim or Equity Interest, including the ABL Claims, the Term Loan Claims, the DIP ABL Facility Claims, the Backstop Commitments, and the DIP Term Facility Claims.

"**Company Parties**" has the meaning set forth in the recitals to this Agreement.

"**Confidentiality Agreement**" means an executed confidentiality agreement, including with respect to the issuance of a "cleansing letter" or other public disclosure of material non-public information agreement, in connection with any proposed Restructuring Transactions.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Consenting Stakeholders**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence Chapter 11 Cases.

"**Definitive Documents**" means the documents listed in Section 3.01.

"**DIP Financing Order**" means the order entered by the Bankruptcy Court setting forth the terms of and approving the DIP ABL Facility, the DIP Term Facility, and the Backstop Commitment Letter on terms acceptable to the Company Parties and the Majority Backstop Commitment Parties (as defined in the Backstop Commitment Letter).

"**Disclosed Interests**" has the meaning set forth in Section 9(a).

"**Disclosure Statement**" means the disclosure statement with respect to the Plan.

"**Disclosure Statement Order**" means the order entered by the Bankruptcy Court approving the Disclosure Statement

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Equity Interests**" or "**Interests**" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any Company Party, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file upon the commencement of the Chapter 11 Cases.

"**Greenhill**" means Greenhill & Co., LLC, as financial advisor to the Lender Group.

"**Initial Consenting Stakeholders**" means Consenting Stakeholders that have that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties as of the Execution Date.

"**Insider**" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Joinder**" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit E**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Lender Group**" means the ad hoc group or committee of Consenting Stakeholders represented by Greenhill and Milbank.

"**Loyens**" means Loyens & Loeff Luxembourg S.à.r.l., as Luxembourg counsel to the Lender Group.

"**LuxCo Entities**" means, collectively, AnnTaylor Loft GP Lux S.à.r.l. and AnnTaylor Loft Borrower Lux SCS.

"**Milbank**" means Milbank LLP, as counsel to the Lender Group.

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, or such other applicable formation documents (if any) of Reorganized Ascena, including any certificates of designation, each of which shall be included in the Plan Supplement.

"**Outside Date**" means the date that is six (6) months after the Petition Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee of any Company Claims/Interests who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means the chapter 11 plan of reorganization to be filed by the Debtors in the Chapter 11 Cases consistent with this Agreement and the Restructuring Term Sheet and otherwise as reasonably acceptable to the Company Parties and the Required Consenting Stakeholders, including any and all exhibits annexes and schedules thereto.

"**Plan Effective Date**" means the date of the occurrence of the "Effective Date" of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court.

"**Post-Emergence Incentive Plan Documents**" means all documentation with respect to any post-emergence management incentive plan, including the Management Incentive Plan, which, for the avoidance of doubt, does not include the Employee Benefits Programs (as defined in the Restructuring Term Sheet).

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

5

"**Rent Deferral Motion**" means a motion seeking an order from the Bankruptcy Court extending the time for performance of the Debtors' obligations arising under unexpired non-residential real property leases to the date that is at least sixty (60) days after the Petition Date.

"**Reorganized Ascena**" means either (a) Ascena Topco, or any successor thereto, as reorganized pursuant to and under the Plan or (b) a new corporation or limited liability company that may be formed or caused to be formed by the Debtors to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Common Stock to be distributed or sold pursuant to the Plan.

"**Required Consenting Stakeholders**" means, as of the relevant date, Initial Consenting Stakeholders holding at least 50.01% of the aggregate outstanding principal amount of the Term Loan Claims that are held by the Initial Consenting Stakeholders.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Rules**" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Solicitation Materials**" means any materials related to the solicitation of votes for the Plan pursuant to sections 1123, 1126, and 1143 of the Bankruptcy Code.

"**Term Loan Claims**" means any Claims arising under, related to, or on account of the Term Loan Credit Agreement.

"**Term Loan Credit Agreement**" means the Term Credit Agreement, dated as of August 21, 2015, as it may be amended, restated, supplemented or otherwise modified, among Ascena TopCo, AnnTaylor Retail, Inc., the lenders party thereto, and Goldman Sachs Bank USA, as administrative agent.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.01, 11.02, 11.03, 11.04 or 11.05.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"**Transfer Agreement**" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit F**.

"**Whiteford Taylor**" means Whiteford, Taylor & Preston LLP, as local counsel to the Lender Group.

1.02.    Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; *provided* that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)      the use of "include" or "including" is without limitation, whether stated or not; and

(j)      the phrase "counsel to the Consenting Stakeholders" refers in this Agreement to each counsel specified in Section 13.11 other than counsel to the Company Parties.

**Section 2.**      *Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Standard Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the other Parties;

(b)     holders of at least two-thirds of the aggregate outstanding principal amount of the Term Loan Claims shall have executed and delivered counterpart signature pages of this Agreement; and

(c)     counsel to the Company Parties shall have given notice to counsel to the Consenting Stakeholders in the manner set forth in Section 13.11 hereof (by email or otherwise) that the other conditions to the Agreement Effective Date set forth in this Section 2 have occurred, which notice shall be promptly following the occurrence of such other conditions.

**Section 3.     *Definitive Documents*.**

3.01.     The Definitive Documents governing the Restructuring Transactions shall include the following:  (A) the Plan; (B) the Confirmation Order; (C) the Disclosure Statement; (D) the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials; (E) the Plan Supplement; (F) the Cash Collateral Order; (G) the DIP Financing Order; (H) the Exit Facility Documents; (I) the New Corporate Governance Documents; (J) the Post-Emergence Incentive Plan Documents; (K) any new employee incentive plan or employee retention plan entered into by the Company Parties after the Agreement Effective Date; (L) any new material employment, consulting, or similar agreements entered into by the Company Parties after the Agreement Effective Date; (M) any disclosure documents related to the issuance of the New Common Stock; and (N) all material pleadings filed by the Company Parties in connection with the Chapter 11 Cases (or related orders), including the First Day Pleadings and all orders sought pursuant thereto.

3.02.     The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12.  Further, subject to and without limiting any additional consent or approval rights of the Parties specified elsewhere in this Agreement, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties and the Required Consenting Stakeholders; *provided* that the New Corporate Governance Documents and Post-Emergence Incentive Plan Documents shall be acceptable to the Required Consenting Stakeholders and reasonably acceptable to the Company Parties.

**Section 4.     *Commitments of the Consenting Stakeholders*.**

4.01.     General Commitments, Forbearances, and Waivers.

(a)     During the Agreement Effective Period, subject to Section 4.03 of this Agreement, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, to:

(i)     support the Restructuring Transactions as contemplated by this Agreement and use commercially reasonable efforts to vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or

approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions;

(ii) support use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order or the DIP Financing Order;

(iii) support entry into the DIP ABL Facility on the terms set forth in the ABL Commitment Letter;

(iv) support entry into the DIP Term Facility on the terms set forth in the Backstop Commitment Letter and take all other applicable actions required by the Backstop Commitment Letter, including the funding of any backstop commitments on the terms set forth therein;

(v) support entry into the Exit Facilities on the terms set forth in the Exit Facility Term Sheet and take all other applicable actions required by the Exit Facility Term Sheet;

(vi) use commercially reasonable efforts to cooperate with the Company Parties, subject to applicable Laws and at the Company Parties' sole cost and expense, in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(vii) give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions; and

(viii) negotiate in good faith and use commercially reasonable efforts to execute and implement, as applicable, the Definitive Documents that are consistent with this Agreement to which it is required to be a party or for which its consent is required.

(b) During the Agreement Effective Period, each Consenting Stakeholder agrees, in respect of all of its Company Claims/Interests, that it shall not directly or indirectly:

(i) object to, delay, impede, or take any other action that is reasonably likely to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii) object to, delay, impede, or take any other action that is reasonably likely to interfere with use of cash collateral by the Debtors during the pendency of the Chapter 11 Cases on the terms set forth in the Cash Collateral Order, entry into or performance under the DIP ABL Facility on the terms set forth in the ABL Commitment Letter, or entry into, performance under, or syndication of the DIP Term Facility on the terms set forth in the Backstop Commitment Letter;

(iii) propose, file, support, solicit, or vote for any Alternative Restructuring Proposal; *provided*, for the avoidance of doubt, that nothing in this Section 4.01(b)(iii) shall limit the consultation and approval rights of Consenting Stakeholders set forth in Section 6.01(k) of this Agreement; *provided*, *further*, that a Consenting Stakeholder may propose an Alternative Restructuring Proposal to the Company Parties in connection with Section 6.01(k) of this Agreement if such Consenting Stakeholder provides notice of its intent to propose such Alternative

Restructuring Proposal (including the terms thereof) to each Initial Consenting Stakeholder at least five (5) Business Days in advance of such proposal;

(iv)    file or have filed on its behalf any motion, pleading, or other document (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement or the Plan;

(v)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind against any Company Party or the other Parties in violation of this Agreement with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement; *provided* that any Consenting Stakeholder may file motions, pleadings or other documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) with respect to its or their rights under any Definitive Document and relating to or arising from matters and rights not specifically set forth in this Agreement, including the Restructuring Term Sheet;

(vi)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claim or Interest; or

(vii)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay under section 362 of the Bankruptcy Code.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)    During the Agreement Effective Period, each Consenting Stakeholder that is entitled to vote to accept or reject the Plan pursuant to its terms agrees that it shall, subject to receipt by such Consenting Stakeholder of the Solicitation Materials, whether before or after the commencement of the Chapter 11 Cases:

(i)    vote each of its Company Claims/Interests to accept the Plan by delivering its duly executed and completed ballot accepting the Plan on a timely basis following the commencement of the solicitation of the Plan and its actual receipt of the Solicitation Materials and the ballot;

(ii)    to the extent it is permitted to elect whether to opt out of any of the releases set forth in the Plan, elect not to opt out of such releases by timely delivering its duly executed and completed ballot(s) indicating such election; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (i) and (ii) above; *provided* that nothing in this Agreement shall prevent any Consenting Stakeholder from changing, withholding, amending, or revoking (or causing the same) its vote, election, or consent with respect to the Plan if this Agreement has been terminated in accordance with its terms.

(b)    During the Agreement Effective Period, each Consenting Stakeholder, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action in violation of this Agreement reasonably likely to interfere

10

with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

4.03.   Notwithstanding the foregoing, nothing in this Agreement shall:  (a) require any Consenting Stakeholder to incur any expenses, liabilities or other obligations that are not expressly subject to reimbursement by the Company Parties pursuant to this Agreement, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities, or other obligations to any Consenting Stakeholder or its Affiliates that such Consenting Stakeholder reasonably believes may not be reimbursed by the Company Parties pursuant to this Agreement; (b) require any Consenting Stakeholder to provide any information that it reasonably determines to be sensitive or confidential; *provided* that, for the avoidance of doubt, each Consenting Stakeholder shall include its holdings on its signature page to this Agreement, which signature page will be delivered to (i) other Consenting Stakeholders in a redacted form that removes such Consenting Stakeholder's holdings and (ii) the Company Parties and Milbank in an unredacted form (to be hold by the Company Parties on a confidential basis and by Milbank on a professionals' eyes only basis); or (c) limit the right of any Party to exercise any right or remedy provided under this Agreement, the Confirmation Order, or any other Definitive Document.  Notwithstanding the immediately preceding sentence, nothing in this Section 4.03 shall serve to limit, alter, or modify any Consenting Stakeholder's express obligations under the terms of this Agreement.

**Section 5.**     *Additional Provisions Regarding the Consenting Stakeholders' Commitments*. Notwithstanding anything in this Agreement to the contrary, nothing in this Agreement shall: (a) affect the ability of any Consenting Stakeholder to consult with any other Consenting Stakeholder, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (b) impair or waive the rights of any Consenting Stakeholder to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (c) prevent any Consenting Stakeholder from enforcing this Agreement or from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 6.**     *Commitments of the Company Parties*.

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary or desirable to consummate the Restructuring Transactions in accordance with this Agreement;

(b)      support and take all steps reasonably necessary and desirable to obtain entry of the Cash Collateral Order, the DIP Financing Order, the Disclosure Statement Order, and the Confirmation Order;

(c)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions, take all steps reasonably necessary or desirable to address any such impediment;

(d)     use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals for the Restructuring Transactions;

(e)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)     use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)     (i) to the extent reasonably practicable, provide counsel to the Consenting Stakeholders draft copies of (x) all First Day Pleadings three (3) Business Days in advance of the Petition Date and (y) any other motions, documents and other pleadings materially affecting any Consenting Stakeholders that the Company Parties intend to file with the Bankruptcy Court, as applicable, three (3) Business Days in advance of the filing thereof and, (ii) without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to the Consenting Stakeholders regarding any comments to draft copies provided pursuant to sub-clause (i);

(h)     pay in full and in cash all of the accrued reasonable and documented fees, costs, and expenses of the professionals and other advisors retained by the Lender Group, including such fees, costs, and expenses of (i) Greenhill, (ii) Milbank, (iii) Whiteford Taylor, and (iv) Loyens, and continue to pay such amounts as they come due and seek to pay such ongoing fees, costs, and expenses in connection with the Cash Collateral Order, DIP Financing Order, or other such appropriate order;

(i)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, or (iv) challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Term Loan Claims, or asserting any other cause of action against and/or with respect or relating to such Term Loan Claims or the prepetition liens securing such Term Loan Claims;

(j)     timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable;

(k)     (i) solicit, consider, respond to, and facilitate Alternative Restructuring Proposals in consultation with the Required Consenting Stakeholders and (ii) pursue a Alternative Restructuring Proposal if (A) the Required Consenting Stakeholders determine that such Alternative Restructuring Proposal is a higher or better transaction than the Restructuring Transactions and (B) the Alternative Restructuring Proposal is implemented under, or without modification to the Company Parties' and the Required Consenting Stakeholders' obligations under this Agreement to pursue and implement, a Plan as modified to implement or allow for such Alternative Restructuring Proposal; *provided* that the structure of such Alternative Restructuring Proposal will not preclude any Initial Consenting Stakeholder from participating in such

Alternative Restructuring Proposal on a pro rata basis on substantially the same terms as any other Initial Consenting Stakeholder; and

(l)     reasonably consult with the Required Consenting Stakeholders regarding (i) the assumption or rejection of any executory contracts or unexpired leases, (ii) entry into any agreement, settlement, or other arrangement with any of the landlords under the Debtors' unexpired leases waiving, deferring, or modifying the rent payments or rent structure under such leases, and (iii) any payments of prepetition Claims (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) of or agreements with the Company Parties' vendors and provide notice and reasonably acceptable reporting to Milbank and Greenhill regarding any of the foregoing actions, which consultation and reporting shall include weekly calls regarding the status of the actions described in this Section 6.01(l) among the relevant employees, advisors and consultants of the Company Parties, Milbank, Greenhill and one or more Initial Consenting Stakeholders.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7 or with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly, and shall cause their respective subsidiaries not to:

(a)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(b)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions or the Plan;

(c)     modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in any material respect;

(d)     file any motion, pleading, or Definitive Documents (including any modifications or amendments thereof) with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistent with this Agreement (including the consent rights of the Consenting Stakeholders set forth in in this Agreement as to the form and substance of such motion, pleading, or other Definitive Document) or the Plan;

(e)     except with respect to any transaction contemplated by the First Day Motions (on the terms set forth in such First Day Motion and any agreement or form of agreement attached thereto) or otherwise consented to in writing by the Initial Consenting Stakeholders prior to the Agreement Effective Date: (i) sell (including any sale leaseback transaction), lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material properties or material assets of the Company Parties, including any Equity Interests, other than in the ordinary course of business; (ii) purchase, lease, or otherwise acquire (by merger, exchange, consolidation, acquisition of stock or assets or otherwise) any material assets or material properties, other than in the ordinary course of business; or (iii) commence any liquidation or wind down process with respect to any of the Company Parties' businesses or enter into any agreement or arrangement, or modification to any agreement or arrangement, in connection therewith;

(f)      (i) enter into or amend, adopt, restate, supplement, or otherwise modify any employee benefit, deferred compensation, incentive, retention, bonus, or other compensatory arrangements, policies, programs, practices, plans or agreements, including offer letters, employment agreements, consulting agreements, severance arrangements, or change in control arrangements with or for the benefit of any of its employees that are a senior vice president or more senior, (ii) increase the base salary, target bonus opportunity, or other benefits payable by the Company Parties or to any of their executive officers, or (iii) make any payment to any former Insider (as of the Agreement Effective Date) of any post-employment, retirement or similar plan or program, severance agreement, or similar arrangement;

(g)      assume, assume and assign, or reject executory contracts or unexpired leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any assumption, assumption and assignment, or rejection of any executory contract or unexpired lease, which notice shall include the analysis underlying the Company Parties' decision to assume, assume and assign, or reject such executory contract or unexpired lease, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholders shall be deemed to have consented to any such assumption, assumption and assignment, or rejection;

(h)      enter in any agreement, settlement, or other arrangement with any of the landlords under the Debtors' leases waiving, deferring, or modifying the rent payments or rent structure under such leases; *provided* that the consent of the Required Consenting Stakeholders shall not be unreasonably withheld; *provided*, *further*, that the Company Parties shall provide four (4) Business Days' prior written notice of any such agreement, settlement, or other arrangement, which notice shall include the analysis underlying the Company Parties' decision to enter into such agreement, settlement, or other arrangement, including adequate information supporting such analysis and decision, and, absent written notification during that period from Milbank or Greenhill to the Company Parties that the Required Consenting Stakeholders do not consent, the Required Consenting Stakeholder shall be deemed to have consented to any such agreement, settlement, or other arrangement; or

(i)      pay any prepetition Claim (including Claims pursuant to section 503(b)(9) of the Bankruptcy Code and lien Claims) held by any of the Company Parties' vendors except in compliance with the First Day Motions and only to the extent that the Company Parties have (i) made commercially reasonable efforts to require such vendor to execute a trade agreement providing for the continuity of goods and services to the Debtors or Reorganized Debtors, as applicable, on terms reasonably acceptable to the Required Consenting Stakeholders (as determined in accordance with the consultation, notice, and consent procedures referenced in the following clause (ii)), and (ii) provided notice of such payment to one or more Initial Consenting Stakeholders pursuant to consultation, notice, and consent procedures to be agreed between the Company Parties and the Required Consenting Stakeholders.

6.03.    Except with the prior written consent of the Required Consenting Stakeholders, during the Agreement Effective Period, neither of the LuxCo Entities shall incur any material

obligations to any third party or otherwise lease, mortgage, pledge, grant, or incur any encumbrance on, or otherwise Transfer, any material asset.

**Section 7.**     *Additional Provisions Regarding Company Parties' Commitments*.

7.01.    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, or similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 7.01 shall not be deemed to constitute a breach of this Agreement (other than a failure to comply with this Section 7); *provided* that the Company Parties shall notify counsel to the Consenting Stakeholders in writing promptly in the event of any such determination (and in any event no later than two (2) Business Days following such determination).

7.02.    Notwithstanding anything to the contrary in this Agreement (but subject to Section 7.01), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the rights to:  (a) consider, respond to, and facilitate Alternative Restructuring Proposals; (b) provide access to non-public information concerning any Company Party to any Entity or enter into Confidentiality Agreements or nondisclosure agreements with any Entity; (c) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (e) enter into or continue discussions or negotiations with holders of Claims or Equity Interests (including any Consenting Stakeholder), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals; *provided* that the Company Parties shall (x) provide a copy of any written Alternative Restructuring Proposal (and notice of, and a written summary of, any oral Alternative Restructuring Proposal) within two (2) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to Greenhill and Milbank and (y) provide such information to Milbank as reasonably requested by the Lender Group or as necessary to keep the Lender Group reasonably informed as to the status and substance of such discussions.

7.03.    Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

**Section 8.**     *Transfer of Interests and Securities*.

8.01.    During the Agreement Effective Period, no Consenting Stakeholder shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) of any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      such Transfer is made on or prior to the date that is at least two (2) Business Days prior to the Plan Effective Date;

(b)      prior to the funding of the DIP Term Facility, in the case of a Transfer (other than by participation) of Term Loan Claims by a Consenting Stakeholder with a commitment to fund New Money DIP Loans (as defined in the Backstop Commitment Letter), such Consenting Stakeholder retains Term Loan Claims in an amount equal to or greater than its allocation of Roll-Up DIP Loans (as defined in the Backstop Commitment Letter); and

(c)      (i) the transferee executes and delivers to counsel to the Company Parties and Milbank, at or before the time of the proposed Transfer, a Transfer Agreement; (ii) the transferee is a Consenting Stakeholder; or (iii) the transferee is an entity that is acting in its capacity as a Qualified Marketmaker, *provided* that (x) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Company Claims/Interests is to a transferee that is or becomes a Consenting Stakeholder at the time of such Transfer and (y) the Qualified Marketmaker complies with Section 8.05 hereof.

8.02.    Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio*.

8.03.    This Agreement shall in no way be construed to preclude the Consenting Stakeholders from acquiring additional Company Claims/Interests; *provided* that such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Stakeholder be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Company Parties or counsel to the other Consenting Stakeholders).

8.04.    This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Stakeholder to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.05.    Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the Transfer otherwise is a Permitted Transfer under Section 8.01.  To the extent that a Consenting Stakeholder is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment,

participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of the Company Claims/Interests who is not a Consenting Stakeholder without the requirement that the transferee be a Permitted Transferee.

8.06.    Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.07.    The Company Parties will provide notice of any Transfer Agreement received pursuant to Section 8.01(c)(i) (which notice shall include the amount and type of Company Claims/Interests Transferred pursuant to such Transfer Agreement) to Milbank by the later of (i) close of business on the second Business Day following the effective date of such Transfer Agreement and (ii) the close of business on the second Business Day after the Company Parties receive notice of any such Transfer Agreement.

8.08.    Each Consenting Stakeholder shall promptly provide Milbank and/or the Company Parties with information concerning its then-current holdings upon reasonable request from Milbank or the Company Parties.

**Section 9.    *Representations and Warranties of Consenting Stakeholders*.**  Each Consenting Stakeholder severally, and not jointly, represents and warrants that, as of the date such Consenting Stakeholder executes and delivers this Agreement and as of the Plan Effective Date:

(a)    it is (or upon the settlement of unsettled trades, will be) the beneficial or record owner of the face amount of the Company Claims/Interests reflected in such Consenting Stakeholder's signature page to this Agreement, Joinder, or Transfer Agreement, as applicable (as may be updated pursuant to Section 8) (the "**Disclosed Interests**") or is the nominee, investment manager, or advisor for beneficial holders of the Disclosed Interests;

(b)    it has (or upon the settlement of unsettled trades, will have) the full power and authority to act on behalf of, vote and consent to matters concerning, such Company Claims/Interests;

(c)    such Company Claims/Interests are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Consenting Stakeholder's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)    it has (or upon the settlement of unsettled trades, will have) the full power to vote, approve changes to, and transfer all of its Company Claims/Interests as contemplated by this Agreement subject to applicable Law; and

(e)    solely with respect to holders of Company Claims/Interests, (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an institutional accredited investor

(as defined in the Rules), and (ii) any securities acquired by the Consenting Stakeholder in connection with the Restructuring Transactions will have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act.

**Section 10.** *Mutual Representations, Warranties, and Covenants*.   Each of the Parties represents, warrants, and covenants to each other Party, as of the date such Party executed and delivers this Agreement and as of the Plan Effective Date:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Plan, and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties that have not been disclosed to all Parties.

**Section 11.** *Termination Events*.

11.01.  Consenting Stakeholder Termination Events.  This Agreement may be terminated by the Required Consenting Stakeholders by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof upon the occurrence of the following events:

(a)     the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)     the Debtors have not filed the Rent Deferral Motion with the Bankruptcy Court by the date that is three (3) calendar days after the Petition Date

(c)     the Bankruptcy Court has not entered the Cash Collateral Order on an interim basis by the date that is five (5) Business Days after the Petition Date;

(d)      the Bankruptcy Court has not entered the DIP Financing Order on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)      the Bankruptcy Court has not entered the Disclosure Statement Order by the date that is sixty (60) calendar days after the Petition Date;

(f)      solicitation of the Plan has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)      the Bankruptcy Court has not entered the Confirmation Order by the date that is one hundred ten (110) calendar days after the Petition Date;

(h)      the Plan Effective Date has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date;

(i)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) is adverse to the Consenting Stakeholders seeking termination pursuant to this provision and (ii) remains uncured for ten (10) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such breach;

(j)      the DIP ABL Facility (as applicable) is terminated and accelerated in accordance with its terms;

(k)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(l)      the Bankruptcy Court enters an order denying confirmation of the Plan or the Confirmation Order is reversed or vacated;

(m)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Consenting Stakeholders, not to be unreasonably withheld), (i) dismissing any of the Chapter 11 Cases, (ii) converting one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases;

(n)      any Company Party (i) files, waives, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to waive, amend or modify any Definitive Document (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to the

consent rights afforded the Consenting Stakeholders under this Agreement), without the prior written consent of the Required Consenting Stakeholders, (ii) withdraws the Plan without the prior consent of the Required Consenting Stakeholders, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii), in the case of each of the foregoing clauses (i) through (iii), which remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Stakeholders transmit a written notice in accordance with Section 15.10 of this Agreement detailing any of the foregoing;

(o)    any Company Party files or supports another party in filing (i) a motion or pleading challenging the amount, validity, or priority of any claims held by any Consenting Stakeholder against the Company Parties (or any liens securing such claims) or (ii) a motion or pleading asserting (or seeking standing to assert) any purported claims or causes of action against any of the Consenting Stakeholders;

(p)    the Bankruptcy Court grants relief that is materially inconsistent with this Agreement or the Plan (in each case, with such amendments and modifications as have been effected in accordance with the terms hereof);

(q)    any Company Party files, proposes, or otherwise supports any plan of liquidation, asset sale of all or substantially all of a Company Party's assets or plan of reorganization other than the Plan;

(r)    the Bankruptcy Court enters an order terminating the Debtors' exclusive right to file or solicit acceptances of a plan of reorganization (including the Plan); or

(s)    any court of competent jurisdiction has entered a final, non-appealable judgment or order declaring this Agreement to be unenforceable.

11.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 13.11 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more of the Consenting Stakeholders of any provision set forth in this Agreement and (i) such breach remains uncured for a period of fifteen (15) Business Days after the receipt by the Consenting Stakeholders of notice of such breach and (ii) the non-breaching Consenting Stakeholders no longer collectively beneficially own or control at least two-thirds of the aggregate principal amount of Term Loan Claims;

(b)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, including the Bankruptcy Court, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for fifteen (15) Business Days after the terminating

Company Party transmits a written notice in accordance with Section 13.11 hereof detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

   (d)  the Bankruptcy Court enters an order denying confirmation of the Plan.

   11.03. <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all of the following:  (a) the Required Consenting Stakeholders; and (b) each Company Party.

   11.04. <u>Individual Termination</u>.  Any individual Consenting Stakeholder may terminate this Agreement, as to itself only, by the delivery to the Company Parties of a written notice in accordance with Section 13.11 hereof if (a) the Plan Effective Date has not occurred by the Outside Date or (b) Section 11.01(o) is breached by any Company Party with respect to such Consenting Stakeholder.

   11.05. <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

   11.06. <u>Effect of Termination</u>.  Upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or causes of action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents, agreements, undertakings, waivers, forbearances, votes or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; *provided* any Consenting Stakeholder withdrawing or changing its vote pursuant to this Section 11.06 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Stakeholders from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (a) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Stakeholder, and (b) any right of any Consenting Stakeholder, or the ability of any Consenting Stakeholder, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or Consenting Stakeholder.  No purported termination of this Agreement shall be effective under this Section 11.06 or otherwise if the Party seeking to terminate

this Agreement is in material breach of this Agreement, except a termination pursuant to Section 11.02(b) or Section 11.02(d).  Nothing in this Section 11.06 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 11.02(b).

**Section 12.**      *Amendments and Waivers*.

(a)      This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)      This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (a) each Company Party and (b) the Required Consenting Stakeholders; *provided* that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Consenting Stakeholder, then the consent of each such affected Consenting Stakeholder shall also be required to effectuate such modification, amendment, waiver or supplement; *provided*, *further*, that (i) any modification, amendment, or supplement to the definition of "Outside Date" shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, (ii) any modification, amendment, or supplement to the definition of "Required Consenting Stakeholders" shall require the prior written consent of each Consenting Stakeholder, (iii) any modification, amendment, or supplement to Section 11.04 hereof shall require the prior written consent of each Consenting Stakeholder, (iv) any modification, amendment, or supplement to Section 4.03 shall not be binding on any Consenting Stakeholder that has not provided its prior written consent to such amendment, and (v) any modification, amendment or supplement to this Section 12 shall require the prior written consent of each Consenting Stakeholder.

(c)      Any proposed modification, amendment, waiver or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 13.**      *Miscellaneous*.

13.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.02. <u>Tax Matters</u>.  The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties.

13.03. <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

13.04. <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

13.05. <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

13.06. <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  EXCEPT TO THE EXTENT SUPERSEDED BY FEDERAL BANKRUPTCY LAW, THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement:   (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

13.07. <u>TRIAL BY JURY WAIVER</u>.   EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

13.08. <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.09.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Stakeholders, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Stakeholders were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.10.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

13.11.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)  if to a Company Party, to:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attn:  Michael Veitenheimer
Email: michael.veitenheimer@ascenaretail.com

with copies to:

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Attn:  Steven N. Serajeddini
Email: steven.serajeddini@kirkland.com

and

Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:  John R. Luze
        Jeff Michalik
Email: john.luze@kirkland.com
        jeff.michalik@kirkland.com

(b)  if to a Consenting Stakeholder, to:

Milbank LLP
55 Hudson Yards

New York, NY 10001-2163
Attn:   Evan R. Fleck
        Abigail L. Debold
Email: efleck@milbank.com
        adebold@milbank.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.12.  <u>Fees and Expenses</u>.  The Company Parties shall pay and reimburse all reasonable and documented fees and expenses when due (including travel costs and expenses) and all outstanding and unpaid amounts incurred in connection with the Restructuring Transactions (including, for the avoidance of doubt, all reasonable and documented fees and expenses incurred prior to the date hereof) of the attorneys, accountants, other professionals, advisors, and consultants of the Lender Group (whether incurred directly or on their behalf and regardless of whether such fees and expenses are incurred before or after the Petition Date), including the fees and expenses of Greenhill, Milbank, Whiteford Taylor, and Loyens, including all amounts payable or reimbursable under applicable fee or engagement letters (including any success or transaction fees when earned) with the Company Parties (which agreements shall not be terminated by the Company Parties before the termination of this Agreement).

13.13.  <u>Reservation of Rights</u>.  After the termination of this Agreement pursuant to Section 11, the Parties each fully reserve any and all of their respective rights, remedies, claims, and interests, subject to Section 11 in the case of any claim for breach of this Agreement.  Further, nothing in herein shall be construed to prohibit any Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Agreement and the Plan and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the Restructuring Transactions.

13.14.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Stakeholder hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties, and without reliance on any statement of any other Party or Entity (other than such express representations or warranties of the Company Parties contained herein).

13.15.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.16.  <u>Waiver</u>.  If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any

proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.17.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

13.18.  <u>Several, Not Joint, Claims</u>.   Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.19.  <u>Severability and Construction</u>.   If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.20.  <u>Remedies Cumulative</u>.   All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.21.  <u>Capacities of Consenting Stakeholders</u>.   Each Consenting Stakeholder has entered into this agreement on account of all Company Claims/Interests that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

13.22.  <u>Relationship Among Consenting Stakeholders and the Company Parties</u>.   None of the Consenting Stakeholders shall have any fiduciary duty, any duty of trust or confidence in any form, or other duties or responsibilities to each other, any Consenting Stakeholder, the Company Parties, or any of the Company Parties' creditors or other stakeholders, and, other than as expressly set forth herein, there are no commitments among or between the Consenting Stakeholders.  It is understood and agreed that any Consenting Stakeholder may trade in any debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Stakeholder, subject to applicable securities laws and this Agreement, including Section 8 hereof.  No prior history, pattern or practice of sharing confidences among or between any of the Consenting Stakeholders and/or the Company Parties shall in any way affect or negate this understanding and agreement.

13.23.  <u>Direction to the Agent</u>.   By their signatures to this Agreement, the Initial Consenting Stakeholders signatory thereto, constituting Required Lenders under the Term Loan Credit Agreement hereby direct and authorize the Administrative Agent (or any of its Affiliates) to (i) consent to the entry of the Cash Collateral Order (each of the Initial Consenting Stakeholders hereby authorizes Milbank, LLP, as counsel for the Initial Consenting Stakeholders, to direct the

administrative agent under the Term Loan Credit Agreement to consent to the entry of the Cash Collateral Order), (ii) to execute an acknowledgement to the supplement to the existing security agreement in respect of the equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities as contemplated by this Agreement and (iii) to execute any documentation deemed reasonably necessary by the Administrative Agent or its Affiliates to evidence such consent or acknowledgment, as applicable (the direction by the Required Lenders hereunder to the Administrative Agent to grant such consent and acknowledgment, as applicable, and to take actions deemed reasonably necessary by it to evidence such consent or acknowledgment, as applicable, is hereinafter referred to as the "Direction"). For the avoidance of doubt, the Initial Consenting Stakeholders agree that the consents and acknowledgments granted, and the actions taken, by the Administrative Agent and its Affiliates pursuant to and arising out of the Direction are indemnified actions covered by the indemnification provisions of Section 9.03 of the Term Loan Credit Agreement. This Direction shall be governed by, and construed in accordance with, the laws of the State of New York. Notwithstanding Section 13.10, the Administrative Agent is a third party beneficiary to this Section 13.23 and is relying thereon in taking action in accordance with the Direction.

13.24. Email Consents. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 12, or otherwise, including a written approval by the Company Parties or the Required Consenting Stakeholders, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.25. Publicity. The Company Parties will submit to Milbank all press releases, public filings, or public announcements, in each case, to be made by any of the Company Parties announcing entry into this Agreement or the transactions contemplated hereby in advance of release and will reasonably consult with Milbank with respect to such communications. Except as required by law or regulation or by any governmental or regulatory (including self-regulatory) authority, no Party or its advisors shall (a) use the name of any Consenting Stakeholder in any public manner (including in any press release) or (b) disclose to any Person (including, for the avoidance of doubt, any other Consenting Stakeholder), other than legal, accounting, financial and other advisors to the Company Parties, the principal amount or percentage of Term Loan Claims, in each case, without such Consenting Stakeholder's prior written consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation or by any governmental or regulatory (including self-regulatory) authority, the disclosing Party shall afford the relevant Consenting Stakeholder a reasonable opportunity to review and comment in advance of such disclosure if reasonably practicable and permitted by applicable law and shall take all reasonable measures to limit such disclosure to the extent permitted by applicable law and (ii) the foregoing shall not prohibit the public disclosure, including in connection with the Chapter 11 Cases, of the aggregate percentage or aggregate principal amount of Claims held by all the Consenting Stakeholders collectively. Notwithstanding the foregoing, (x) any Party hereto may disclose the identities of the Parties hereto in any action to enforce this Agreement or in an action for damages as a result of any breaches hereof and (y) any Party hereto may disclose, to the extent expressly consented to in writing by a Consenting Stakeholder, such Consenting Stakeholder's identity and individual holdings.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

[*Signature pages follow.*]

**Company Parties' Signature Page to**
**the Restructuring Support Agreement**

**ASCENA RETAIL GROUP, INC.**
**AND THE OTHER COMPANY PARTIES**

By:  _C. Teffner_____

Name: Carrie W. Teffner

Authorized Signatory

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**ANNTAYLOR LOFT GP LUX S.À R.L.**

By: *Marc Crawford*
B3D63F8C32E5472
Name: Marc Crawford
Title:   authorised signatory

**ANNTAYLOR LOFT BORROWER LUX
SCS**

By: *Marc Crawford*
B3D63F8G32E5472
Name: Marc Crawford
Title:   authorised signatory

[*Signature pages of the Consenting Stakeholders on file with the Company*]

# **EXHIBIT A**

**Company Parties**

## EXHIBIT A

**Company Parties**

Ascena Retail Group, Inc.
933 Inspiration LLC
ANN Card Services, Inc.
ANN, Inc.
AnnCo, Inc.
AnnTaylor Distribution Services, Inc.
AnnTaylor of Puerto Rico, Inc.
AnnTaylor Retail, Inc.
AnnTaylor, Inc.
AnnTaylor Loft Borrower Lux SCS
AnnTaylor Loft GP Lux S.À R.L.
Ascena Retail Holdings, Inc.
Ascena Trade Services, LLC
ASNA Plus Fashion, Inc.
ASNA Value Fashion LLC
BackingBrands Buying Agent, LLC
BackingBrands Solutions, LLC
C.S.F. Corp.
Catalog Receivables LLC
Catalog Seller LLC
Catherines #5124, Inc.
Catherines #5147, Inc.
Catherines Stores Corporation
Catherines, Inc.
CCTM, Inc.
Charming Sales Co. Four, Inc.
Charming Sales Co. One, Inc.
Charming Sales Co. Three, Inc.
Charming Sales Co. Two, Inc.
Charming Shoppes of Delaware, Inc.
Charming Shoppes Receivables Corp.
Charming Shoppes Seller, Inc.
Charming Shoppes Street, Inc.
Charming Shoppes, Inc.
Chestnut Acquisition Sub Inc.
Crosstown Traders, Inc.
CS Holdco II Inc.
CSGC, Inc.
CSI Industries, Inc.
CSPE, LLC
DBI Holdings, Inc.
DBCM Holdings, LLC
DBX, Inc.

Duluth Real Estate LLC
Etna Retail DC, LLC
Fashion Apparel Sourcing LLC
Fashion Service Fulfillment Corporation
Fashion Service LLC
GC Fulfillment, LLC
Lane Bryant #6243, Inc.
Lane Bryant of Pennsylvania, Inc.
Lane Bryant Outlet 4106, Inc.
Lane Bryant Purchasing Corp.
Lane Bryant, Inc.
PSTM, Inc.
Sponsi, Inc.
Spirit of America, Inc.
Too GC, LLC
Tween Brands Agency, Inc.
Tween Brands Direct Services Inc.
Tween Brands Investment, LLC
Tween Brands Marketing, Inc.
Tween Brands Service Co.
Tween Brands, Inc.
Winks Lane, Inc.
Worldwide Retail Holdings, Inc.

## **EXHIBIT B**

### **Restructuring Term Sheet**

*Execution Version*

---

### ASCENA RETAIL GROUP, INC., ET AL.

### RESTRUCTURING TERM SHEET[1]

---

This term sheet (the "Restructuring Term Sheet") sets forth the principal terms of the Restructuring Transactions. The Restructuring Transactions will be consummated through cases (the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court") and as otherwise set forth in the Restructuring Support Agreement. This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that are to be contained in the definitive documentation governing the Restructuring Transactions, which shall be subject to the applicable consent and approval rights of the Parties as set forth in the Restructuring Support Agreement.

THIS RESTRUCTURING TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY CHAPTER 11 PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH A SOLICITATION, IF ANY, SHALL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY AND/OR OTHER APPLICABLE STATUTES, RULES, AND LAWS.

UNLESS OTHERWISE SET FORTH HEREIN, TO THE EXTENT THAT ANY PROVISION OF THIS RESTRUCTURING TERM SHEET IS INCONSISTENT WITH ANOTHER PROVISION OF THE RESTRUCTURING SUPPORT AGREEMENT, THE TERMS OF THIS RESTRUCTURING TERM SHEET WITH RESPECT TO SUCH PROVISION SHALL CONTROL.

| OVERVIEW | |
|---|---|
| **Implementation** | The Debtors will effectuate the Restructuring Transactions through the filing of the Chapter 11 Cases and confirmation of the Plan, which shall be consistent with this Restructuring Term Sheet, subject to the terms and conditions set forth in the Restructuring Support Agreement. As further described herein and in the Restructuring Support Agreement, including the Backstop Commitment Letter, the Restructuring Transactions shall be funded through: (i) the consensual use of cash collateral under the Cash Collateral Order and the DIP Financing Order; (ii) a DIP Term Facility including $150 million in New Money DIP Loans and $161.8 million in Roll-Up DIP Loans; (iii) as applicable, a DIP ABL Facility; and (iv) the Exit Facilities. |
| | The Plan will constitute a separate chapter 11 plan of reorganization for each Debtor. For the avoidance of doubt, any action required to be taken by the Debtors on the Plan Effective Date pursuant to this Restructuring Term Sheet may be taken on the Plan Effective Date or as soon as is reasonably practicable thereafter. |
| FINANCING | |
| **DIP ABL Facility** | The Debtors may obtain a commitment from certain ABL Lenders to provide an up to $400 million senior secured asset-based revolving debtor-in-possession credit facility (the "DIP ABL Facility"), pursuant to which the commitments and loans of the ABL Lenders under the ABL Facility will |

---

[1] Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings ascribed to them in (i) the Restructuring Support Agreement, dated as of July 23, 2020 (the "Restructuring Support Agreement"), to which this Restructuring Term Sheet is attached as Exhibit B or (ii) Annex I hereto.

| | |
|---|---|
| | convert into the DIP ABL Facility during the Chapter 11 Cases pursuant to the DIP Financing Order, and will obtain a commitment from certain lenders to provide the Exit ABL Facility in an amount not less than $400 million subject to the conditions set forth in the ABL Commitment Letter. |
| **DIP Term Facility** | Certain Prepetition Term Lenders (as defined in the Backstop Commitment Letter) and/or their affiliates (in their capacities as such, the "<u>Backstop Commitment Parties</u>") have committed to provide the Debtors with an up to $311.8 million superpriority senior secured debtor-in-possession term loan credit facility (the "<u>DIP Term Facility</u>") consisting of (a) $150 million in new money term loans (the "<u>New Money DIP Loans</u>") and (b) $161.8 million of term loans (the "<u>Roll-Up DIP Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Term Loans</u>") rolling Term Loan Claims held by the DIP Term Lenders that provide New Money DIP Loans on the terms and conditions set forth in the Backstop Commitment Letter and the DIP Financing Order. Prepetition Term Lenders (including, for the avoidance of doubt, the Backstop Commitment Parties) will have the right to commit to their ratable share of 50% of the DIP Term Facility up to the date that is expected to be 10 business days after distribution of the Syndication Materials, which is estimated to occur within 5 business days after the Petition Date, by executing the Restructuring Support Agreement and taking such other actions as specified in the Syndication Materials.  For the avoidance of doubt, participation in the DIP Term Facility shall include a commitment to convert the DIP Term Loans into First Out Exit Term Loans on the Plan Effective Date if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as <u>Exhibit D</u> to the Restructuring Support Agreement are satisfied

The Cash Collateral Order and DIP Financing Order will include customary adequate protection for the Term Lenders, including, without limitation, and as acceptable to the Majority Backstop Commitment Parties:

    i.    superpriority adequate protection claims and adequate protection liens to the extent of any diminution in value in the collateral securing the Term Loan Claims, which adequate protection liens shall include liens on all unencumbered assets of the Debtors (excluding any assets that qualify as ABL Priority Collateral (as defined in the ABL Credit Agreement) and including the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities);

    ii.    payment of the fees and expenses of the Lender Group's advisors; and

    iii.    the reporting and milestones described below.

Material terms for the DIP Term Loans include, without limitation and as set forth in the Form DIP Credit Agreement:

    a.    <u>Maturity</u>: Earlier of (i) 6 months after the Effective Date of the DIP Term Agreement, (ii) conversion into the First Out Term Loan Facility, (iii) dismissal of the Chapter 11 Cases, (iv) acceleration, (v) a sale of all or substantially all of the Debtors' assets, and (vi) the Plan Effective Date

    b.    <u>Coupon</u>: L+1,175 bps

    c.    <u>LIBOR Floor</u>: 1.00%

    d.    <u>Commitment Payment</u>: 250 bps payable in cash on the principal amount of New Money DIP Loans to all DIP Term Lenders that |

        provide New Money DIP Loans (including the Backstop Commitment Parties)

e.    <u>Seasoning/Fronting</u>: Fees to be paid by the Company Parties (in addition to the Backstop Premium and Commitment Payment)

f.    <u>Mechanics</u>: Full amount of the New Money DIP Term Loans may be drawn after entry of the DIP Financing Order, subject to the terms and conditions set forth in the DIP Credit Agreement

g.    <u>Ratings Covenant</u>: Commercially reasonable efforts to obtain a rating by each of S&P and Moody's within 15 days of the entry of the DIP Financing Order

h.    <u>Milestones</u>: Consistent with the milestones contained in sections 11.01(a) through 11.01(g) of the Restructuring Support Agreement.

i.    <u>Events of Default</u>: Customary debtor-in-possession facility "Events of Default"

j.    <u>Covenants</u>: Customary covenants for similarly sized debtor-in-possession facilities

k.    <u>Reporting</u>: Monthly, quarterly and annual Financial Statements; weekly reports of liquidity and line-item receipts and disbursements (including professional fees); weekly advisor and lender steering committee calls

l.    <u>Variance Reporting</u>: Delivered weekly, with written explanations for variances above 15% of actual receipts or actual operating disbursements (unless the dollar amount corresponding to such percentage variance is less than $1 million)

m.    <u>Budget</u>: Delivered monthly, subject to approval of the Required Lenders

n.    <u>Permitted Variance</u>: 20%, tested on a cumulative basis, tested weekly on a 4-week rolling basis, of total net cash flow to projected net cash flow, applicable only when Liquidity (as defined in the Form DIP Credit Agreement) is less than $150 million

o.    <u>Liquidity Covenant</u>: Minimum Liquidity of $100 million

p.    <u>Collateral</u>: First priority on all collateral securing the Term Loan Claims and all unencumbered assets (excluding any assets that qualify as ABL Priority Collateral, which shall be subject to a second priority lien), including, for the avoidance of doubt, a first priority interest in the funding account for the DIP Term Facility and 100% of the equity interests in the LuxCo Entities

q.    <u>Use of Proceeds</u>: To be used in accordance with the approved budget for (i) transaction expenses, (ii) adequate protection payments, (iii) fund Carve Out and (iv) general corporate purposes. Up to $50 million of the proceeds of the DIP Term Loans may be used to repay any DIP ABL Facility Claims in cash

The DIP Term Loans will be repaid in cash on their stated maturity date; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet attached as <u>Exhibit D</u> to the Restructuring Support Agreement are satisfied, on the Conversion Date (as defined in the DIP Term Agreement), the DIP Term Loans held as of the date that is 2 Business Days prior to the Plan Effective Date will be converted to loans under the First Out

| | |
|---|---|
| | Term Loan Facility (the "First Out Exit Term Loans") on the terms and conditions set forth in the DIP Term Agreement and the Exit Facility Term Sheet; *provided* that upon certain events described in the DIP Term Agreement and if the Conversion Date has not occurred, each DIP Term Loan shall be repaid with a non-refundable aggregate premium in an amount equal to 11.23% of the DIP Term Loans so repaid in cash on the date on which such DIP Term Loans are repaid, and shall be subject to the withholding provisions set forth in Section 2.15 of the DIP Term Agreement. |
| **Backstop Commitment** | Pursuant to the Backstop Commitment Letter, the Backstop Commitment Parties will, in the allocations set forth on Schedule 1 thereto, (a) provide 50% of the DIP Term Loans and First Out Exit Term Loans and (b) provide any DIP Term Loans and First Out Exit Term Loans not provided by other Prepetition Term Lenders in accordance with the syndication process described above. |
| | As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties under the Restructuring Support Agreement, Ascena Topco will pay (or cause to be paid) to the Backstop Commitment Parties (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "Backstop Premium"),[2] which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on Schedule 2 to the Backstop Commitment Letter (the "Backstop Percentage"), *multiplied by* (2) the Backstop Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of the Backstop Commitment Letter and payable, free and clear of any withholding tax, in cash upon the funding of the New Money DIP Loans. |
| | If (a) a Termination Date occurs prior to the funding of the DIP Term Facility or (b) the DIP Term Facility has been funded and the Conversion Date does not occur, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable, free and clear of any withholding tax, in cash (the "Termination Premium") on the Termination Date, in the case of clause (a), or the date on which the DIP Term Loans are repaid in full in cash, in the case of clause (b), which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, *multiplied by* (2) the Termination Premium. |
| **Definitive Documents** | Any documents, including any Definitive Documents, that remain the subject of negotiation as of the Agreement Effective Date shall be subject to the rights and obligations set forth in the Restructuring Support Agreement.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |

---

[2]    For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), the Company Parties and the Backstop Commitment Parties will (i) treat the Backstop Premium and the Termination Premium as premiums paid by Ascena Topco to the Backstop Commitment Parties in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Term Facility and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

| TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | |
|---|---|
| **DIP ABL Facility Claims** | To the extent the Debtors obtain a commitment for a DIP ABL Facility that is funded prior to the Plan Effective Date, the Plan shall provide as follows: |
| | i.  If those certain conversion conditions set forth in the DIP ABL Agreement remain unsatisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, cash in an amount equal to its allowed DIP ABL Facility Claim in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP ABL Facility Claim. |
| | ii.  If those certain conversion conditions as set forth in the DIP ABL Agreement are fully satisfied as of the Plan Effective Date, on the Plan Effective Date, each holder of an allowed DIP ABL Facility Claim shall receive, unless such holder agrees to less favorable treatment, its pro rata share of participation in the Exit ABL Facility. |
| **DIP Term Facility Claims** | On the Plan Effective Date, each holder of an allowed DIP Term Facility Claim shall receive, unless such holder agrees to less favorable treatment and subject to the terms and conditions of the DIP Term Facility and the Exit Facility Term Sheet, cash in an amount equal to its allowed DIP Term Facility Claim; *provided* that, if certain conditions as set forth in the DIP Term Agreement and Exit Facility Term Sheet are satisfied, each holder of an allowed DIP Term Facility Claim shall receive (i) loans arising under the First Out Exit Term Loan Facility in an amount equal to such holder's allowed DIP Term Facility Claim and (ii) cash on account of accrued and unpaid interest and other charges payable through the Plan Effective Date, in full and final satisfaction, release, and discharge of, and in exchange for, such allowed DIP Term Facility Claim. |
| **Administrative Claims** | On the Plan Effective Date, each holder of an allowed Administrative Claim shall receive payment in full in cash. |
| **Priority Tax Claims** | On the Plan Effective Date, each holder of an allowed Priority Tax Claim shall receive treatment in a manner consistent with section 1129(a)(9)(C) of the Bankruptcy Code. |
| **Other Secured Claims** | Each holder of an allowed Other Secured Claim shall receive, at the option of the applicable Debtor: |
| | i.  payment in full in cash; |
| | ii.  delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; |
| | iii.  reinstatement of such Claim; or |
| | iv.  other treatment rendering such Claim unimpaired. |
| **Other Priority Claims** | Each holder of an Other Priority Claim shall receive payment in full in cash or other treatment rendering such Claim unimpaired. |
| **ABL Claims** | To the extent any allowed ABL Claims remain outstanding on the Plan Effective Date, each holder of an allowed ABL Claim shall receive: |
| | i.  payment in full in cash of its allowed ABL Claim; |
| | ii.  the collateral securing its allowed ABL Claim; |
| | iii.  reinstatement of its allowed ABL Claim under the Exit ABL |

| | |
|---|---|
| | Facility; or |
| | iv.  such other treatment that renders its allowed ABL Claim unimpaired in accordance with section 1124 of the Bankruptcy Code. |
| **Term Loan Claims** | Each holder of an allowed Term Loan Claim shall receive its pro rata share of: |
| | i.  $88.2 million of Last Out Term Loans, which shall include the terms set forth in the Exit Facility Term Sheet; and |
| | ii.  55.1% of the common shares of Reorganized Ascena (such shares, the "New Common Stock") less the percentage of New Common Stock distributed as the Equity Premium (as defined below), subject to dilution on account of the Management Incentive Plan. |
| **General Unsecured Claims** | i.  *If holders of allowed General Unsecured Claims vote as a class to accept the Plan,* each holder of an allowed General Unsecured Claim shall receive its pro rata share of cash in an aggregate amount equal to $500,000, as determined by the Debtors and the Required Consenting Stakeholders. |
| | ii.  *If holders of allowed General Unsecured Claims vote as a class to reject the Plan,* each holder of an allowed General Unsecured Claim shall receive treatment consistent with section 1129(a)(7) of the Bankruptcy Code, as determined by the Debtors and the Required Consenting Stakeholders. |
| **Intercompany Claims** | Each allowed Intercompany Claim shall be reinstated, distributed, contributed, set off, settled, cancelled and released, or otherwise addressed at the option of the Reorganized Debtors. |
| **Intercompany Interests** | Intercompany Interests shall receive no recovery or distribution and be reinstated solely to the extent necessary to maintain the Debtors' corporate structure. |
| **Interests in Ascena** | Each holder of an allowed Interest in Ascena shall have such Interest cancelled, released, and extinguished without any distribution. |
| **CHAPTER 11 PLAN RELEASES, EXCULPATION, AND INJUNCTION PROVISIONS** | |
| **Discharge of Claims and Termination of Interests** | Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Plan Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Plan Effective Date by the Reorganized Debtors), Interests, and Causes of Action against any Debtor of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Plan Effective Date, any liability (including withdrawal liability) to the extent such Claims or Causes of Action accrued before the Plan Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim based upon such debt or right |

| | |
|---|---|
| | is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or their Affiliates with respect to any Claim that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Plan Effective Date.  Unless expressly provided in the Plan, the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Plan Effective Date occurring. |
| **Releases by the Debtors** | Effective as of the Plan Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted or assertable on behalf of any of the Debtors, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Restructuring Transactions, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date. |
| **Releases by Holders of Claims and Interests** | Effective as of the Plan Effective Date, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted or assertable on behalf of |

any of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership or operation thereof), the purchase, sale, or rescission of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the ABL Credit Agreement, the Term Loan Credit Agreement, the Chapter 11 Cases, the Restructuring Support Agreement, the formulation, preparation, dissemination, negotiation, entry into, or filing of, as applicable, the Restructuring Support Agreement and related prepetition transactions, the Backstop Commitment Letter, the Disclosure Statement, the New Corporate Governance Documents, the Plan, the Exit Facilities, the DIP Financing Order, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Disclosure Statement, the New Corporate Governance Documents, the Exit Facilities, the Plan (including, for the avoidance of doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act, omission, transaction, agreement, event, or other occurrence (in each case, related to any of the foregoing) taking place on or before the Plan Effective Date.

| | |
|---|---|
| **Exculpation** | Notwithstanding anything contained in the Plan to the contrary, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action or any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, the Exit Facilities, the Backstop Commitment Letter, the DIP Financing Order, or any Restructuring Document, contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing |

| | |
|---|---|
| | the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. |
| **Injunction** | Except with respect to the obligations arising under the Plan, the DIP Financing Order, or the Confirmation Order, and except as otherwise expressly provided in the Plan, the DIP Financing Order, or the Confirmation Order, all Entities that held, hold, or may hold claims or interests or Causes of Action that have been released, discharged, or exculpated pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Reorganized Debtors or the other Released Parties:  (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests or Causes of Action unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests or Causes of Action released or settled or subject to exculpation pursuant to the Plan. |
| **OTHER TERMS OF THE RESTRUCTURING TRANSACTIONS** | |
| **Equity Allocation** | On the Plan Effective Date, each Consenting Stakeholder shall receive (a) its pro rata share (the numerator being such party's holdings of First Out Exit Term Loans (including through any of its Related Parties) and the denominator being the aggregate outstanding amount of all First Out Exit Term Loans) of 44.9% of the New Common Stock, which will be subject to dilution from the Management Incentive Plan, and (b) its pro rata share (based on such party's Backstop Percentage (including through any of its Related Parties)) of an amount of New Common Stock equal to $7.5 million, calculated assuming a total equity value of Reorganized Ascena to be agreed by the Company Parties and the Required Consenting Stakeholders (such pro rata share, the "Equity Premium"), which will be subject to dilution from the Management Incentive Plan.[3] |

---

[3] For tax purposes, unless otherwise required by a change in applicable tax law or contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), (i) the Company Parties and the Consenting Stakeholders as of the Petition Date will treat the Equity Premium as acquired by such Consenting Stakeholders at the Plan Effective Date in exchange for participation in the Restructuring Transactions and for tax purposes more specifically as a put premium and (ii) not take any tax position inconsistent with the tax treatment described in clause (i).

| | |
|---|---|
| **Critical Vendors** | The Debtors will seek the Bankruptcy Court's approval to use up to $50 million in the aggregate to pay the prepetition claims of certain foreign and critical vendors, subject to the consent and consultation rights in the Restructuring Support Agreement. |
| **LuxCo Entities** | On the Execution Date, all of the previously unencumbered equity held by the Loan Parties (as defined in the Term Loan Credit Agreement) in the LuxCo Entities will be pledged as Collateral (as defined in the Term Loan Credit Agreement). |
| **New Board** | The initial board of directors, members, or managers, as applicable (each, a "<u>Director</u>"), of Reorganized Ascena (the "<u>New Board</u>") will consist of 7 Directors, including, subject to the terms of the New Corporate Governance Documents:<br><br>   i.   Carrie W. Teffner;<br><br>   ii.   the CEO of Reorganized Ascena;<br><br>   iii.   1 Director determined by Bain Capital Credit, LP ("<u>Bain</u>");<br><br>   iv.   1 Director determined by Monarch Alternative Capital LP ("<u>Monarch</u>");<br><br>   v.   1 Director determined collectively by Bain, Eaton Vance Management, Lion Point Capital, LP, and Monarch; and<br><br>   vi.   2 Directors determined by the Backstop Commitment Parties. |
| **Management Incentive Plan** | The Reorganized Debtors will reserve a pool of up to 10% of the New Common Stock for a post-emergence management incentive plan (the "<u>Management Incentive Plan</u>") for management employees of the Reorganized Debtors, which will contain terms and conditions (including, without limitation, with respect to participants, form, allocation, structure, duration and timing and extent of issuance and vesting) as determined at the discretion of the New Board after the Plan Effective Date. |
| **Tax Structure** | The Parties will work together in good faith to structure and implement the Restructuring Transactions in a tax efficient manner; *provided* that such tax structure shall be reasonably acceptable to the Required Consenting Stakeholders and the Company Parties. |
| **Executory Contracts and Unexpired Leases** | The Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Plan Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. |
| **Employment Obligations** | Pursuant to the Restructuring Support Agreement and this Restructuring Term Sheet, the Consenting Stakeholders consent to the continuation and assumption of all of the Debtors' wages, compensation, and employee benefits programs according to existing terms and practices, including executive and Insider compensation and benefits programs, Insider and non-Insider severance programs, Insider and non-Insider incentive programs, and Insider and non-Insider retention programs, in each case as are in effect as of the Agreement Effective Date and have been disclosed to counsel for the Required Consenting Stakeholders, including any modifications agreed between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement (collectively, the "<u>Employee Benefits Programs</u>"), and any motions in the Bankruptcy Court for approval thereof; provided, however, that Employee Benefits Programs shall not include (x) any compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) any non-qualified |

|  | deferred compensation plan or supplemental retirement plan, solely to the extent and such plan would benefit any former Insider (as of the Agreement Effective Date), in each case without the consent of the Required Consenting Stakeholders following the Petition Date.  On the Plan Effective Date, pursuant to the Plan, the Debtors shall assume all obligations related to all Employee Benefits Programs (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) and assume all employment agreements or letters, indemnification agreements, or other agreements entered into with current and former employees (as agreed to be modified between the Debtors and the Required Consenting Stakeholders prior to the effectiveness of the Restructuring Support Agreement, as applicable) unless such employees agree to enter into new agreements on terms and conditions acceptable to the Reorganized Debtors, the Required Consenting Stakeholders and such employee.   Notwithstanding the foregoing, no (x) compensation, post-employment, separation or retirement arrangement with any former Insider (as of the Agreement Effective Date) or (y) non-qualified deferred compensation plan or supplemental retirement plan, solely to the extent any such plan would benefit any former Insider (as of the Plan Effective Date), will be assumed on the Plan Effective Date, in each case without the prior consent of the Required Consenting Stakeholders. |
|---|---|
| **Indemnification Obligations** | Consistent with applicable law, all indemnification provisions in place as of the Plan Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors, as applicable, shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring Transactions on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Plan Effective Date. |
| **Subordination** | The classification and treatment of Claims under the Plan shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. |
| **Restructuring Transactions** | The Confirmation Order shall be deemed to authorize, among other things, all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan and the Restructuring Transactions therein.  On the Plan Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring Transactions. |
| **Cancellation of Notes, Instruments, Certificates, and Other Documents** | On the Plan Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged. |
| **Retention of Jurisdiction** | The Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters. |

| Retained Causes of Action | The Reorganized Debtors, as applicable, shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors have released pursuant to the release and exculpation provisions of the Plan. |
|---|---|
| **Exemption from SEC Registration** | The issuance of all securities under the Plan will be exempt from SEC registration under applicable law.  On the Plan Effective Date, Reorganized Ascena will cease to be a public reporting company. |
| **Conditions Precedent to the Plan Effective Date** | The following, among others as agreed by the Debtors and the Required Consenting Stakeholders, shall be conditions to the Plan Effective Date:<br><br>1.  The Bankruptcy Court shall have entered the Confirmation Order, which shall:<br><br>    a.  be in form and substance consistent with the Restructuring Support Agreement;<br><br>    b.  authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;<br><br>    c.  decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;<br><br>    d.  authorize the Debtors, as applicable/necessary, to:  (a) implement the Restructuring Transactions; (b) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (c) make all distributions and issuances as required under the Plan, including cash and the New Common Stock; and (d) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the Exit Facilities;<br><br>    e.  authorize the implementation of the Plan in accordance with its terms; and<br><br>    f.  provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax;<br><br>2.  the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;<br><br>3.  the Restructuring Support Agreement shall remain in full force and effect and shall not be terminated;<br><br>4.  the documentation related to the Exit Facilities shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Plan Effective Date) to the effectiveness of the Exit Facilities shall have been satisfied or duly waived in writing in accordance with the terms of each of the Exit Facilities and the closing of the Exit Facilities shall have |

|  | occurred; |
|---|---|
|  | 5. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan and each of the other transactions contemplated by the Restructuring; |
|  | 6. all actions, documents, certificates, and agreements necessary to implement the Plan (including any documents contained in the Plan Supplement) shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units, in accordance with applicable laws; |
|  | 7. all professional fees and expenses of retained professionals that require the Bankruptcy Court's approval shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in a professional fee escrow account pending the Bankruptcy Court's approval of such fees and expenses; |
|  | 8. all professional fees and expenses and of the advisors to the Consenting Stakeholders shall have been paid in full in accordance with the Restructuring Support Agreement; and |
|  | 9. the Debtors shall have implemented the Restructuring Transactions in a manner consistent with the Restructuring Support Agreement and this Plan. |
| **Waiver of Conditions Precedent to the Plan Effective Date** | The Debtors, with the prior consent of the Required Consenting Stakeholders, may waive any one or more of the Conditions Precedent to the Plan Effective Date. |

*Execution Version*

### ANNEX I

### DEFINITIONS

| Term | Definition |
|------|------------|
| **ABL Commitment Letter** | The letter committing certain ABL Lenders to provide the DIP ABL Facility and Exit ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **ABL Facility** | The credit facility established by the ABL Credit Agreement. |
| **ABL Lenders** | Each of the lenders from time to time party to the ABL Credit Agreement. |
| **Administrative Claim** | A Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Plan Effective Date of preserving the Estates and operating the Debtors' businesses; and (b) allowed Professional Fee Claims. |
| **Causes of Action** | Any claims, interests, damages, remedies, causes of action, demands, rights, actions, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, Liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim |
| **DIP ABL Agreement** | The debtor-in-possession senior secured asset-based revolving credit agreement establishing the DIP ABL Facility on terms acceptable to the Required Consenting Stakeholders. |
| **DIP ABL Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP ABL Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP ABL Facility. |
| **DIP Term Agreement** | The Superpriority Senior Secured Debtor-In-Possession Credit Agreement in the form of the Form DIP Credit Agreement and otherwise acceptable to the Majority Backstop Commitment Parties. |
| **DIP Term Facility Claim** | Any Claim derived from, based upon, or secured pursuant to the DIP Term Agreement, including claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto, in each case, with respect to the DIP Term Facility. |
| **DIP Term Lenders** | The lenders under the DIP Term Agreement. |

| Term | Definition |
|------|------------|
| **Estate** | As to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to sections 301 and 541 upon the commencement of the applicable Debtor's Chapter 11 Case. |
| **Exculpated Parties** | Collectively, and in each case in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) any statutory committees appointed in the Chapter 11 Cases and each of their respective members; (e) each current and former Affiliate of each Entity in clause (a) through the following clause (f); and (f) each Related Party of each Entity in clause (a) through this clause (e). |
| **Exit ABL Facility** | The senior secured asset-based revolving credit facility in an aggregate amount up to $400 million and otherwise on the terms set forth in the ABL Commitment Letter and pursuant to definitive documentation acceptable to the Required Consenting Stakeholders. |
| **Exit Facilities** | Collectively, the Exit ABL Facility, the First Out Term Loan Facility, and the Last Out Term Loan Facility. |
| **General Unsecured Claim** | Any Claim that is not secured and is not (a) an Administrative Claim, (b) an Other Secured Claim, (c) a Priority Tax Claim, (d) an Other Priority Claim, (e) an ABL Claim, (f) a Term Loan Claim, or (g) an Intercompany Claim. |
| **Intercompany Claim** | Any Claim held by a Debtor or a Debtor's affiliate against a Debtor or a Debtor's affiliate. |
| **Intercompany Interests** | Other than an Interest in Ascena Topco, an Interest in one Debtor held by another Debtor or a Debtor's affiliate. |
| **Lien** | Has the meaning set forth in section 101(37) of the Bankruptcy Code. |
| **Other Priority Claim** | Any Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases. |
| **Other Secured Claim** | Any secured Claim, other than (a) an ABL Claim, (b) a DIP ABL Facility Claim, (c) a Term Loan Claim, or (d) a DIP Term Facility Claim. |
| **Priority Tax Claim** | Any Claim of a Governmental Unit (as set forth in section 101(27) of the Bankruptcy Code) of the kind specified in section 507(a)(8) of the Bankruptcy Code. |
| **Professional** | An Entity retained in the Chapter 11 Cases pursuant to a final order in accordance with sections 327, 363, and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Plan Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code. |
| **Professional Fee Claims** | All Claims for accrued, contingent, and/or unpaid fees and expenses (including transaction and success fees) incurred by a Professional in the Chapter 11 Cases on or after the Petition Date and through and including the date on which the Confirmation Order is entered that the Bankruptcy Court has not denied by final order.  To the extent that the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a final order any amount of a Professional's fees or expenses, then those reduced or denied amounts shall no longer constitute Professional Fee Claims. |

| Term | Definition |
|---|---|
| **Proof of Claim** | A proof of Claim filed in the Chapter 11 Cases. |
| **Related Party** | With respect to any person or Entity, each of, and in each case in its capacity as such, current and former directors, managers, officers, investment committee members, special or other committee members, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an Entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors of such person or Entity, and any such Person's or Entity's respective heirs, executors, estates, and nominees. |
| **Released Party** | Collectively, each of the following in their capacity as such:  (a) each of the Debtors;  (b)  the  Reorganized  Debtors;  (c) each  of  the  Consenting Stakeholders; (d) the ABL Agent; (e) the Term Loan Agent; (f) each of the lenders and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders;  (l) each current and former Affiliate of each Entity in the foregoing clause (a) through the following clause (m); and (m) each Related Party of each Entity in the foregoing clause (a) through this clause (m). |
| **Releasing Party** | Collectively, and in each case in its capacity as such: (a) each of the Debtors; (b) the Reorganized Debtors; (c) each of the Consenting Stakeholders; (d) the ABL Agent; (e) the Term Loan Agent; (f) each of the lenders and administrative agents under the Exit Facilities; (g) the Backstop Parties; (h) the DIP ABL Agent; (i) the DIP ABL Lenders; (j) the DIP Term Agent; (k) the DIP Term Lenders; (l) all holders of Claims; (m) all holders of Interests; (n) each current and former Affiliate of each Entity in foregoing clause (a) through the following clause (o); and (o) each Related Party of each Entity in the foregoing clause (a) through this clause (o); *provided* that, in each case, an Entity shall not be a Releasing Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation; *provided further* that any such Entity shall be identified by name as a non-Releasing Party in the Confirmation Order. |
| **Reorganized Debtors** | Reorganized Ascena and each of the other Debtors, or any successor thereto, as reorganized pursuant to and under the Plan. |
| **Term Lenders** | Each of the lenders from time to time party to the Term Loan Credit Agreement. |

## <u>EXHIBIT C</u>

**Backstop Commitment Letter**

**EXECUTION VERSION**

July 23, 2020

<u>PERSONAL AND CONFIDENTIAL</u>
Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Dan Lamadrid

<div align="center">

<u>Superpriority Senior Secured Debtor-In-Possession Term Loan Credit Facility</u>
<u>Backstop Commitment Letter</u>

</div>

Ladies and Gentlemen:

Ascena Retail Group, Inc. ("<u>Ascena TopCo</u>", "<u>you</u>" or "<u>your</u>") has (i) advised the parties listed on the signature pages hereto as Backstop Commitment Parties (each, a "<u>Backstop Commitment Party</u>" and, collectively, the "<u>Backstop Commitment Parties</u>", "<u>we</u>", "<u>us</u>" or "<u>our</u>"), that Ascena Topco and certain of its subsidiaries (the "<u>Subsidiary Debtors</u>" and, collectively with Ascena Topco, the "<u>Debtors</u>"), are considering filing voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 <u>et seq</u>. (as amended, the "<u>Bankruptcy Code</u>"), and, in connection with the foregoing, (ii) requested that the Backstop Commitment Parties agree to commit to provide a superpriority senior secured debtor-in-possession term loan credit facility for Ascena Topco under Sections 364(c) and 364(d) of the Bankruptcy Code (the "<u>DIP Facility</u>") consisting of (x) new money term loans (the "<u>New Money DIP Loans</u>") in an aggregate principal amount of $150 million and (y) term loans (the "<u>Roll-Up DIP Loans</u>" and, together with the New Money DIP Loans, the "<u>DIP Loans</u>") resulting from the conversion of the Prepetition Term Loans (as defined below) of the Prepetition Term Lenders (as defined below) that provide (themselves or through their affiliates) New Money DIP Loans in an aggregate amount equal to $161.8 million on the Effective Date, or as otherwise set forth in the Form DIP Credit Agreement.  The DIP Facility shall convert on a dollar-for-dollar basis into an exit facility (the "<u>Exit Conversion</u>", such converted loans, the "<u>Exit Term Loans</u>", and the financing provided by the Exit Term Loans, the "<u>Exit Facility</u>") substantially on the terms set forth in this letter (including all exhibits, annexes, and schedules hereto, the "<u>Backstop Commitment Letter</u>"), as well as the form Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement attached hereto as **Exhibit A** (the "<u>Form DIP Credit Agreement</u>") and the Exit Facility Term Sheet attached hereto as **Exhibit B** (the "<u>Exit Facility Term Sheet</u>"), which terms will be memorialized in a credit agreement that will govern the Exit Facility (the "<u>Exit Facility Credit Agreement</u>"), subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrower" set forth in the Exit Facility Term Sheet, in each case, that are applicable to the relevant borrowing.  Unless otherwise specified herein, all references to "$" shall refer to U.S. dollars.  Capitalized terms used herein without definition shall have the meaning assigned thereto in the Form DIP Credit Agreement or the Exit Facility Term Sheet, as applicable.

1.    <u>Backstop Commitment</u>.

To provide assurance that the DIP Facility and the Exit Facility shall be available on the terms and conditions set forth herein, in the Form DIP Credit Agreement and the Exit Facility Term Sheet, as applicable, each Backstop Commitment Party is pleased to advise Ascena Topco of its several and not joint commitment (the "<u>Backstop Commitment</u>") to provide, itself or through one or more funds managed by such Backstop Commitment Party, the amount of the DIP Loans and Exit Term Loans, each as set forth on **Schedule 1** hereto (as updated from time to time prior to the date that is two business days prior to the Effective Date) on the terms set forth in the Backstop Commitment Letter, subject solely to the conditions set forth in the sections of Article IV of the Form DIP Credit Agreement and the "Conditions to Borrowing" set forth in the Exit Facility Term Sheet that are applicable to the relevant borrowing.  Each Backstop

Commitment Party may, at its option, arrange for the Form DIP Credit Agreement or the Exit Facility Credit Agreement, if applicable, to be executed by one or more financial institutions selected by the applicable Backstop Commitment Party and reasonably acceptable to Ascena Topco (the "Fronting Lender(s)"), to act as an initial lender and to fund some or all of the Backstop Commitment Party's Backstop Commitment, in which case the applicable Backstop Commitment Party will acquire its shares of the DIP Facility and/or Exit Facility, as applicable, by assignment from the Fronting Lender(s) in accordance with the assignment provisions of the Form DIP Credit Agreement and the Exit Facility Credit Agreement, as applicable.

It is understood and agreed that the aggregate commitments under this Backstop Commitment Letter in respect of New Money DIP Loans (and the automatic conversion thereof to Exit Term Loans on the Conversion Date) are $150 million in total, subject to the Initial Allocation, as set forth in Section 2 hereof and each Backstop Commitment Party hereby agrees and commits to such automatic conversion of the New Money DIP Loans to Exit Term Loans on the Conversion Date.

2.      Initial Allocation.

Each Lender (as defined in the Prepetition Term Loan Credit Agreement, a "Prepetition Term Lender") as of the Syndication End Date (as defined below) (including the Backstop Commitment Parties) shall have the right to participate (the "Opportunity") in 50.0% of the DIP Facility and the Exit Facility, in each case based on its Pro Rata Share (as defined below). The Opportunity will be conducted on the terms and conditions set forth in syndication procedures and related documentation, which procedures and documentation shall be reasonably acceptable to the Debtors and the Backstop Commitment Parties (the "Syndication Procedures"); provided that, the Backstop Commitment Parties shall use commercially reasonable efforts to cause the Syndication Procedures to be distributed by no later than 10:00 am New York Time on the fifth Business Day following the Petition Date (or such later date as agreed by you and the Majority Backstop Commitment Parties (as defined below)). Pursuant to the Syndication Procedures, each Prepetition Term Lender electing to participate in the Opportunity shall, among other things (i) provide written notification of such election to the Ad Hoc Committee Advisors by no later than the date that is 10 Business Days after the Syndication Procedures are distributed to the Prepetition Term Lenders (the "Syndication End Date") (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) and (ii) execute a joinder to the Restructuring Support Agreement, dated as of the date hereof (the "Restructuring Support Agreement"), by and among Ascena Topco and certain of its subsidiaries and certain Prepetition Term Lenders prior to the Syndication End Date (or such later time as reasonably agreed by the Majority Backstop Commitment Parties and you) (the "Initial Allocation"); provided, that, any Backstop Commitment Party that is a Prepetition Term Lender shall (unless it elects otherwise) be deemed to have provided such notice of election to participate in the DIP Facility and the Exit Facility in respect of such holdings upon executing this Backstop Commitment Letter and the Restructuring Support Agreement. Each Prepetition Term Lender that elects to participate in the DIP Facility shall be obligated to participate in its ratable portion of the Exit Term Loans and the commitments under the Exit Facility will be "stapled to" the DIP Facility and traded in equal percentage.

"Pro Rata Share" means with respect to each Prepetition Term Lender  (x) the aggregate principal amount of Loans (as defined in the Prepetition Term Loan Credit Agreement, the "Prepetition Term Loans") held by such Prepetition Term Lender, as set forth in the register for the Prepetition Term Loan Credit Agreement on the Syndication End Date divided by (y) the aggregate principal amount of Prepetition Term Loans held by all Prepetition Term Lenders outstanding under the Prepetition Term Loan Credit Agreement at such time.

2

"Majority Backstop Commitment Parties" means, at any time, Backstop Commitment Parties having Backstop Commitments outstanding that, taken together, represent at least 50.01% of the sum of all Backstop Commitments outstanding at such time.

Each Backstop Commitment Party shall have the right to assign its Commitments under the DIP Facility and the Exit Facility to participating Lenders in accordance with the Initial Allocation; provided that, notwithstanding the Initial Allocation, (i) no Backstop Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the DIP Facility on the Effective Date, subject to the satisfaction (or waiver) of the conditions set forth in Article IV of the Form DIP Credit Agreement and its obligation to convert into the Exit Facility on the Conversion Date, subject to the satisfaction (or waiver) of the conditions set forth in the Exit Facility Term Sheet) in connection with the Initial Allocation, including its Backstop Commitments, until after the Initial Allocation Date has occurred, (ii) no allocation shall become effective as between you and such Backstop Commitment Party with respect to all or any portion of such Backstop Commitment Party's Backstop Commitments in respect of the DIP Facility and the Exit Facility until after the occurrence of the Initial Allocation Date, and (iii) unless you otherwise agree in writing, each Backstop Commitment Party shall retain exclusive control over all rights and obligations with respect to its Backstop Commitments in respect of the DIP Facility and the Exit Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the Initial Allocation Date has occurred.  Any unsubscribed portion of the Opportunity as of the Syndication End Date shall be automatically allocated to, and funded by (if applicable), the Backstop Commitment Parties based on their respective percentages set forth on Schedule 2 hereto.

Each of the parties hereto agrees to use its respective commercially reasonable efforts to assist the Administrative Agent in connection with the Initial Allocation.  The Backstop Commitment Parties agree that, following the Initial Allocation, Ascena Topco and its subsidiaries and the Administrative Agent may conclusively rely on the schedule of "Post-Initial Allocation Term Loan Commitments" provided to Ascena Topco by the financial advisor for the Backstop Commitment Parties, Greenhill & Co., LLC, including the Lenders listed therein and their respective Commitments.  None of Ascena Topco nor any of its affiliates nor any of their respective advisors shall be liable with respect to such schedule.

You acknowledge and agree that nothing in this Backstop Commitment Letter or the nature of our services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between any Backstop Commitment Party, the Administrative Agent or its affiliates, on the one hand, and you, your equity holders or your affiliates, on the other hand, and you waive, to the fullest extent permitted by law, any claims you may have against any Backstop Commitment Party, the Administrative Agent or its affiliates for breach of fiduciary duty or alleged breach of fiduciary duty in connection with this Backstop Commitment Letter or the transactions contemplated hereby, and agree that no Backstop Commitment Party, the Administrative Agent or affiliates of any of the foregoing will have any liability (whether direct or indirect) to you in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on your behalf, including your equity holders, employees or creditors. You acknowledge that the transactions contemplated hereby (including the exercise of rights and remedies hereunder) are arms'-length commercial transactions and that we and the Administrative Agent are acting as principal and in our own respective best interests. You are relying on your own experts and advisors to determine whether the transactions contemplated hereby are in your best interests and are capable of evaluating and understanding, and you understand and accept, the terms, risks and conditions of the transactions contemplated hereby. In addition, you acknowledge that we and the Administrative Agent may employ the services of our respective affiliates in providing certain services hereunder and may exchange with such affiliates information concerning Ascena Topco and other companies that may be the subject of the transactions contemplated hereby and such affiliates will be entitled to the benefits afforded to us and the Agents hereunder; provided, that any such affiliates receiving information concerning Ascena Topco and other companies in accordance with this paragraph shall be subject to the same confidentiality

obligations provided for in this Backstop Commitment Letter (with each Backstop Commitment Party responsible for its affiliates' compliance with this paragraph).

3. <u>Information.</u>

You hereby represent and warrant that (a) all written information concerning you and your subsidiaries and your and their respective business (other than financial projections, estimates, forecasts and budgets and other forward-looking information (collectively, the "<u>Projections</u>") and information of a general economic or industry specific nature) (the "<u>Information</u>") that has been or will be made available to us or any of our respective affiliates by or on behalf of you is or will be, when furnished and to the best of your knowledge, complete and correct in all material respects, when taken as a whole, and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to the updates provided for in the penultimate sentence of this Section 3) and (b) the Projections that have been or will be made available to us or any of our affiliates by or on behalf of you or any of your representatives have been or will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time made and at the time the related Projections are made available to us or any of our affiliates (it being acknowledged that (i) such Projections are merely a prediction as to future events and are not to be viewed as facts, (ii) such Projections are subject to significant uncertainties and contingencies, many of which are beyond your control, (iii) the actual results during the period or periods covered by any such Projections may differ significantly from the projected results, and (iv) no guarantee or assurance can be given that the projected results will be realized).  In particular, where Projections expressly or implicitly take into account  the  current  market volatility and widespread impact of the COVID-19 outbreak, the extent of the impact of these developments on the Debtors' and their subsidiaries' operational and financial performance will depend on future developments, including the duration and spread of the outbreak and related governmental advisories and restrictions, and the impact of the COVID-19 outbreak on overall demand for the Debtors' and their subsidiaries' products and services, all of which are outside of the control of the Debtors or their subsidiaries, highly uncertain and cannot be predicted.  You agree that if, at any time prior to the entry of the Order approving the DIP Facility, any of the representations, warranties and covenants in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations, warranties and covenants were being made, at such subsequent time, then you will promptly supplement the Information and the Projections so that such representations, warranties and covenants would be correct in material respects; provided, for the avoidance of doubt, there will be no requirement to update previously delivered Projections to reflect new assumptions so long as the assumptions were reasonable at the time made and made available to us or any of our affiliates.  The accuracy of the foregoing representations and warranties, whether or not cured, shall not be a condition to the obligations of the Backstop Commitment Parties hereunder or the availability of the DIP Facility.

4. <u>Premium</u>.

As consideration for the Backstop Commitments and agreements of the Backstop Commitment Parties hereunder and under the Restructuring Support Agreement, Ascena Topco agrees to pay (or cause to be paid) to the  Backstop Commitment Parties, (or, at any Backstop Commitment Party's option and upon such Related Lender's designation (which may be provided by electronic communication), its Related Lender), a non-refundable backstop premium equal to $7.5 million (the "<u>Backstop Commitment Premium</u>"), which shall be allocated to each Backstop Commitment Party, in an amount equal to (1) its percentage set forth on <u>Schedule 2</u> hereto (the "<u>Backstop Percentage</u>"), *multiplied by* (2) the Backstop Commitment Premium, which shall be fully earned, nonrefundable and non-avoidable on the execution of this Backstop Commitment Letter and payable in cash free and clear of any withholding tax upon the

funding of the New Money DIP Loans on the Funding Date. Notwithstanding the foregoing, at the option of the Lenders, any or all of the Backstop Commitment Premium may instead be effected in the form of original issue discount with respect to the DIP Facility.

If a Termination Date occurs prior to the funding of the DIP Term Facility, a non-refundable aggregate premium in an amount equal to $7.5 million shall be payable in cash free and clear of any withholding tax (the "Termination Premium") on the Termination Date, which shall be allocated to each Backstop Commitment Party in an amount equal to (1) its Backstop Percentage, multiplied by (2) the Termination Premium.

5.    Payments and Fees

Without duplication of any amounts payable pursuant to Section 2.10 of the Form DIP Credit Agreement, the New Money DIP Loans will be subject to a commitment payment for each Lender participating in the DIP Facility in an amount of up to 2.50% of the principal amount of such Lender's New Money DIP Loans as of the Funding Date, earned upon entry of the Order and due and payable upon the Funding Date (the payment described in this sentence, the "DIP Commitment Payment").  For the avoidance of doubt, the entirety of the DIP Commitment Payment shall be treated as original issue discount with respect to the DIP Facility, and shall be subject to the withholding provisions set forth in Section 2.15 of the Form DIP Credit Agreement.

The Debtors agree to pay the fees, costs and expenses (collectively, the "Fronting Expenses") incurred in connection with the initial funding of the New Money DIP Loans by the Fronting Lender(s) and any assignments made by such Fronting Lender(s) to the Backstop Commitment Parties in connection therewith; provided that such Fronting Expenses shall not exceed 0.50% of such Fronting Lender(s)' New Money DIP Loans so funded.

6.    Conditions.

The Backstop Commitment Parties' Backstop Commitments and agreements hereunder in respect of the DIP Facility are subject solely to the satisfaction (or waiver) of the conditions precedent set forth in the sections of Article IV of the Form DIP Credit Agreement that are applicable to the relevant borrowing. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the DIP Facility, and there will be no conditions (implied or otherwise) to the availability of the DIP Facility on the Effective Date or the funding of the New DIP Term Loans on the Funding Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the applicable sections of Article IV of the Form DIP Credit Agreement relevant to the availability of the DIP Facility on the Effective Date or the Funding Date, as applicable.  The Backstop Commitment Parties' commitment in respect of the Exit Facility are subject to the satisfaction or waiver of the conditions precedent set forth in "Conditions to Borrowing" in the Exit Facility Term Sheet. Subject to the Order, there are no conditions (implied or otherwise) to the Backstop Commitments hereunder in respect of the Exit Facility, and there will be no conditions (implied or otherwise) to the conversion of the Exit Facility on the Conversion Date, including compliance with the terms of this Backstop Commitment Letter or the Form DIP Credit Agreement, other than those that are expressly stated in the  "Conditions to Borrowing" in the Exit Facility Term Sheet.

7.    Indemnification and Expenses.

You agree to (a) indemnify and hold harmless each Backstop Commitment Party and the Administrative Agent, their respective affiliates and their and their affiliates' officers, directors, employees, agents, attorneys, accountants, advisors (including investment managers and advisers),

consultants, representatives, controlling persons, members and permitted successors and assigns (each, an "Indemnified Person") from and against any and all losses, claims, damages, liabilities and expenses, joint or several ("Losses") to which any such Indemnified Person may become subject arising out of or in connection with this Backstop Commitment Letter, the DIP Facility, the Exit Facility the use of proceeds thereof or any claim, litigation, investigation or proceeding relating to any of the foregoing, and to (b) reimburse each Backstop Commitment Party from time to time within five (5) Business Days of receipt of their reasonable demand by presentation of a summary statement for any reasonable and documented out-of-pocket legal or other expenses incurred in connection with the Cases, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility, the Exit Facility, and, in each case any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Greenhill & Co., LLC as financial advisor for the Backstop Commitment Parties) without your prior written consent; provided, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses to the extent (a) they are found in a final non-appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Person's (i) gross negligence, bad faith, fraud or willful misconduct or (ii) material breach of its obligations under this Backstop Commitment Letter, or (b) they relate to a dispute solely among Indemnified Persons and not arising out of any act or omission of the Debtors or any of their respective subsidiaries (other than any claim, litigation, investigation or proceeding against the Administrative Agent in its capacity or in fulfilling its role as such).

None of you, the other Debtors, any of your or their respective subsidiaries, we nor any other Indemnified Person will be responsible or liable to one another for any indirect, special, punitive or consequential damages which may be alleged as a result of or arising out of, or in any way related to, the DIP Facility, the Exit Facility, the enforcement of this Backstop Commitment Letter, the definitive documentation for the DIP Facility or the Exit Facility, or any ancillary documents and security arrangements in connection therewith; provided that your indemnity and reimbursement obligations under this Section 6 shall not be limited by this sentence.

8.      Assignments, Amendments.

This Backstop Commitment Letter shall not be assignable by you or us without the prior written consent of the other parties hereto (and any attempted assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto, the Indemnified Persons and with respect to Section 2, Section 6 and this Section 7, the Administrative Agent, and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto, the Indemnified Persons and with respect to Section 2 and Section 6 and this Section 7, the Administrative Agent. Notwithstanding anything set forth in this Section 8 to the contrary, each Backstop Commitment Party (i) shall assign all or a portion of its Backstop Commitment to other banks, financial institutions, or institutional lenders and investors solely in connection with the Initial Allocation pursuant to Section 2 above (subject to the terms and conditions set forth therein) and (ii) may assign its respective Backstop Commitment, in whole or in part, to any Related Lender, or to any other Backstop Commitment Party. This Backstop Commitment Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by the Backstop Commitment Parties and you.

This Backstop Commitment Letter may be executed in any number of counterparts, each of which shall be an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Backstop Commitment Letter by facsimile or other electronic transmission (including E-Signature) shall be effective as delivery of a manually executed counterpart hereof. Section headings used herein are for convenience of reference only, are not part of this Backstop Commitment Letter and are not to affect the construction of, or to be taken into consideration in interpreting, this Backstop Commitment Letter. You acknowledge that information and documents

relating to the DIP Facility and/or Exit Facility may be transmitted through the internet, e-mail or similar electronic transmission systems and that neither any Backstop Commitment Party nor any Agent, nor any of their respective affiliates, shall be liable for any damages arising from the unauthorized use by others of information or documents transmitted in such manner.

This Backstop Commitment Letter supersedes all prior understandings, whether written or oral, between us with respect to the DIP Facility and the Exit Facility.

9.      Governing Law, Etc.; Jurisdiction.

THIS BACKSTOP COMMITMENT LETTER AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS BACKSTOP COMMITMENT LETTER (INCLUDING, WITHOUT LIMITATION, ANY CLAIMS SOUNDING IN CONTRACT LAW OR TORT LAW ARISING OUT OF THE SUBJECT MATTER HEREOF) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK (WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF THE DOMESTIC SUBSTANTIVE LAWS OF ANY OTHER STATE).

Each of the parties hereto hereby irrevocably and unconditionally (a) submits, for itself and its property, to the non-exclusive jurisdiction of any New York State court or Federal court of the United States of America sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof and the Bankruptcy Court, in any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility, and agrees that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York State court or, to the extent permitted by law, in such Federal court, or, to the extent applicable, the Bankruptcy Court; *provided* that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction, (b) waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Backstop Commitment Letter or the DIP Facility in any New York State court, in any such Federal court or in Bankruptcy Court, (c) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such suit, action or proceeding in any such court, and (d) agrees that a final judgment in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

You hereby agree that you shall not bring any suit, action, proceeding, claim or counterclaim under this Backstop Commitment Letter or with respect to the transactions contemplated hereby in any court other than such New York State court or Federal Court of the United States of America sitting in the Borough of Manhattan in New York City.  Service of any process, summons, notice or document by registered mail addressed to you at the address above shall be effective service of process against you for any suit, action or proceeding brought in any such court.

10.     Waiver of Jury Trial.

EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES (TO THE EXTENT PERMITTED BY APPLICABLE LAW) THE RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY RELATED TO OR ARISING OUT OF THIS BACKSTOP COMMITMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

11.    <u>Confidentiality</u>.

This Backstop Commitment Letter is delivered to Ascena Topco on the understanding that neither this Backstop Commitment Letter nor any of its terms or substance shall be disclosed, directly or indirectly, to any other person or entity except (a) you and your officers, directors, employees, legal counsel, accountants, auditors, financial advisors, existing and prospective holders of indebtedness and their respective affiliates, representatives, officers, directors and legal counsel, in each case, who are involved in the consideration of the financing transactions contemplated hereby who have been informed by you of the confidential nature of this Backstop Commitment Letter and have agreed to treat such information confidentially, (b) in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental authority (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (c) the office of the U.S. Trustee, any *ad-hoc* or statutorily appointed committee of unsecured creditors, and their respective representatives and professional advisors on a confidential and "need to know" basis, (d) to the Bankruptcy Court, in a redacted manner in form and substance reasonably satisfactory to the Backstop Commitment Parties, to the extent required to obtain Bankruptcy Court approval in connection with any acts or obligations to be taken pursuant to this Backstop Commitment Letter or the transactions contemplated hereby and (e) you may disclose the aggregate fee amounts contained herein, as part of pro forma information or a generic disclosure of aggregate sources and uses related to fee amounts related to the Transactions to the extent customary or required in offering or marketing materials or in any public or regulatory filing relating to the Transactions.

Each Backstop Commitment Party agrees to keep confidential, and not to publish, disclose or otherwise divulge, confidential information with respect to the transactions contemplated hereby or obtained from or on behalf of you or your respective affiliates in the course of the transactions contemplated hereby, except that the Backstop Commitment Parties shall be permitted to disclose such confidential information (a) to their affiliates and their and their affiliates' respective directors, officers, agents, employees, attorneys, accountants, auditors and advisors involved in the transactions contemplated hereby on a "need to know" basis and who are made aware of and agree to comply with the provisions of this paragraph, in each case on a confidential basis (with the Backstop Commitment Party responsible for such persons' compliance with this paragraph), (b) on a confidential basis to any bona fide prospective Lender, prospective participant or swap counterparty (in accordance with the terms of the Form DIP Credit Agreement) that agrees to keep such information confidential in accordance with (x) the provisions of this paragraph (or language substantially similar to this paragraph that is reasonably acceptable to you) for your benefit or (y) other customary confidentiality language in a "click-through" arrangement, (c) as required by the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, regulation or compulsory legal process (in which case you agree, to the extent not prohibited by law, to inform Backstop Commitment Parties promptly in advance thereof), (d) to the extent such information:  (i) becomes publicly available other than as a result of a breach of this Backstop Commitment Letter or other confidentiality obligation owed by such Backstop Commitment Party to you or your affiliates or (ii) becomes available to the Backstop Commitment Parties on a non-confidential basis from a source other than you or on your behalf that, to such Backstop Commitment Party's knowledge, is not in violation of any confidentiality obligation owed to you or your affiliates, (e) to the extent you shall have consented to such disclosure in writing (which may include through electronic means), (f) as is necessary in protecting and enforcing the Backstop Commitment Parties' rights with respect to this Backstop Commitment Letter and/or the DIP Facility, (g) to the extent independently developed by such Backstop Commitment Party or its affiliates without reliance on confidential information, (h) with respect to the existence and contents of the Form DIP Credit Agreement, in consultation with you, to the rating agencies or (i) with respect to the existence and contents of the Backstop Commitment Letter and the DIP Facility, to market data collectors or similar service providers in connection with the arrangement, administration or management of the DIP Facility and to industry

trade organizations where such information with respect to the DIP Facility is customarily included in league table measurements.  The Backstop Commitment Parties' and their respective affiliates', if any, obligations under this paragraph shall terminate automatically to the extent superseded by the confidentiality provision in the Form DIP Credit Agreement upon the effectiveness thereof and, in any event, will terminate one year from the date hereof.

12.    <u>Miscellaneous</u>.

The Backstop Commitment Parties hereby notify Ascena Topco that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "<u>PATRIOT Act</u>"), it and its affiliates are required to obtain, verify and record information that identifies Ascena Topco, each other Debtor, which information includes names, addresses, tax identification numbers and other information that will allow Backstop Commitment Parties and its affiliates to identify Ascena Topco and each other Debtor in accordance with the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for Backstop Commitment Parties and its affiliates.

Absent a change in applicable tax law or a contrary determination (as defined in Section 1313(a) of the Internal Revenue Code of 1986, as amended), each of the parties hereto agrees (i) the Backstop Commitment Premium and the Termination Premium shall be treated as premiums paid by the Debtors to the relevant Backstop Commitment Party in exchange for the issuance of a put right to Ascena Topco with respect to the DIP Facility and (ii) to not take any tax position inconsistent with the tax treatment described in clause (i).

Each of the parties hereto agrees that this Backstop Commitment Letter is a binding and enforceable agreement with respect to the subject matter contained herein, including an agreement to negotiate in good faith the definitive documentation for the DIP Facility and the Exit Facility by the parties hereto in a manner consistent with this Backstop Commitment Letter, it being acknowledged and agreed that the availability of the DIP Facility and Exit Facility is subject to the conditions precedent expressly set forth in <u>Section 5</u> hereof.

If the foregoing correctly sets forth our agreement, please indicate Ascena Topco's acceptance of the terms of this Backstop Commitment Letter by returning to the Backstop Commitment Parties executed counterparts of this Backstop Commitment Letter not later than 11:59 p.m., New York City time, on July 23, 2020.  This offer will automatically expire at such time if the Backstop Commitment Parties have not received such executed counterparts in accordance with the preceding sentence.  This Backstop Commitment Letter and the Backstop Commitments and agreements hereunder shall automatically terminate on the earlier of (i) July 26, 2020, unless the Petition Date has occurred by such date, (ii) the date that is 36 calendar days after the Petition Date, unless prior to such time the DIP Financing Order (as defined in the Restructuring Support Agreement) shall have been entered by the Bankruptcy Court, (iii) five Business Days after the Termination Date (as defined in the Restructuring Support Agreement) or the Restructuring Support Agreement otherwise ceases to be in full force and effect or (iv) five Business Days after the Outside Date (as defined in the Restructuring Support Agreement), unless prior to such time the Exit Conversion shall have occurred, in each case unless extended by agreement of you and the Majority Backstop Commitment Parties (which agreement may be evidenced by email of counsel).  Notwithstanding the immediately preceding sentence, Section 4 above, as well as the indemnification and expenses, confidentiality, Initial Allocation, information, jurisdiction, governing law and waiver of jury trial provisions contained herein shall remain in full force and effect in accordance with their terms notwithstanding the termination of this Backstop Commitment Letter or the Backstop Commitment Parties' Backstop Commitments hereunder; *provided* that your obligations under this Commitment Letter, other than those pursuant to Section 4 and with respect to the Initial Allocation and confidentiality, shall

automatically terminate and be superseded by the applicable provisions in the Form DIP Credit Agreement and the Exit Facility Credit Agreement, in each case, to the extent covered thereby, upon the initial funding on the Effective Date or the occurrence of the Exit Conversion, and you shall be released from all liability in connection therewith at such time.

[Signature Pages follow.]

[*Signature pages of the Backstop Commitment Parties on file with the Company*]

Accepted and agreed to as of July 23, 2020:

ASCENA RETAIL GROUP, INC.

By: _____
Name: Dan Lamadrid
Title:  Executive Vice President and
Chief Financial Officer

*Signature page to Backstop Commitment Letter*

**Schedule 1**

[*On file with the Company*]

**Schedule 2**

[*On file with the Company*]

**Exhibit A**

<u>See Attached.</u>

$311,800,000

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION
TERM CREDIT AGREEMENT

dated as of

[  ], 2020,

among

ASCENA RETAIL GROUP, INC.,
as Parent Borrower

ANNTAYLOR RETAIL, INC.,
as Subsidiary Borrower

The LENDERS Party Hereto

and

ALTER DOMUS (US) LLC,
as Administrative Agent

# TABLE OF CONTENTS

**Page**

## ARTICLE I

### Definitions

| | | |
|---|---|---|
| SECTION 1.01. | Defined Terms | 2 |
| SECTION 1.02. | Classification of Loans and Borrowings | 34 |
| SECTION 1.03. | Terms Generally | 34 |
| SECTION 1.04. | Accounting Terms; GAAP | 35 |
| SECTION 1.05. | Classification of Actions | 35 |
| SECTION 1.06. | Divisions | 35 |

## ARTICLE II

### The Credits

| | | |
|---|---|---|
| SECTION 2.01. | Commitments | 36 |
| SECTION 2.02. | Loans and Borrowings | 36 |
| SECTION 2.03. | Requests for Borrowings | 37 |
| SECTION 2.04. | Funding of Borrowings | 37 |
| SECTION 2.05. | Interest Elections | 38 |
| SECTION 2.06. | Termination of Commitments | 39 |
| SECTION 2.07. | Repayment of Loans; Evidence of Debt | 39 |
| SECTION 2.08. | Amortization of Term Loans | 40 |
| SECTION 2.09. | Prepayment of Loans | 40 |
| SECTION 2.10. | Fees | 42 |
| SECTION 2.11. | Interest | 42 |
| SECTION 2.12. | Alternate Rate of Interest | 43 |
| SECTION 2.13. | Increased Costs | 44 |
| SECTION 2.14. | Break Funding Payments | 45 |
| SECTION 2.15. | Taxes | 46 |
| SECTION 2.16. | Payments Generally; Pro Rata Treatment; Sharing of Set-offs | 50 |
| SECTION 2.17. | Mitigation Obligations; Replacement of Lenders | 52 |
| SECTION 2.18. | [Reserved] | 53 |
| SECTION 2.19. | [Reserved] | 53 |
| SECTION 2.20. | Joint and Several Liability of the Borrowers | 53 |
| SECTION 2.21. | Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations | 54 |
| SECTION 2.22. | Conversion to Exit Facility Agreement | 55 |

## ARTICLE III

### Representations and Warranties

| | | |
|---|---|---|
| SECTION 3.01. | Organization; Powers | 56 |

i

SECTION 3.02.    Authorization; Enforceability; Benefit to Loan Parties ............................56
SECTION 3.03.    Governmental Approvals; No Conflicts ....................................................56
SECTION 3.04.    Financial Condition; No Material Adverse Change..................................57
SECTION 3.05.    Properties ..................................................................................................57
SECTION 3.06.    Litigation and Environmental Matters ......................................................57
SECTION 3.07.    Compliance with Laws and Agreements ...................................................58
SECTION 3.08.    Investment Company Status .....................................................................58
SECTION 3.09.    Taxes .........................................................................................................58
SECTION 3.10.    ERISA; Labor Matters ..............................................................................59
SECTION 3.11.    [Reserved] .................................................................................................59
SECTION 3.12.    Subsidiaries and Joint Ventures ...............................................................59
SECTION 3.13.    Insurance ...................................................................................................60
SECTION 3.14.    Federal Reserve Regulations.....................................................................60
SECTION 3.15.    [Reserved] .................................................................................................60
SECTION 3.16.    Collateral Matters......................................................................................60
SECTION 3.17.    Use of Proceeds.........................................................................................60
SECTION 3.18.    Approved Budget .......................................................................................61
SECTION 3.19.    Chapter 11 Cases .......................................................................................61

## ARTICLE IV

### Conditions

SECTION 4.01.    Conditions to Effective Date and Availability of the Term Loans ............62
SECTION 4.02    Conditions to the New Money Loan. ........................................................63

## ARTICLE V

### Affirmative Covenants

SECTION 5.01.    Financial Statements and Other Information ..............................................64
SECTION 5.02.    Notices of Material Events........................................................................67
SECTION 5.03.    Collateral Obligations; Additional Subsidiaries .......................................68
SECTION 5.04.    Information Regarding Collateral ..............................................................68
SECTION 5.05.    Existence; Conduct of Business.................................................................69
SECTION 5.06.    Payment of Obligations..............................................................................70
SECTION 5.07.    Maintenance of Properties .........................................................................70
SECTION 5.08.    Insurance ....................................................................................................70
SECTION 5.09.    Books and Records; Inspection and Rights ...............................................70
SECTION 5.10.    Compliance with Laws ..............................................................................71
SECTION 5.11.    Bankruptcy Matters....................................................................................71
SECTION 5.12.    Maintenance of Ratings .............................................................................72
SECTION 5.13.    Certain Post-Closing Collateral Obligations.............................................72
SECTION 5.14.    Reserved.....................................................................................................72
SECTION 5.15.    Conference Calls........................................................................................72

# ARTICLE VI

## Negative Covenants

SECTION 6.01.    Indebtedness; Certain Equity Securities ....................................................73
SECTION 6.02.    Liens...........................................................................................................74
SECTION 6.03.    Fundamental Changes; Business Activities ..............................................76
SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions...................76
SECTION 6.05.    Asset Sales .................................................................................................78
SECTION 6.06.    Sale/Leaseback Transactions .....................................................................79
SECTION 6.07.    Swap Agreements .......................................................................................79
SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness ..........................79
SECTION 6.09.    Transactions with Affiliates.......................................................................81
SECTION 6.10.    Restrictive Agreements...............................................................................81
SECTION 6.11.    Amendment of Organizational Documents ...............................................82
SECTION 6.12.    Financial Covenants....................................................................................82
SECTION 6.13.    Accounting Changes ...................................................................................83
SECTION 6.14.    Sanctions .....................................................................................................83
SECTION 6.15.    Anti-Corruption Laws .................................................................................83

# ARTICLE VII

## Events of Default

# ARTICLE VIII

## The Administrative Agent

# ARTICLE IX

## Miscellaneous

SECTION 9.01.    Notices .......................................................................................................93
SECTION 9.02.    Waivers; Amendments.................................................................................95
SECTION 9.03.    Expenses; Indemnity; Damage Waiver.......................................................97
SECTION 9.04.    Successors and Assigns................................................................................99
SECTION 9.05.    Survival .....................................................................................................103
SECTION 9.06.    Counterparts; Integration; Effectiveness; Electronic Execution..............104
SECTION 9.07.    Severability................................................................................................104
SECTION 9.08.    Right of Setoff...........................................................................................104
SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process...................105
SECTION 9.10.    WAIVER OF JURY TRIAL.......................................................................105
SECTION 9.11.    Headings .....................................................................................................106
SECTION 9.12.    Confidentiality ...........................................................................................106
SECTION 9.13.    Several Obligations; Nonreliance; Violation of Law................................106
SECTION 9.14.    USA Patriot Act Notice .............................................................................106
SECTION 9.15.    Interest Rate Limitation .............................................................................107

LA\4104335.13

SECTION 9.16.    Release of Liens and Guarantees ............................................................107
SECTION 9.17.    No Fiduciary Relationship ...................................................................107
SECTION 9.18.    Non-Public Information .......................................................................108
SECTION 9.19.    Intercreditor Agreement .....................................................................108
SECTION 9.20.    Acknowledgement and Consent to Bail-In of EEA Financial
                 Institutions...........................................................................................109

SCHEDULE:

Schedule 2.01    —    Commitments
Schedule 3.05    —    Real Property
Schedule 3.06    —    Disclosed Matters
Schedule 3.12    —    Subsidiaries and Joint Ventures
Schedule 3.13    —    Insurance
Schedule 5.11    —    Required Milestones
Schedule 6.01    —    Pre-Petition Indebtedness
Schedule 6.02    —    Liens
Schedule 6.04    —    Investments
Schedule 6.09    —    Transactions with Affiliates
Schedule 6.10    —    Restrictive Agreements

EXHIBITS:

Exhibit A      —    Form of Assignment and Assumption
Exhibit B      —    Form of Borrowing Request
Exhibit C      —    Form of Guarantee and Collateral Agreement
Exhibit D      —    Form of Compliance Certificate
Exhibit E      —    Form of Interest Election Request
Exhibit F      —    [Reserved]
Exhibit G      —     Form of Exit Facility Term Sheet
Exhibit H-1    —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are not
                    Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-2    —    Form of U.S. Tax Certificate for Non-U.S. Lenders that are Partnerships
                    for U.S. Federal Income Tax Purposes
Exhibit H-3    —    Form of U.S. Tax Certificate for Non-U.S. Participants that are not
                    Partnerships for U.S. Federal Income Tax Purposes
Exhibit H-4    —    Form of U.S. Tax Certificate for Non-U.S. Participants that are
                    Partnerships for U.S. Federal Income Tax Purposes
Exhibit I      —    [Reserved]
Exhibit J      —    Form of Variance Report
Exhibit K      —    Form of Note

Annex A        —    Approved Budget

LA\4104335.13

SENIOR SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION TERM CREDIT AGREEMENT, dated as of [  ], 2020, among ASCENA RETAIL GROUP, INC., a Delaware corporation, as debtor and debtor-in-possession (the "Parent Borrower"), ANNTAYLOR RETAIL, INC., a Florida corporation as debtor and debtor-in-possession (the "Subsidiary Borrower" and, together with the Parent Borrower, the "Borrowers" and each, a "Borrower"), the LENDERS party hereto and Alter Domus (US) LLC ("Alter Domus"), as Administrative Agent.

On July 23, 2020 (the "Petition Date"), the Borrowers and the other Loan Parties (collectively, the "Debtors", and each individually, a "Debtor") commenced voluntary cases (collectively, the "Cases" and each individually, a "Case") in the United States Bankruptcy Court for the Eastern District of Virginia Richmond Division (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

Prior to the Petition Date, the Lenders provided financing to the Borrowers pursuant to that certain Term Credit Agreement dated as of August 21, 2015, among the Borrowers, the other Loan Parties, the Pre-Petition Lenders and Goldman Sachs Bank USA, as the Pre-Petition Agent and the other parties thereto (as amended, amended and restated, supplemented or otherwise modified from time to time through the date hereof, the "Pre-Petition Credit Agreement").

As of the Petition Date, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed approximately $1,271,597,089 in Loans (as defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Lender Obligations under the Pre-Petition Credit Agreement.

The Loan Document Obligations under and as defined in the Pre-Petition Credit Agreement are secured by a security interest in substantially all of the existing and after-acquired assets of the Borrowers and the other Loan Parties as more fully set forth in the Pre-Petition Loan Documents, and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

The Borrowers have requested, and, upon the terms set forth in this Agreement, the Lenders have agreed to make or be deemed to have made available to the Borrowers, a senior secured super priority term credit facility of up to $311,800,000 in the aggregate that is automatically convertible into a secured exit facility upon the satisfaction (or waiver) of certain conditions in the form of a term facility to be made available to the Borrowers at any time until the Maturity Date subject to the terms and conditions set forth herein (the "Term Credit Facility").

The Borrowers and other Loan Parties have agreed to secure all of their Loan Document Obligations under the Loan Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Secured Parties, a security interest in and lien upon all of their existing and after-acquired personal and real property, subject to the Intercreditor Agreement and the limitations and priorities contained in the Loan Documents and the Order.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

<div align="center">ARTICLE I</div>

<div align="center">Definitions</div>

SECTION 1.01.   Defined Terms.  As used in this Agreement, the following terms have the meanings specified below:

"ABL Agent" means the Person acting as agent under the ABL Credit Agreement, in its individual capacity, and its successors.

"ABL Credit Agreement" means the Senior Secured Super-Priority Debtor-In-Possession Credit Agreement, dated the Funding Date, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the ABL Agent, as administrative agent, as amended, restated, supplemented, modified, renewed, refunded, replaced or refinanced from time to time through the date hereof.

"ABL Lenders" means the lenders under the ABL Credit Agreement.

"ABL Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"ABR," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bears interest at a rate determined by reference to the Alternate Base Rate.

"Acceptable Plan" means a Plan of Reorganization that is consistent with the RSA and otherwise satisfactory to the Required Lenders  and the Loan Parties in their reasonable discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof in accordance with the terms thereof); it being agreed that the Plan (as defined in the RSA) is an "Acceptable Plan" to the Required Lenders.

"Actual Net Cash Flow Amount" means the actual net cash flows of the Loan Parties during the relevant period of determination which corresponds to each of the Budgeted Net Cash Flow Amounts described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow, Including Restructuring".

"Ad Hoc Committee" means the ad hoc committee of Consenting Stakeholders (as defined in the RSA).

"Ad Hoc Committee Advisors" means Greenhill Partners and Milbank LLP, the advisors of the Ad Hoc Committee.

"Adjusted LIBO Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded to the nearest 1/16 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate; provided that,

<div align="center">2</div>

notwithstanding the foregoing, in the case of the Term Loans, the Adjusted LIBO Rate shall at no time be less than 1.00% per annum.

"Administrative Agent" means Alter Domus (US) LLC, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Agent Fee Letter" means that certain Fee Letter dated as of even date herewith between the Borrowers and Alter Domus.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" means this Senior Secured Super-Priority Debtor-In-Possession Term Credit Agreement, as modified, supplemented, amended or restated from time to time.

"Alter Domus" has the meaning set forth in the introductory paragraph hereto.

"Alternate Base Rate" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1% per annum and (c) the Adjusted LIBO Rate on such day (or if such day is not a Business Day, the immediately preceding Business Day) for a deposit in dollars with a maturity of one month plus 1% per annum; provided that, for the avoidance of doubt, the Adjusted LIBO Rate for any day shall be based on the Screen Rate (or the Interpolated Screen Rate, as applicable) at approximately 11:00 a.m., London time, on such day for a deposit in dollars with a maturity of one month.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, respectively.  Notwithstanding the foregoing, in the case of the Term Loans, the Alternate Base Rate shall at no time be less than 2.00% per annum.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Parent Borrower and its Subsidiaries from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010.

"Applicable Rate" means, for any day, with respect to any Term Loan, (i) 11.75% in the case Eurodollar Term Loans and (ii) 10.75% in the case of ABR Term Loans.

"Approved Budget" means the budget prepared by the Parent Borrower in form and substance reasonably satisfactory to the Ad Hoc Committee Advisors, it being understood and agreed that the budget in the form of Annex A and initially furnished to the Administrative Agent on or prior to the Effective Date is deemed reasonably satisfactory to the Ad Hoc Committee Advisors, as the same may be updated, modified or supplemented from time to time as provided in Section 5.01. The initial Approved Budget shall depict, on a weekly and line item

3

basis, (i) projected cash receipts, (ii) projected cash disbursements (including ordinary course operating expenses, bankruptcy-related expenses (including professional fees of the Loan Parties' professionals and advisors), asset sales and any other fees and expenses relating to the Loan Documents), (iii) net cash flows, (iv) Liquidity and (v) professional fees and disbursements with respect to the Loan Parties' professionals, in each case for the first thirteen (13) week period from the Effective Date, and such initial Approved Budget shall be approved by, and in form and substance reasonably satisfactory to, the Administrative Agent and the Required Lenders in their sole discretion (it being acknowledged and agreed that the initial Approved Budget attached hereto as <u>Annex A</u> is approved by and reasonably satisfactory to the Administrative Agent and the Required Lenders)[1].

"<u>Approved Fund</u>" means any Person (other than a natural person that is engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Sale</u>" has the meaning set forth in Section 6.05.

"<u>Asset Sale Escrow Account</u>" [_____][2].

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an Eligible Assignee, with the consent of any Person whose consent is required by Section 9.04, and accepted by the Administrative Agent, in the form of Exhibit A or any other form approved by the Administrative Agent.

"<u>Automatic Stay</u>" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"<u>Backstop Lender</u>" means each Lender who is party to the Commitment Letter.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of such EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means the Bankruptcy Reform Act of 1978, as codified at 11 U.S.C. §§ 101 et seq.

---

[1] Subject to review of initial Approved Budget.

[2] Escrow mechanics to be confirmed.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"Board of Governors" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" has the meaning set forth in the introductory paragraph hereto.

"Borrowing" means Loans of the same Type made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrowers for a Borrowing in accordance with Section 2.03, which shall be, in the case of any such written request, in the form of Exhibit B or any other form approved by the Administrative Agent.

"Budgeted Net Cash Flow Amount" means the amount described in the line item contained in the Approved Budget across from the heading "Unlevered Operating Cash Flow Including Restructuring", during the relevant period of determination.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP (as in effect on December 31, 2018, notwithstanding any modification or interpretative change thereto after such date and excluding the effect to any treatment of lease under Accounting Standards Codification 842 (or any other Accounting Standards Codification or Financial Accounting Standard have a similar result or effect)), the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Carve Out" has the meaning set forth in the Order.

"Cases" has the meaning set forth in the Recitals.

"Cash Equivalents" means:

(a)     marketable direct obligations issued or unconditionally guaranteed by the United States Government, the Government of Canada, or the UK government, or issued by an agency thereof and backed by the full faith and credit of the United States Government, the Government of Canada, or the UK government, as the case may be, in each case maturing within two years after the date of acquisition thereof;

LA\4104335.13

(b)       marketable direct obligations issued by any state of the United States of America or any province of Canada, or any member of the European Union or any political subdivision of any such state or province or any public instrumentality thereof, in each case maturing within two years after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A by S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from such other nationally recognized rating services acceptable to the Administrative Agent);

(c)       commercial paper maturing no more than one year after the date of creation thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then the highest rating from such other nationally recognized rating services acceptable to the Administrative Agent);

(d)       certificates of deposit or bankers acceptances denominated in US Dollars, Canadian Dollars, Sterling or Euro and maturing within one year after the date of acquisition thereof issued by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(e)       repurchase agreements of any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(f)       overnight investments with any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(g)       other readily marketable instruments issued or sold by any Lender or any other commercial bank organized under the laws of the United States of America or Canada or any state or province thereof or the District of Columbia, or the UK, in each case having combined capital and surplus of not less than $250,000,000 (or the foreign currency equivalent thereof);

(h)       shares of mutual funds whose investment guidelines restrict 95% of such funds' investments to those satisfying the provisions of clauses (a) through (g) above;

(i)       funds invested in brokerage accounts with nationally recognized brokerage houses or money market accounts; and

(j)       in the case of investments by any Foreign Subsidiary or investments made in a country outside the United States, other customarily utilized high quality investments

in the country where such Foreign Subsidiary is located or in which such investment is made that would customarily constitute "cash equivalents".

"Cash Management Order" means the order of the Court entered in the Cases after the "first day" hearing on a final basis, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Required Lenders, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Required Lenders in all material respects

"CFC" means (a) any Person that is a "controlled foreign corporation" within the meaning of Section 957(a) of the Code and (b) each subsidiary of any Person described in clause (a).

"CFC Holdco" means a Subsidiary with no material assets other than equity interests of one or more Foreign Subsidiaries that are CFCs.

"Change in Control" means during any period of 12 consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Parent Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any rule, regulation, treaty or other law, (b) any change in any rule, regulation, treaty or other law or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted, promulgated or issued.

"Charges" has the meaning set forth in Section 9.15.

"Claim" means any (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an

LA\4104335.13

equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means (a) means, collectively, all of the real, personal and mixed property (including Equity Interests) in which Liens are purported to be granted pursuant to the Collateral Documents as security for the Loan Document Obligations, and (b) the ["DIP Collateral"][3] referred to in the Order, it being understood that "Collateral" shall include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents.

"Collateral Agreement" means the Guarantee and Collateral Agreement among the Borrowers, the other Loan Parties and the Administrative Agent, substantially in the form of Exhibit C, together with all supplements thereto.

"Collateral and Guarantee Requirement" means, at any time, the requirement that:

(a)    the Administrative Agent shall have received from the Borrowers and each Designated Subsidiary (a) either (i) a counterpart of the Collateral Agreement, duly executed and delivered on behalf of such Person, or (ii) in the case of any Person that becomes a Designated Subsidiary after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, together with such documents with respect to such Designated Subsidiary as may reasonably be requested by the Administrative Agent and (b) an Intercreditor Acknowledgement in the form referred to in the Intercreditor Agreement, duly executed and delivered on behalf of such Person;

(b)    all Equity Interests owned by or on behalf of any Loan Party shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement, including Equity Interests in any Luxembourg IP Subsidiary and any first-tier CFC or CFC Holdco, and the Administrative Agent shall, to the extent required by the Collateral Agreement, have received certificates or other instruments representing all such certificated Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

(c)    all other assets, to the extent not constituting Excluded Property, shall have been pledged pursuant to, and to the extent required by, the Collateral Agreement;

(d)    all documents and instruments, including UCC financing statements, required by law or reasonably requested by the Administrative Agent to be filed, registered or recorded to perfect the Liens intended to be created by the Collateral Documents with the priority required by the Collateral Documents shall have been filed,

---

[3] Subject to Final Order.

registered or recorded or delivered to the Administrative Agent for filing, registration or recording;

(e)     each Loan Party shall have obtained all material consents and approvals required in connection with the execution and delivery of all Collateral Documents to which it is a party and the performance of its obligations thereunder; and

(f)     the Loan Document Obligations shall at all times be secured by a valid, binding, continuing, enforceable perfected first priority Lien on the DIP Accounts and the proceeds thereof and, on the Effective Date (or such later date as the Required Lenders may agree in its sole discretion), the Borrowers must obtain Control Agreement for the DIP Accounts.

Notwithstanding the foregoing, any Designated Subsidiary formed or acquired after the Effective Date shall not be required to comply with the foregoing requirements prior to the time specified in Section 5.03.  The foregoing definition shall not require the creation or perfection of pledges of or security interests in, or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to, particular assets of the Loan Parties, or the provision of Guarantees by any Restricted Subsidiary, if and for so long as the Administrative Agent (acting at the direction of the Required Lenders), in consultation with the Borrowers, reasonably determines that the cost of creating or perfecting such pledges or security interests in such assets, or obtaining such title insurance or flood insurance, legal opinions, appraisals, surveys or other deliverables in respect of such assets, or providing such Guarantees, shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  The Required Lenders may in their sole discretion, grant extensions of time for the creation and perfection of security interests in (including delivery of promissory notes as required by clause (c) above) or the obtaining of title insurance or, subject to the requirements of applicable law, flood insurance, legal opinions, appraisals, surveys or other deliverables with respect to particular assets or the provision of any Guarantee by any Designated Subsidiary where it determines that such action cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required to be accomplished by this Agreement or the Collateral Documents.

"Collateral Documents" means the Order, Collateral Agreement, and each other document granting a Lien upon any assets of any Loan Party as security for payment of the Loan Document Obligations.

"Commitment" means, with respect to each Lender, such Lender's New Money Commitment and such Lender's Roll-Up Loans Commitment.

"Commitment Letter" means the Commitment Letter dated July 23, 2020, among the Ad Hoc Committee and the Parent Borrower.

"Committee" means an official committee of unsecured creditors appointed in any of the Cases by the U.S. Trustee.

"Communications" means, collectively, any written notice, demand, communication, information, document or other material provided by or on behalf of any Loan Party pursuant to

9

any Loan Document or the transactions contemplated therein that is distributed to the Administrative Agent or any Lender by means of electronic communications pursuant to Section 9.01, including through the Platform.

"Compliance Certificate" means a Compliance Certificate in the form of Exhibit D or any other form approved by the Administrative Agent.

"Confirmation Order" means an order of the Court entered in the Cases pursuant to section 1129 of the Bankruptcy Code, which order (x) shall confirm an Acceptable Plan, be a final Order and otherwise be in form and substance reasonably satisfactory to  the Required Lenders, together with all extensions, modifications, and amendments thereto, also in form and substance reasonably satisfactory to the Required Lenders and (y) (i) if the Term Credit Facility converts to the Exit Facility, shall authorize and approve the extensions of credit under the Exit Facility Credit Agreement and the performance of the Borrowers' (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan) and Guarantors' obligations thereunder, authorize a pro forma capital structure that satisfies the conditions precedent to the occurrence of the Conversion Date and otherwise satisfies all other conditions to the Conversion Date or (ii) if the Term Credit Facility is to be repaid in cash, shall authorize and approve such repayment, any financing the proceeds of which will be used to fund such repayment, and the termination in full of all outstanding obligations under the Term Credit Facility.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account or securities account maintained by any Loan Party, a control agreement in form and substance reasonably satisfactory to the Administrative Agent, duly executed and delivered by such Loan Party and the depositary bank or the securities intermediary, as the case may be, with which such account is maintained.

"Conversion Date" means the date upon which each of the conditions precedent to effectiveness of the Exit Facility Agreement set forth in the Exit Facility Term Sheet shall have been satisfied or waived.

"Court" has the meaning set forth in the Recitals.

"Cumulative Four-Week Period" means the four-week period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date, or if a four-week period has not then elapsed from the Petition Date, such shorter period since the Petition Date through the Saturday of the most recent week then ended.

"Debtor" has the meaning set forth in the Recitals.

"Debtors' Investment Banker" means Guggenheim Securities, LLC.

"Declined Proceeds" has the meaning set forth in Section 2.09(d).

LA\4104335.13

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Default Rate" means (i) in the case of overdue principal of any Loan, 2.0% per annum plus the rate otherwise applicable to such Loan as provided in Section 2.11 or (ii) in the case of any other overdue amount, 2.0% per annum plus the rate applicable to ABR Term Loans as provided in Section 2.11(a).

"Deposit Account" has the meaning set forth in the Collateral Agreement.

"Designated Jurisdiction" means any country or territory to the extent that such country or territory itself is the subject of any Sanction.

"Designated Persons" means any person or entity listed on a Sanctions list.

"Designated Subsidiary" means each Subsidiary other than an Excluded Subsidiary.

"DIP Accounts" means the DIP Funding Account and the Asset Sale Escrow Account.

"DIP Funding Account" means a Deposit Account in the name of the Parent Borrower subject to a blocked Control Agreement in favor of the Administrative Agent, on behalf of the Secured Parties, in which the proceeds of the Loans shall be deposited and held on the Funding Date and used solely for the purposes set forth in Section 3.17.

"DIP Superpriority Claim" means allowed superpriority expense claims pursuant to Bankruptcy Code Sections 364(c)(1), 503 and 507 granted by the Order.

"Disclosed Matters" means the actions, suits and proceedings and the environmental matters disclosed in Schedule 3.06.

"Disqualified Stock" means any Equity Interests which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof), or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) cash, (ii) debt or (iii) any Equity Interests referred to in (a) above, in each case at any time prior to the date that is 91 days after the latest Maturity Date (determined as of the date of issuance thereof or, in the case of any such Equity Interests outstanding on the date hereof, the date hereof).  Notwithstanding the foregoing, any Equity Interests that would constitute Disqualified Stock solely because holders of the Equity Interests have the right to require the issuer of such Equity Interests to repurchase such Equity Interests upon the occurrence of a change in control or an asset sale will not constitute Disqualified Stock if the terms of such Equity Interests provide that the issuer may not repurchase or redeem any such

11

Equity Interests pursuant to such provisions unless such repurchase or redemption is permitted under the terms of this Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of the Parent Borrower that is organized under the laws of the United States, any state of the United States or the District of Columbia, except for a Subsidiary directly or indirectly owned by a CFC.

"EEA Financial Institution" means (a) any financial institution established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clause (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any member state of the European Union, Iceland, Liechtenstein and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02), which date is [  ], 2020[4].

"Electronic Signature" means an electronic sound, symbol, or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person, other than, in each case, a natural person or the Parent Borrower, any Subsidiary or any other Affiliate of the Parent Borrower.

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata, and natural resources such as wetlands, flora and fauna.

"Environmental Laws" means all applicable federal, state, and local laws (including common law), regulations, rules, ordinances, codes, decrees, judgments, directives, orders (including consent orders), and binding agreements with any Governmental Authority in each case, relating to pollution or protection of the Environment, human health and safety (to the extent related to exposure to Hazardous Materials), or the presence, Release of, or exposure to, Hazardous Materials, or the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials.

---

[4] To be the date the Order is approved.

"Environmental Liability" means any liability, claim, action, suit, agreement, judgment or order arising under or relating to any Environmental Law for any damages, injunctive relief, losses, fines, penalties, fees, expenses (including reasonable fees and expenses of attorneys and consultants) or costs, whether contingent or otherwise, including those arising from or relating to:  (a) compliance or non-compliance with any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threat of Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest (other than, prior to the date of such conversion, any Indebtedness that is convertible into any such Equity Interests).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or 414(o) of the Code.

"ERISA Event" means (a) any "reportable event," as defined in Section 4043(c) of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived), (b) any failure by any Plan to satisfy the minimum funding requirements of Section 412 or 430 of the Code or Section 302 or 303 of ERISA with respect to such Plan, in each case whether or not waived, or any failure by any Loan Party or any ERISA Affiliate to make a required contribution to a Multiemployer Plan, (c) the filing pursuant to Section 412(c) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, (d) a determination that any Plan is in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code), (e) the incurrence by any Loan Party or any ERISA Affiliate of any liability under Title IV of ERISA (other than PBGC premiums due but not delinquent under Section 4007 of ERISA), (f) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA, (g) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (h) a complete withdrawal or partial withdrawal by any Loan Party or any ERISA Affiliate from any Plan or Multiemployer Plan, (i) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning the imposition of Withdrawal Liability, or a determination that a Multiemployer Plan is insolvent, within the meaning of Title IV of ERISA, or in "endangered" or "critical" status, within the meaning of Section 305 of ERISA or Section 432 of the Code, (j) a failure by any Loan Party or any ERISA Affiliate to pay when due (after expiration of any applicable grace period) any installment payment with respect to Withdrawal Liability, (k) the imposition of a Lien upon any Loan Party or any ERISA

13

Affiliate pursuant to Section 430(k) of the Code or Section 303(k) of ERISA, (l) the occurrence of a non-exempt "prohibited transaction" (as defined in Section 4975 of the Code or Section 406 of ERISA) with respect to which any Loan Party or any ERISA Affiliate is a "disqualified person" (within the meaning of Section 4975 of the Code) or a "party in interest" (within the meaning of Section 406 of ERISA) or could otherwise reasonably be expected to be liable or (m) any event with respect to any Foreign Plan which could reasonably be expected to result in liability to any Loan Party similar to the liability that could arise with respect to an event described in clauses (a) through (l) above.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Events of Default" has the meaning set forth in Article VII.

"Exchange Act" means the United States Securities Exchange Act of 1934.

"Excluded Deposit Account" means (a) [reserved], (b) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for the payment of salaries and wages, (c) any Deposit Account that is a zero balance disbursement account the funds in which are used solely for payment of medical or insurance reimbursement, workers' compensation and similar expenses, (d) any escrow account to the extent the creation of a security interest therein would violate any agreement with a Person other than the Parent Borrower or a Subsidiary, and (e) any fiduciary or trust account.

"Excluded Property" the collective reference to:

(A)    any licenses, franchises, charters and authorizations of a Governmental Authority to the extent a security interest therein under the Loan Documents is prohibited by or would require the consent, license or approval of any Governmental Authority (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(B)    any asset if the granting of a security interest under the Loan Documents in such asset would be prohibited by any (x) law, treaty, rule or regulation (including all applicable regulations and laws regarding assignments of and security interests in, government receivables) or a court or other Governmental Authority or would require the consent, license or approval of any Governmental Authority (other than proceeds thereof, to the extent the assignment of such proceeds is effective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition and the assignment of such proceeds is not prohibited by applicable law and does not require the consent, license or approval of any Governmental Authority) or (y) contractual obligation (only to the extent such restriction is binding on such asset (i) on the Petition Date or (ii) on the date of the acquisition thereof and not entered into in contemplation thereof) (except to the extent such prohibition or restriction is

14

ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(C)     any lease, license or other agreement to the extent that a grant of a security interest therein under the Loan Documents would violate or invalidate such lease, license or agreement (except any such lease, license or agreement among Parent Borrower and its wholly-owned Subsidiaries and except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order or other applicable law notwithstanding such prohibition);

(D)     Equity Interests  in any Person that is not a Subsidiary, in partnerships, in joint ventures and in non-wholly owned Subsidiaries to the extent the pledge or other granting of a security interest under the Loan Documents in such Equity Interests would be prohibited by, or require a consent or approval of unaffiliated third parties or are not permitted under, organizational or governance documents or shareholders' or similar agreements of or with respect to such Person (except to the extent such prohibition or restriction is ineffective under the Uniform Commercial Code, the Order, or other applicable law notwithstanding such prohibition);

(E)     to the extent applicable law requires that a Subsidiary issue directors' qualifying shares, nominee shares or similar shares which are required by applicable law to be held by persons other than a Loan Party, such qualifying shares, nominee shares or similar shares held by Persons other than a Loan Party;

(F)     any United States intent-to-use application for registration of a trademark or service mark prior to the acceptance by the United States Patent and Trademark Office of a statement of use or an amendment to allege use, to the extent and for so long as the grant of a security interest therein would impair the validity or enforceability of, or render void or voidable or result in the cancellation of, a Loan Party's right, title or interest therein or any trademark or service mark registration issued therefrom;

(G)     "margin stock" within the meaning of Regulation U;

(H)     Excluded Deposit Accounts; and

(I)     proceeds in an amount not to exceed the Carve Out, if applicable, under the Order.

provided that (a) in the case of clauses 2(y), (3) and (5), such exclusion shall not apply (i) to the extent the prohibition or restriction is ineffective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law or (ii) to proceeds of the assets referred to in such clause, the assignment of which is expressly deemed effective under Section 9-406, 9-407, 9-408 or 9-409 of the Uniform Commercial Code, the Bankruptcy Code or other applicable law and (b) assets described above shall no longer be "Excluded Property" upon termination of the applicable prohibition or restriction described above that caused such assets to be treated as "Excluded Property".

15

"Excluded Subsidiary" means (a) [reserved], (b) any Foreign Subsidiary of the Parent Borrower, (c) any Subsidiary that is a direct or indirect Subsidiary of a Foreign Subsidiary of the Parent Borrower that is a CFC, (d) any CFC Holdco, (e) any Subsidiary that is prohibited or restricted by applicable law, rule or regulation or contractual obligation in existence on the Petition Date  from providing a Guarantee of the Loan Document Obligations (solely  for so long as such prohibition or restriction remains in existence) or if such Guarantee would require governmental (including regulatory) consent, approval, license or authorization unless such consent, approval, license or authorization has been received (but without obligation to seek the same), (f) [reserved], (g) [reserved], (h) [reserved], and (i) any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Required Lenders (confirmed in writing by notice to the Parent Borrower), the cost or other consequences of becoming a Guarantor shall be excessive in view of the benefits to be obtained by the Lenders therefrom.  In no event shall (i) the Subsidiary Borrower be an Excluded Subsidiary or (ii) any Subsidiary of the Parent Borrower that is a "Subsidiary Loan Party" (under and as defined in the ABL Credit Agreement to the extent applicable) or that is otherwise a guarantor of, or has otherwise provided security for, the obligations under the ABL Credit Agreement(to the extent applicable) be an Excluded Subsidiary.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by such Recipient's net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed by a jurisdiction as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, such jurisdiction (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the applicable Loan or Commitment (other than an assignee pursuant to an assignment request by the Borrowers under Section 2.17(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.15, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in such Loan or Commitment or to such Lender immediately before it changed its lending office, (c) any Taxes attributable to a Lender's failure to comply with Section 2.15(e) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Conversion" has the meaning set forth in Section 2.22.

"Exit Facility Agreement" means the credit agreement that is approved by the Confirmation Order and entered into on the Conversion Date consistent in all material respects with the terms set forth in the Exit Facility Term Sheet and any related schedules and exhibits attached thereto; *provided*, that such credit agreement shall have been made available to the Administrative Agent and all Lenders; provided, further, that upon the satisfaction of waiver of the conditions contemplated by Section 2.22, each Lender hereunder that is a Lender on the Conversion Date hereby authorizes the Administrative Agent to use its executed signature page to this Agreement as an executed signature page to the Exit Facility Agreement without any further action on the part of any such Lender or any other Person.

16

"Exit Facility Term Sheet" means the term sheet attached as Exhibit G hereto, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury regulations or other official administrative interpretations thereof, any agreements entered into pursuant to current Section 1471(b) of the Code (or any amended or successor version described above), and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement between a non-U.S. jurisdiction and the United States of America.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Financial Officer" means, with respect to any Person, the chief financial officer, principal accounting officer, treasurer, assistant treasurer, chief restructuring officer or controller of such Person.

"Foreign Lender" means a Lender that is not a U.S. Person.

"Foreign Plan" means any defined benefit pension plan, benefit plan, fund (including any superannuation fund) or other similar program that, under the requirements of law of any jurisdiction other than the United States, is required to be funded through a trust or other funding vehicle (other than a trust or funding vehicle or any of the foregoing sponsored or maintained exclusively by a Governmental Authority) and is directly sponsored and maintained by a Loan Party primarily for the benefit of its employees who are employed and residing outside the United States.

"Foreign Subsidiary" means any Subsidiary of the Parent Borrower, other than a Domestic Subsidiary.

"Funding Date" means the date on which the conditions specified in Section 4.02 are satisfied (or waived in accordance with Section 9.02).

"GAAP" means generally accepted accounting principles in the United States of America, applied in accordance with the consistency requirements thereof.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state, local, county, provincial or otherwise, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers

17

or functions of or pertaining to government (including any supra-national body exercising such powers or functions, such as the European Union or the European Central Bank).

"GS Bank" means Goldman Sachs Bank USA, in its individual capacity, and its successors.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or other obligation; provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The amount, as of any date of determination, of any Guarantee shall be the principal amount outstanding on such date of Indebtedness or other obligation guaranteed thereby (or, in the case of (i) any Guarantee the terms of which limit the monetary exposure of the guarantor or (ii) any Guarantee of an obligation that does not have a principal amount, the maximum monetary exposure as of such date of the guarantor under such Guarantee (as determined, in the case of clause (i), pursuant to such terms or, in the case of clause (ii), reasonably and in good faith by a Financial Officer of the Parent Borrower)).

"Guarantors" means each Subsidiary of the Parent Borrower (other than any Excluded Subsidiary), in each case, until any such Subsidiary (other than the Subsidiary Borrower) is released as a Guarantor in accordance with the Loan Documents.

"Hazardous Materials" means any chemical, material, substance or waste that is prohibited, limited or regulated by or pursuant to any applicable Environmental Law, including, without limitation, any petroleum products or byproducts and all other hydrocarbons, coal ash, radon gas, asbestos-containing materials, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances or mold.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person (excluding trade accounts payable incurred in the ordinary course of business), (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) current accounts payable incurred in the ordinary course of business, (ii) deferred compensation payable to directors, officers or employees of the Parent Borrower or any Restricted Subsidiary and (iii) any purchase price adjustment or earnout incurred in connection with an acquisition, except to the extent that the amount payable pursuant

18

to such purchase price adjustment or earnout is, or becomes, a liability on the balance sheet of the Parent Borrower in accordance with GAAP), (e) all Capital Lease Obligations and Synthetic Lease Obligations of such Person, (f) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (g) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (h) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed by such Person (but only to the extent of the lesser of (x) the amount of such Indebtedness and (y) the fair market value of such property, if such Indebtedness has not been assumed by such Person), (i) net payments that would have to be made in the event of an early termination in respect of any outstanding Swap Agreement, (j) all obligations of such Persons with respect to the redemption, repayment or repurchase of Disqualified Stock (excluding accrued dividends) and (k) all Guarantees by such Person of Indebtedness of others.  The Indebtedness of any Person shall include the Indebtedness of any other Person (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor by contract, as a matter of law or otherwise as a result of such Person's ownership interest in or other relationship with such other Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  It is acknowledged and agreed that private label and corporate letters of credit issued by the Parent Borrower or any Subsidiary for the making of payment for the purchase of inventory in the ordinary course of business (and in respect of which no financial institution is an issuer thereof or has any disbursement obligations thereunder) do not constitute Indebtedness of the Parent Borrower or such Subsidiary.

"Indemnified Taxes" means (a) all Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), all Other Taxes.

"Indemnitee" has the meaning set forth in Section 9.03(b).

"Information" has the meaning set forth in Section 9.12.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the Funding Date, by and among the Administrative Agent, the Pre-Petition Agent, the ABL Agent and the Pre-Petition ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Agreement" means the Intercreditor Agreement, dated as of August 21, 2015, among the Pre-Petition Agent, as term collateral agent, the Pre-Petition ABL Agent, as ABL collateral agent, and acknowledged by the Loan Parties, as may be supplemented and modified by the Intercreditor Acknowledgment, and as may be further amended, amended and restated, supplemented or otherwise modified and in effect from time to time.

"Interest Election Request" means a request by the Borrowers to convert or continue a Borrowing in accordance with Section 2.05, which shall be, in the case of any such written request, in the form of Exhibit E or any other form approved by the Administrative Agent.

"Interest Payment Date" means (a) with respect to any ABR Loan, the first Business Day of each calendar quarter and the Maturity Date applicable to such ABR Loan and (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Borrowing with an Interest Period of more than three months' duration, such day or days prior to the last day of such Interest Period as shall occur at intervals of three months' duration after the first day of such Interest Period and the Maturity Date applicable to such Eurodollar Loan.

"Interest Period" means, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two, three or six months (or, with the consent of each Lender participating therein, twelve months) thereafter, as the Borrowers may elect; provided that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing. For the avoidance of doubt, no Interest Period shall extend beyond the Maturity Date.

"Interpolated Screen Rate" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate per annum which results from interpolating on a linear basis between (a) the Screen Rate for the longest maturity for which a Screen Rate is available that is shorter than such Interest Period and (b) the Screen Rate for the shortest maturity for which a Screen Rate is available that is longer than such Interest Period, in each case at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Investment" means, with respect to a specified Person, any direct or indirect acquisition or investment by such Person in any other Person, in the form of (a) the purchase or other acquisition (including without limitation by merger or otherwise) of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of Indebtedness of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person  or (c) the purchase or other acquisition (in one transaction or a series of transactions, including without limitation by merger or otherwise) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, division, product or line of business of such Person.  For purposes of covenant compliance, the amount of any Investment at any time shall be the amount actually invested (measured at the time made), without adjustment for subsequent changes in the value of such Investment, net of any cash return representing a return of capital with respect to such Investment.

"IRS" means the United States Internal Revenue Service.

"<u>Lenders</u>" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that shall have ceased to be a party hereto pursuant to an Assignment and Assumption.

"<u>LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, a rate *per annum* equal to the London interbank offered rate as administered by the ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for deposits in dollars (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period as displayed on  the applicable Bloomberg screen page that displays such rate  (or, in the event such rate does not appear the applicable Bloomberg screen page, on the appropriate page of such other information service that publishes such rate as shall be selected by the Administrative Agent from time to time in its reasonable discretion)  at 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period (the "<u>Screen Rate</u>").  If no Screen Rate shall be available for a particular Interest Period but Screen Rates shall be available for maturities both longer and shorter than such Interest Period, then the LIBO Rate for such Interest Period shall be the Interpolated Screen Rate. Notwithstanding the foregoing, if the LIBO Rate, determined as provided above in this definition, would be less than zero, the LIBO Rate shall for all purposes of this Agreement be zero.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, charge, security interest or other encumbrance in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"<u>Liquidity</u>" means, at any time, the sum of, without duplication, (a) Availability (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement as in effect on the Funding Date), (b) unrestricted cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries that would be reflected on a consolidated balance sheet of the Parent Borrower in accordance with GAAP on such date (other than the cash proceeds of any Indebtedness being incurred on such date) and (c) cash and cash equivalents of the Parent Borrower and its Restricted Subsidiaries (excluding, for the avoidance of doubt, Eligible Pledged Cash (as defined in the Pre-Petition ABL Credit Agreement as in effect on the date hereof or, to the extent applicable, the ABL Credit Agreement, as in effect on the Funding Date) to the extent duplicative) that are restricted in favor of the Administrative Agent or any Lender (or, the Pre-Petition ABL Agent or, to the extent applicable, the ABL Agent, for the benefit of the Administrative Agent pursuant to the Intercreditor Agreement) (which cash and cash equivalents may also secure other Indebtedness together with the Loan Document Obligations).

"<u>Loan Document Obligations</u>" means all unpaid principal of and accrued and unpaid interest on the Loans, all accrued and unpaid fees, premiums (including the Redemption Premium, if any) and all expenses, reimbursements, indemnities and other obligations of the Loan Parties to any Lender, the Administrative Agent, or any Indemnitee arising under the Loan Documents, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest, fees,

premiums (including the Redemption Premium, if any), costs, expenses and indemnities that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any bankruptcy or insolvency laws naming such Person as the debtor in such proceeding, regardless of whether such interest, fees, premiums (including the Redemption Premium, if any), costs, expenses and indemnities are allowed claims in such proceeding.

"<u>Loan Documents</u>" means this Agreement, the Commitment Letter, the Collateral Agreement, the Control Agreement with respect to the DIP Accounts, the other Collateral Documents, the Intercreditor Agreement, the Intercreditor Acknowledgment, the Administrative Agent Fee Letter, the Order and, except for purposes of Section 9.02, any promissory notes delivered pursuant to Section 2.07(e).

"<u>Loan Parties</u>" means the Borrowers and the Guarantors.

"<u>Loans</u>" means the loans made by the Lenders to the Borrowers pursuant to this Agreement.

"<u>Luxembourg IP Subsidiary</u>" means each of (i) AnnTaylor Loft GP Lux S.à.rl. and (ii) AnnTaylor Loft Borrower Lux SCS.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries, taken as a whole, excluding in any event (i) the effect of filing the Cases, the events and conditions leading up to and customarily resulting from the commencement and continuation of the Cases, the effects thereof and any action required to be taken under the Loan Documents or the Order and the Cases themselves, (ii) any matters publicly disclosed prior to the filing of the Cases and (iii) any matters or transactions disclosed, contemplated or required to be taken in any "first day" or "second day" orders, motions related thereto or in any supporting declarations thereof, (b) the ability of the Loan Parties to perform any of their monetary obligations under the Loan Documents to which it is a party or (c) the rights of or benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided that in determining whether a "material adverse effect" has occurred or exists under clause (a) hereof, the impacts of COVID-19 on the results of operations, assets, business or financial condition of the Parent Borrower and the Restricted Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate).

"<u>Material Indebtedness</u>" means Indebtedness (other than the Loans and Guarantees under the Loan Documents), or obligations in respect of one or more Swap Agreements, of any one or more of the Parent Borrower and the Subsidiaries in an aggregate principal amount exceeding $10,000,000.  For purposes of determining Material Indebtedness, the "principal amount" of the obligations of the Parent Borrower or any Restricted Subsidiary in respect of any Swap Agreement at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that the Parent Borrower or such Restricted Subsidiary would be required to pay if such Swap Agreement were terminated at such time.

LA\4104335.13

"Maturity Date" means the date that is the earliest of (i) six months after the Effective Date, (ii) the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of an Acceptable Plan, (iii) the date the Court converts any of the Cases to a Chapter 7 case, (iv) the date the Court dismisses any of the Cases, (v) the date on which the Loan Parties consummate a sale of all or substantially all of the assets of the Loan Parties pursuant to section 363 of the Bankruptcy Code or otherwise, and (vi) such earlier date on which the Loans shall become due and payable by acceleration or otherwise in accordance with the terms of this Agreement and the other Loan Documents.

"Maximum Rate" has the meaning set forth in Section 9.15.

"MNPI" means material information concerning the Parent Borrower, any Subsidiary or any Affiliate of any of the foregoing or their securities that has not been disseminated in a manner making it available to investors generally, within the meaning of Regulation FD under the Securities Act and the Exchange Act.  For purposes of this definition, "material information" means information concerning the Parent Borrower or its Subsidiaries, or any of their respective securities, that would reasonably be expected to be material for purposes of the United States federal and state securities laws.

"Moody's" means Moody's Investors Service, Inc., and any successor to its rating agency business.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA that is or was, during the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the past six years has made or been obligated to make contributions, in each case, if a liability to a Loan Party remains outstanding.

"Net Proceeds" means, with respect to any event, (a) the cash (which term, for purposes of this definition, shall include Cash Equivalents) proceeds (including, in the case of any casualty, condemnation or similar proceeding, insurance, condemnation or similar proceeds) received in respect of such event, including any cash received in respect of any noncash proceeds, but only as and when received, net of (b) the sum, without duplication, of (i) all actual fees and out-of-pocket expenses paid in connection with such event by the Parent Borrower and the Restricted Subsidiaries to Persons that are not Affiliates of the Parent Borrower or any Restricted Subsidiary, (ii) in the case of a sale, transfer or other disposition (including pursuant to a Sale/Leaseback Transaction or a casualty or a condemnation or similar proceeding) of an asset, the amount of all payments required to be made by the Parent Borrower and the Restricted Subsidiaries as a result of such event to repay Indebtedness (other than Loans and Indebtedness under the ABL Credit Agreement) secured by such asset on a basis prior to the Liens, if any, on such assets securing the Loan Document Obligations and (iii) the amount of all taxes paid (or reasonably estimated to be payable) by the Parent Borrower and the Restricted Subsidiaries, and the amount of any reserves established by the Parent Borrower and the Restricted Subsidiaries in accordance with GAAP to fund purchase price adjustment, indemnification and similar contingent liabilities (other than any earnout obligations) reasonably estimated to be payable, in each case during the year that such event occurred or the next succeeding year and that are directly attributable to the occurrence of such event (as determined reasonably and in good faith

23

by the chief financial officer of the Parent Borrower).  For purposes of this definition, in the event any contingent liability reserve established with respect to any event as described in clause (b)(iii) above shall be reduced, the amount of such reduction shall, except to the extent such reduction is made as a result of a payment having been made in respect of the contingent liabilities with respect to which such reserve has been established, be deemed to be receipt, on the date of such reduction, of cash proceeds in respect of such event.

"New Money Commitment" means as to each Lender, its obligation to make a New Money Loan to Borrowers hereunder, expressed as an amount representing the maximum principal amount of New Money Loans to be made by such Lender under this Agreement, as such commitment may be reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption substantially in the form of Exhibit A hereto.  The amount of each Lender's New Money Commitment is set forth on Schedule 2.01 under the caption "New Money Loans" or, otherwise, in the Assignment and Assumption pursuant to which such Lender shall have assumed its New Money Commitment, as the case may be.  The aggregate amount of the New Money Commitments on the date hereof is $150 million.

"New Money Loans" means the loans made pursuant to Section 2.01(a).

"OFAC" means the United States Treasury Department Office of Foreign Assets Control.

"Order" means the order of the Court entered in the Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be satisfactory in form and substance to the Required Lenders, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied with no further appeal and the time for filing such appeal has passed (unless Administrative Agent waives such requirement), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to the Required Lenders, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Other Connection Taxes"  means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under , engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, excluding any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17).

24

"Parent Borrower" has the meaning set forth in the introductory paragraph hereto.

"Participant Register" has the meaning set forth in Section 9.04(c)(ii).

"Participants" has the meaning set forth in Section 9.04(c)(i).

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub.L. No. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Permitted Encumbrances" means:

(a)     Liens imposed by law for Taxes that are not yet delinquent or are being contested in compliance with Section 5.06;

(b)     carriers', warehousemen's, mechanics', materialmen's, repairmen's and other like Liens imposed by law (other than any Lien imposed pursuant to Section 430(k) of the Code or Section 303(k) of ERISA or a violation of Section 436 of the Code), arising in the ordinary course of business and securing obligations that are not overdue by more than 30 days or are being contested in compliance with Section 5.06;

(c)     pledges and deposits made (i) in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations and (ii) in respect of letters of credit, bank guarantees or similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations of the type set forth in clause (i) above or reimbursement or indemnification obligations to insurance carriers providing property, casualty or liability insurance to the Parent Borrower and its Restricted Subsidiaries;

(d)     pledges and deposits made to secure the performance of bids, trade contracts (other than Indebtedness for borrowed money), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(e)     judgment liens in respect of judgments that do not constitute an Event of Default under clause (k) of Article VII;

(f)     easements, zoning restrictions, rights-of-way, site plan agreements, development agreements, operating agreements, cross-easement agreements, reciprocal easement agreements and other encumbrances and exceptions to title on real property that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of the Parent Borrower or any Restricted Subsidiary or the ordinary operation of such real property;

25

(g)      customary rights of setoff upon deposits of cash in favor of banks and other depository institutions and Liens of a collecting bank arising under the UCC in respect of payment items in the course of collection;

(h)      Liens arising from precautionary UCC financing statement filings (or similar filings under applicable law) regarding operating leases or consignments, in each case arising in the ordinary course of business;

(i)      Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor, or a licensee, lessee or sublicensee or sublessee, in the property subject to any lease (other than Capital Lease Obligations), license or sublicense or concession agreement permitted by this Agreement;

(j)      Liens arising in the ordinary course of business in favor of custom and forwarding agents and similar Persons in respect of imported goods and merchandise in the custody of such Persons;

(k)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)      Liens or rights of setoff against credit balances of the Parent Borrower or any Restricted Subsidiary with credit card issuers or credit card processors to secure obligations of the Parent Borrower or such Restricted Subsidiary, as the case may be, to any such credit card issuer or credit card processor incurred in the ordinary course of business as a result of fees and chargebacks;

(m)      Liens on Equity Interests of any joint venture (i) securing obligations of such joint venture or (ii) pursuant to the relevant joint venture agreement, in each case in existence on or prior to the Petition Date; and

(n)      other Liens that are contractual rights of set-off;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness, other than Liens referred to in clause (c) above securing letters of credit, bank guarantees or similar instruments.

"Permitted Variance" means, any variance that does not violate Section 6.12(b).

"Person" or "person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan," as defined in Section 3(2) of ERISA (other than a Multiemployer Plan or Foreign Plan), (a) that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and (b) (i) in respect of which any Loan Party or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA

26

and/or (ii) that is or was, within the past six years, maintained or sponsored by any Loan Party or ERISA Affiliate or to which any Loan Party or ERISA Affiliate makes or is obligated to make contributions, or during the past six years, has made or been obligated to make contributions, in each case of (ii) if a liability to a Loan Party remains outstanding.

"Plan of Reorganization" means a plan of reorganization with respect to the Loan Parties and their Subsidiaries pursuant to the Cases.

"Platform" has the meaning set forth in Section 9.01(d).

"Pre-Petition ABL Agent" means JPMorgan Chase Bank, N.A., as administrative agent under the Pre-Petition ABL Credit Agreement.

"Pre-Petition ABL Credit Agreement" means the Amended and Restated ABL Credit Agreement, dated as of August 21, 2015, among the Parent Borrower, the borrowing subsidiaries party thereto, the other loan parties party thereto, the lenders party thereto and the Pre-Petition ABL Agent, as amended, restated, supplemented, modified, renewed, refunded, replaced (whether at maturity or thereafter) or refinanced from time to time in one or more agreements (in each case with the same or new agents, lenders or institutional investors), including any agreement adding or changing the borrower or any guarantor or extending the maturity thereof or otherwise restructuring all or any portion of the Indebtedness thereunder or increasing the amount loaned or issued thereunder or altering the maturity thereof, in each case, through the Petition Date.

"Pre-Petition Agent" means GS Bank, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"Pre-Petition Credit Agreement" has the meaning assigned to such term in the Recitals.

"Pre-Petition Indebtedness" means the Indebtedness of the Loan Parties existing prior to the Petition Date and set forth on Schedule 6.01.

"Pre-Petition Lenders" means the lenders under the Pre-Petition Credit Agreement.

"Pre-Petition Lender Obligations" means all "Loan Document Obligations" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loan Documents" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"Pre-Petition Loans" means Pre-Petition Lender Obligations in respect of principal of "Loans" under, and as defined in, the Pre-Petition Credit Agreement and interest, expenses, fees, premium and other sums payable in respect thereof under the Pre-Petition Loan Documents.

"Prepayment Event" means:

27

(a)      any Asset Sale of the type described in clauses (j) and (k) of Section 6.05 unless such disposition results in aggregate Net Proceeds not exceeding $500,000 for any individual transactions or series of related transactions;

(b)      any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any asset of the Parent Borrower or any Restricted Subsidiary resulting in aggregate Net Proceeds exceeding $500,000; or

(c)      the incurrence by the Parent Borrower or any Restricted Subsidiary of any Indebtedness, other than any Indebtedness permitted to be incurred by Section 6.01.

"Prime Rate" means the rate of interest per annum published by The Wall Street Journal, Money Rates Section as the "Prime Rate", as in effect from time to time.  Each change in the Prime Rate shall be effective from and including the date such change is published. If the Wall Street Journal ceases publication of such rate, in such other nationally recognized financial publication of general circulation as the Administrative Agent may designate based on the Administrative Agent's reasonable determination that the rate so published is comparable to the "Prime" rate published in the Wall Street Journal.

"Private Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that are not Public Side Lender Representatives.

 "Public Side Lender Representatives" means, with respect to any Lender, representatives of such Lender that do not wish to receive MNPI.

"Recipient" means the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder or under any other Loan Document.

"Redemption Premium" has the meaning set forth in Section 2.09(e).

 "Register" has the meaning set forth in Section 9.04(b)(v).

"Related Lender" means with respect to any Person, an Affiliate or any fund, account or investment vehicle that is controlled, managed, advised or sub-advised by such Person, an Affiliate or the same investment manager, advisor or sub-advisor as such Person or an Affiliate of such investment manager, advisor or sub-advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

"Release" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the Environment or within or upon any building, structure, facility or fixture.

LA\4104335.13

"Required Lenders" means, at any time, Lenders having aggregate Loans (or, prior to the borrowing hereunder on the date hereof, Commitments) representing more than 50.01% of the aggregate principal amount of the Loans (or, prior to the borrowing hereunder on the date hereof, the aggregate Commitments) at such time.

"Required Milestones" means the covenants set forth on Schedule 5.11.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in the Parent Borrower or any Restricted Subsidiary, or any payment or distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, exchange, conversion, cancellation or termination of any Equity Interests in the Parent Borrower or any Restricted Subsidiary.

"Restricted Subsidiary" means any Subsidiary of the Parent Borrower.

"Restructuring Support Agreement" or "RSA" means that certain Restructuring Support Agreement, dated as of July 23, 2020, executed and delivered by the Loan Parties and the other parties thereto, as such agreement may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Roll-up Loans" are the loans made pursuant to Section 2.01(b).

"Roll-up Loans Commitment" means, as to each Lender, its obligation to make a Loan to the Borrower pursuant to Section 2.01(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 2.01 (as updated from time to time within [ ] days of the Effective Date) under the caption "Roll-up Loans Commitment", as applicable. The aggregate amount of the Roll-up Loans Commitment on the date hereof is $161.8 million, which amount shall (i) comprise a roll-up and refinancing of the Prepetition Loans approved pursuant to the Order and (ii) be deemed funded by the Lenders pursuant to Section 2.01.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Sale/Leaseback Transaction" means an arrangement relating to property owned by the Parent Borrower or any Restricted Subsidiary whereby the Parent Borrower or such Restricted Subsidiary sells or transfers such property to any Person and the Parent Borrower or any Restricted Subsidiary leases such property, or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred, from such Person or its Affiliates.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions.

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of Designated Persons maintained by OFAC, the U.S. Department of State, or by the United Nations Security Council, the European Union or any EU member state, (b) any Person

29

operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any Person or Persons described in the preceding clauses (a) and (b).

"Sanctions" means economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union or Her Majesty's Treasury of the United Kingdom.

"Screen Rate" has the meaning assigned to it in the definition of "LIBO Rate."

"SEC" means the United States Securities and Exchange Commission.

"Secured Parties" means (a) the Administrative Agent, (b) [reserved], (c) the Lenders, (d) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (e) the permitted successors and assigns of the foregoing.

"Securities Act" means the United States Securities Act of 1933.

"Specified Dispositions" means (i) the closure, sale, transfer or disposition of the Loan Parties' or their Subsidiaries' stores, leases, warehouses, distribution centers and other real property (and all fixtures and equipment in each case in connection therewith), (ii) bulk sales or other dispositions of inventory or equipment of the Loan Parties' or their Subsidiaries' and (iii) termination of leases, licenses, subleases or sublicenses, in each case, in connection therewith; provided that such Specified Dispositions are identified in writing by the Parent Borrower to the Required Lenders and agreed to by the Required Lenders, in their reasonable discretion on or prior to the Effective Date and as may be updated, supplemented or modified from time to time, as agreed to by the Required Lenders in their reasonable discretion.

"Specified Indebtedness" means any Subordinated Indebtedness and any unsecured Indebtedness or any secured Indebtedness that is not secured on a pari passu basis with the Loan Document Obligations; provided that, Indebtedness under the ABL Credit Agreement, to the extent applicable, shall constitute Specified Indebtedness solely for purposes of Section 6.08(c).

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves), expressed as a decimal, established by the Board of Governors to which the Administrative Agent is subject for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board of Governors).  Such reserve percentages shall include those imposed pursuant to such Regulation D. Eurodollar Loans shall be deemed to constitute eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Subordinated Indebtedness" of a Person means any Indebtedness of such Person which is subordinated in right of payment to the Loan Document Obligations.

LA\4104335.13

"subsidiary" means, with respect to any Person (the "parent") at any date, (a) any Person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date and (b) any other Person (i) of which Equity Interests representing more than 50% of the equity value or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held, or (ii) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any direct or indirect subsidiary of the Parent Borrower (including, for the avoidance of doubt, the Subsidiary Borrower).

"Subsidiary Borrower" has the meaning set forth in the introductory paragraph hereto.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of the Parent Borrower or any Subsidiary shall be a Swap Agreement.

"Synthetic Lease" means, as to any Person, any lease (including leases that may be terminated by the lessee at any time) of any property (whether real, personal or mixed) (a) that is accounted for as an operating lease under GAAP and (b) in respect of which the lessee retains or obtains ownership of the property so leased for US federal income tax purposes, other than any such lease under which such Person is the lessor.

"Synthetic Lease Obligations" means, as to any Person, an amount equal to the sum, without duplication, of (a) the obligations of such Person to pay rent or other amounts under any Synthetic Lease which are attributable to principal and (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term.  For purposes of Section 6.02, a Synthetic Lease Obligation shall be deemed to be secured by a Lien on the property being leased and such property shall be deemed to be owned by the lessee.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Credit Facility" has the meaning set forth in the Recitals.

"Term Lender" means a Lender with a Commitment or an outstanding Term Loan.

"Term Loan" means a Loan made pursuant to Section 2.01.

"Term Priority Collateral" has the meaning set forth in the Intercreditor Agreement.

"Transactions" means (a) the execution, delivery and performance by the Loan Parties of this Agreement, the borrowing of the Term Loans and the use of the proceeds thereof, (b) to the extent applicable, the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement, (c) the creation and perfection of the security interests provided for in the Collateral Documents, and (d) the payment of all fees, commissions, costs and expenses in connection with the foregoing.

"Type" when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBO Rate or the Alternate Base Rate.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the perfection of security interests created by the Collateral Documents.

"U.S. Person" means a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning set forth in Section 2.15(e)(ii)(B)(3).

"U.S. Trustee" means the United States Trustee applicable in the Cases.

"Variance Report" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Report Date" shall have the meaning assigned to such term in Section 5.01(g).

"Variance Testing Period" shall mean the four-week calendar period up to and through the Saturday of the week most recently ended prior to the applicable Variance Report Date (provided that, the first Variance Testing Period shall include the entire period from the Petition Date through the Saturday of the week most recently ended prior to the applicable Variance Testing Period).

"wholly-owned" when used in reference to a subsidiary of any Person, means that all the Equity Interests in such subsidiary (other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) are owned, beneficially and of record, by such Person, another wholly-owned subsidiary of such Person or any combination thereof.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02.   Classification of Loans and Borrowings.  For purposes of this Agreement, Loans and Borrowings may be classified and referred to by Type.

SECTION 1.03.   Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all real and personal, tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  The word "law" shall be construed as referring to all statutes, rules, regulations, codes and other laws (including official rulings and interpretations thereunder having the force of law or with which affected Persons customarily comply), and all judgments, orders, writs and decrees, of all Governmental Authorities.  Except as otherwise provided herein and unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document (including this Agreement and the other Loan Documents) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any definition of or reference to any statute, rule or regulation shall be construed as referring thereto as from time to time amended, supplemented or otherwise modified (including by succession of comparable successor laws), and all references to any statute shall be construed as referring to all rules, regulations, rulings and official interpretations promulgated or issued thereunder, (c) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (d) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof and (e) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement.

SECTION 1.04.   Accounting Terms; GAAP.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature used herein shall be construed in accordance with GAAP as in effect from time to time; provided that (a) if the Parent Borrower notifies the Administrative Agent in writing (including via e-mail) that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrowers that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith; provided that the Borrowers, on the one hand, and the Lenders, on the other hand, agree to negotiate in good faith with respect to any proposed amendment to eliminate or adjust for the effect of any such change in GAAP; and (b) notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed,

33

and all computations of amounts and ratios referred to herein shall be made, without giving effect to (i) any election under Statement of Financial Accounting Standards 159, The Fair Value Option for Financial Assets and Financial Liabilities, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of the Parent Borrower or any Restricted Subsidiary at "fair value," as defined therein, and (ii) any change in GAAP occurring after July 24, 2015 as a result of the adoption of any proposals set forth in the Proposed Accounting Standards Update, Leases (Topic 840), issued by the Financial Accounting Standards Board on August 17, 2010, or any other proposals issued by the Financial Accounting Standards Board in connection therewith, in each case if such change would require treating any lease (or similar arrangement conveying the right to use) as a capital lease where such lease (or similar arrangement) was not required to be so treated under GAAP as in effect on July 24, 2015.

SECTION 1.05.    Classification of Actions.  For purposes of determining compliance at any time with the covenants set forth in Section 6.01 and Section 6.02 (or, in each case, any defined terms used therein), in the event that the subject transaction meets the criteria of more than one of the categories of transactions permitted pursuant to the Sections (or related defined terms) in Section 6.01 and Section 6.02, the Borrowers may, in their sole discretion, classify the applicable transaction (or any portion thereof) under such Section (or defined term); it being understood that (i) the Borrowers may divide and include such transaction under one or more of the clauses of such Section (or any relevant portion thereof or of the applicable related defined term) that permit such transaction, but will not be permitted to later reclassify such transaction and (ii) notwithstanding anything in this Section 1.05 to the contrary for purposes of this Agreement, (x) Indebtedness incurred under the Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement shall only be permitted to be incurred or be outstanding under Section 6.01(j) and (y) Indebtedness uncured under the Loan Documents or the Pre-Petition Loan Documents shall only be permitted to be incurred or be outstanding under Section 6.01(a).

SECTION 1.06.    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

The Credits

SECTION 2.01.    Commitments.

(a)    Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make, on the Funding Date, Loans to the Borrowers in an aggregate amount not to exceed such Lender's New Money Commitment.  The New Money Commitments in respect of the New Money Loans shall terminate automatically immediately

after the making of the New Money Loans on the Funding Date.  Proceeds of the New Money Loans shall be deposited in the DIP Funding Account and used solely as permitted herein.

(b)      Subject to the terms and conditions set forth herein and in the Order, each Lender severally and not jointly agrees to make or be deemed to have made on the Effective Date, Loans to the Borrower in the aggregate amount of the Roll-up Loans Commitment.  The Administrative Agent, the Lenders and the Loan Parties each acknowledges and agrees that the Roll-up Loans Commitment shall expire upon the deemed funding of the Roll-up Loans on the Effective Date.[5]

SECTION 2.02.    Loans and Borrowings.

(a)      Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments.

(b)      Subject to Section 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans as the Borrowers may request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrowers to repay such Loan in accordance with the terms of this Agreement.

(c)      At the commencement of each Interest Period for any Eurodollar Borrowing, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $1,000,000 and not less than $5,000,000; provided that a Eurodollar Borrowing that results from a continuation of an outstanding Eurodollar Borrowing may be in an aggregate amount that is equal to such outstanding Borrowing.  At the time that each ABR Borrowing is made, such Borrowing shall be in an aggregate principal amount that is an integral multiple of $500,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; provided that there shall not at any time be more than a total of six (or such greater number as may be agreed to by the Administrative Agent) Eurodollar Borrowings outstanding.

(d)      Notwithstanding any other provision of this Agreement, the Borrowers shall not be entitled to request, or to elect to convert to or continue, any Eurodollar Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date applicable thereto.

SECTION 2.03.    Requests for Borrowings.  To request a Borrowing, the Borrowers deliver to the Administrative Agent a Borrowing Request  (delivered by e-mail, hand or facsimile) (a) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing (or, such shorter period of time as may be agreed to by the Administrative Agent) or (b) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing.  Each written Borrowing Request shall specify the following information in compliance with Section 2.02:

---

[5] Roll-Up Loan funding mechanics to be confirmed.

(i)        the aggregate amount of such Borrowing;

(ii)        the date of such Borrowing, which shall be a Business Day;

(iii)        whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

(iv)        in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period"; and

(v)        the location,  number of the account and any other wiring information required by the Administrative Agent of the Borrowers to which funds are to be disbursed.

If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

SECTION 2.04.    Funding of Borrowings.

(a)        Each Lender shall make each Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders.  Upon receipt of all requested funds, the Administrative Agent will make such Loans available to the Borrowers by promptly remitting the amounts so received, in like funds, by wire transfer to the DIP Funding Account.

(b)        Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, but shall have no obligation to, in reliance on such assumption, make available to the Borrowers a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of a payment to be made by the Borrowers, the interest rate applicable to ABR Loans.  If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period.  If such Lender pays such amount

to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

SECTION 2.05.    Interest Elections.

(a)    Each Borrowing initially shall be of the Type and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in the applicable Borrowing Request or as otherwise provided in Section 2.03.  Thereafter, the Borrowers may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrowers may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    To make an election pursuant to this Section, the Borrowers shall notify the Administrative Agent of such election in writing by delivering (by e-mail, hand delivery or facsimile) an Interest Election Request to the Administrative Agent by the time that a Borrowing Request would be required under Section 2.03 if the Borrowers were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.  Each such Interest Election Request shall be irrevocable.  Each written Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)    the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)    the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)    whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)    if the resulting Borrowing is to be a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period."

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period, then the Borrowers shall be deemed to have selected an Interest Period of one month's duration.

(c)    Promptly following receipt of an Interest Election Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

37

LA\4104335.13

(d)      If the Borrowers fail to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be continued as a Eurodollar Borrowing for an additional Interest Period of one month. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing with respect to any Borrower, or if any other Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, has notified the Borrowers of the election to give effect to this sentence on account of such Event of Default, then, so long as such Event of Default is continuing, (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

SECTION 2.06.    Termination of Commitments.

(a)      Unless previously terminated, the Commitments of each Lender shall automatically terminate and permanently reduce to $0 upon the making of such Lender's Loans pursuant to Section 2.01(a) and (b), as applicable.

SECTION 2.07.    Repayment of Loans; Evidence of Debt.

(a)      The Borrowers hereby unconditionally, jointly and severally, promise to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in Section 2.08.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)      The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)      The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any conflict between the accounts maintained pursuant to paragraph (b) or (c) of this Section, the accounts maintained by the Administrative Agent shall, absent manifest error, control.

(e)      Any Lender may request that Loans made by it be evidenced by a promissory note.  In such event, the Borrowers shall prepare, execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its

registered assigns) substantially in the form of Exhibit K attached hereto.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 9.04) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

SECTION 2.08.    Amortization of Term Loans.

(a)    [Reserved]

(b)    To the extent not previously paid, all Term Loans shall be due and payable on the Maturity Date.

(c)    [Reserved]

(d)    Prior to any repayment of any Borrowings under this Section, the Borrowers shall notify the Administrative Agent in writing of such selection not later than 12:00 p.m., New York City time, three Business Days before the scheduled date of such repayment.  Administrative Agent shall promptly notify each Lender of such repayment notification. Each repayment of a Borrowing shall be applied ratably to the Loans included in the repaid Borrowing.  Repayments of Borrowings shall be accompanied by accrued interest (and premium, if any) on the amounts repaid.

SECTION 2.09.    Prepayment of Loans.

(a)    Subject to the Order and the Intercreditor Agreement, in the event that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries, the Borrowers shall, within three Business Days after such Net Proceeds are received, prepay Borrowings in an amount equal to 100% of such Net Proceeds subject to the requirements of Section 2.09(e), with application to the Loan Document Obligations set forth in Section 2.09(d) below; provided that any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Asset Sale shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

(b)    Subject to the Order and the Intercreditor Agreement, in the event and on each occasion that any Net Proceeds are received by or on behalf of the Parent Borrower or any Restricted Subsidiary in respect of any Prepayment Event (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), the Borrowers shall, on the day such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event," within three Business Days after such Net Proceeds are received), be deposited into the Asset Sale Escrow Account and held in the Asset Sale Escrow Account in accordance with clause (c) below; provided that in the case of a Prepayment Event described in clauses (a) or (b) of the definition thereof, any Net Proceeds in respect of ABL Priority Collateral received by the Borrowers or any Restricted Subsidiary as a result of such Prepayment Event shall be applied in accordance with the Order and the Intercreditor Agreement, as applicable.

39

(c)      Net Proceeds received in connection with any Prepayment Event described in clause (a) or (b) of the definition of "Prepayment Event" (other than an Asset Sale of all or substantially all of the assets of the Company and its Restricted Subsidiaries), and solely to the extent that such Net Proceeds in respect of the applicable Asset Sale constitute Term Priority Collateral, shall be deposited into the Asset Sale Escrow Account.  Notwithstanding anything to the contrary herein, Net Proceeds of any Asset Sale held in the Asset Sale Escrow Account may be used solely, (i) prior to the occurrence of the Conversion Date, to prepay the Loan Document Obligations (including, for the avoidance of doubt, the Redemption Premium) in full in cash (including, for the avoidance of doubt, on the Maturity Date) and (ii) upon the occurrence of the Conversion Date, as directed by the Borrowers.

(d)      Any optional or mandatory prepayment of Borrowings under this Section, shall be applied to reduce the principal amount of the Term Loans to be repaid on the Maturity Date. Notwithstanding the foregoing, any Lender may elect, by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, two Business Days (or such shorter period as may be established by the Administrative Agent) prior to the required prepayment date, to decline all or any portion of any prepayment of its Loans pursuant to this Section (other than an optional prepayment pursuant to paragraph (a) of this Section or a prepayment pursuant to clause (c) of the definition of "Prepayment Event," which may not be declined), in which case the aggregate amount of the payment that would have been applied to prepay Loans but was so declined shall *first*, be offered to Lenders who did not decline its pro rata share of the prepayment who may elect by written notice to the Administrative Agent by not later than 3:00 p.m. New York City time, one Business Day prior to the required prepayment date, to decline all or any portion of such offered prepayment amount and *second*, if declined by such Lenders, may be retained by the Borrowers and shall constitute "Declined Proceeds." For the avoidance of doubt, a Lender shall be deemed to have accepted any prepayment amount offered under this paragraph (d) is such Lender does not deliver a written notice to the Administrative Agent rejecting such prepayment amount in accordance with this paragraph (d).

(e)      In the event that all or any portion of the Loans are repaid or prepaid as a result of (i) [reserved], (ii) a mandatory prepayment pursuant to Section 2.09(a), solely as a result of an Asset Sale of all or substantially all of the assets of the Parent Borrower and its Restricted Subsidiaries (which, for the avoidance of doubt, includes the "Premium" and "Lane Bryant" business lines) or (iii) the repayment of the Loans on the Maturity Date, in each case prior to or without the occurrence of the Conversion Date, such repayments or prepayments will include a premium in an aggregate amount equal to 11.23% of the amount of the loans so prepaid or repaid (the foregoing premium, the "Redemption Premium").

(f)      The Borrowers shall notify the Administrative Agent in writing of any optional prepayment and, to the extent practicable, any mandatory prepayment hereunder by Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of such prepayment.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided that a notice of prepayment of Borrowings pursuant to paragraph (a) of this Section may state that such notice is conditioned upon the occurrence of one or more events specified therein, in which case such notice may be revoked by the Parent Borrower (by notice to the

Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of an advance of a Borrowing of the same Type as provided in Section 2.02, except as necessary to apply fully the required amount of a mandatory prepayment.  Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing.  Prepayments shall be accompanied by accrued interest as required by Section 2.11.

(g)     Notwithstanding any provisions of this Section 2.09 to the contrary, if any prepayment would otherwise be required to be made pursuant to clause (b) of this Section 2.09, solely as it relates to the portion of such Net Proceeds generated outside of the United States, so long as (x) the applicable local law will not permit repatriation of such Net Proceeds to the United States or (y) material adverse tax consequences to the Parent Borrower or any of its Subsidiaries would result from such repatriation, such Net Proceeds so affected shall not be required to be included in the mandatory prepayments referred to in such clause (b).

SECTION 2.10.    Closing Payments, Premiums and Fees.

(a)     The Borrowers agree, jointly and severally, to pay (or cause to be paid) on the Funding Date to each Lender, a closing payment in an amount equal to 2.50% of the aggregate principal amount of such Lender's New Money Loan, which such payment may be treated as original issue discount.  The premium referenced in this clause (a) shall be fully earned on the Effective Date and due and payable in full on the date set forth above.

(b)     The Borrowers agree, jointly and severally, to pay (i) to the Administrative Agent, for its own account, fees and expenses in the amounts and payable at the times and in the manner set forth  in the Administrative Agent Fee Letter, (ii) to the Backstop Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the Commitment Letter and (iii) to the Lenders, for their own account, premiums in amounts and payable at the times separately agreed upon in the RSA.

(c)     All amounts payable hereunder shall be paid on the dates due, in immediately available funds, to the Administrative Agent for distribution, in the case of closing payments, to the Term Lenders entitled thereto.  Amounts paid shall not be refundable under any circumstances (absent manifest error in the amount paid).

SECTION 2.11.    Interest.

(a)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing plus the Applicable Rate.

(c)     During the continuance of an Event of Default (i) under clauses (a) or (b) of Article VII, the Borrowers shall pay interest on such past due amounts (after giving effect to any

41

applicable grace period) owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws and (ii) under any other clause of Article VII, the Borrowers shall pay interest on all outstanding Loan Document Obligations owing by the Borrowers hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable laws. Accrued and unpaid interest on such amounts (including interest on past due interest) shall be due and payable upon written demand.

(d)      Accrued interest on each Loan (for ABR Loans, accrued through the last day of the prior calendar quarter) shall be payable in arrears on each Interest Payment Date for such Loan; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(e)      All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the Prime Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBO Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.12.    Alternate Rate of Interest.  (i) If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)      the Administrative Agent determines in good faith (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate for such Interest Period; or

(b)      the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Eurodollar Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrowers and the Lenders as promptly as practicable and, until the Administrative Agent notifies the Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist (which notification shall be made promptly after the Administrative Agent obtains knowledge of the cessation of such circumstances), (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Borrowing, and (ii) any Borrowing Request for a Eurodollar Borrowing shall be treated as a request for an ABR Borrowing.

LA\4104335.13

(ii) If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in paragraph (i)(a) of this Section have arisen (including because the Screen Rate is not available or published on a current basis) and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in paragraph (i)(a) of this Section have not arisen but the supervisor for the administrator of the Screen Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Screen Rate shall no longer be used for determining interest rates for loans, then the Administrative Agent and the Company shall endeavor to establish an alternate rate of interest to the Adjusted LIBO Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans denominated in dollars in the United States at such time, and the Administrative Agent and the Company shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; provided that if such alternate rate of interest shall be less than 1.00%, such rate shall be deemed to be 1.00% for all purposes of this Agreement.  Such amendment shall become effective with the prior consent of the Required Lenders and without any further action or consent of any other party to this Agreement.  Until an alternate rate of interest shall be determined in accordance with this paragraph (but, in the case of the circumstances described in clause (ii) above, only to the extent the Screen Rate for such Interest Period is not available or published at such time on a current basis), (x) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Term Loan Borrowing shall be ineffective, and such Borrowing shall be continued as an ABR Term Loan Borrowing, and (y) any Borrowing Request for a Eurodollar Term Loan Borrowing shall be treated as a request for an ABR Term Loan Borrowing.

SECTION 2.13.    Increased Costs.

(a)        If any Change in Law shall:

(i)        impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any such reserve requirement reflected in the Adjusted LIBO Rate);

(ii)        impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Eurodollar Loans made by such Lender; or

(iii)        subject any Recipient to any Taxes (other than any (A) Indemnified Taxes or (B) Excluded Taxes) on or with respect to its loans, loan principal, letters of credit, commitments or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

and the result of any of the foregoing shall be to increase the cost to such Lender or other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount)

43

then, from time to time upon request of such Lender or other Recipient, the Borrowers will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs or expenses incurred or reduction suffered.  Notwithstanding the foregoing, if the Parent Borrower reasonably believes that any such Taxes were not correctly or legally asserted, the applicable Recipient will use commercially reasonable efforts to cooperate with the Parent Borrower to obtain a refund of such Taxes so long as such efforts would not, in the sole determination of such Recipient exercised in good faith result in any non-reimbursable additional costs, expenses or risks or be otherwise disadvantageous to it.

(b)     If any Lender determines that any Change in Law regarding capital or liquidity requirements has had or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy or liquidity), then, from time to time upon request of such Lender, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company as well as a reasonably detailed description of the occurrence giving rise to such event, as the case may be, as specified in paragraph (a) or (b) of this Section delivered to the Borrowers shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 Business Days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrowers shall not be required to compensate a Lender pursuant to this Section for any increased costs or expenses incurred or reductions suffered more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or expenses or reductions and of such Lender's or intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or expenses or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(e)     Notwithstanding the above, a Lender will not demand compensation for any increased cost or reduction set forth in this Section 2.13 at any time if it is not the general practice and policy of such Lender to demand such compensation from similarly situated borrowers in similar circumstances under agreements containing provisions permitting such compensation to be claimed at such time.

SECTION 2.14.   Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan

44

other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Eurodollar Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.09(f) and is revoked in accordance therewith) or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrowers pursuant to Section 2.17, then, in any such event, the Borrowers shall compensate each Lender for the loss, cost and expense (excluding any loss of margin) attributable to such event.  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan (but not including the Applicable Rate applicable thereto), for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate such Lender would bid if it were to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market.  A certificate of any Lender delivered to the Borrowers and setting forth and explaining in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be conclusive absent manifest error.  The Borrowers shall pay such Lender the amount shown as due on any such certificate within 30 days after receipt thereof.

SECTION 2.15.   Taxes.

(a)   Payments Free of Taxes.  Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment by any applicable withholding agent, then the applicable withholding agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 2.15) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)   Payment of Other Taxes by the Loan Parties.  The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the, option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)   Evidence of Payment.  As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.15, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

45

(d)    <u>Indemnification by the Loan Parties</u>.  The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    <u>Status of Lenders</u>.  (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Borrowers or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.15(e)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)    Without limiting the generality of the foregoing:

(A)    any Lender that is a U.S. Person shall deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), whichever of the following is applicable (in such number of copies as shall be requested by the recipient):

(1)    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party(x) with respect to payments of interest under any Loan Document, executed

copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms) establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      executed copies of IRS Form W-8ECI (or any successor forms);

(3)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit H-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Parent Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and that no payments in connection with any Loan Document are effectively connected with the Foreign Lender's conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E (or any successor forms); or

(4)      to the extent a Foreign Lender is not the beneficial owner (for example, where the Foreign Lender is a partnership or a participating Lender), executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-2 or H-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit H-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrowers and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrowers or the Administrative Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be

47

prescribed by applicable law to permit the Borrowers or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrowers or the Administrative Agent as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA and to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered (including any specific documentation required in this Section 2.15(e)) expires or becomes obsolete or inaccurate in any respect, it shall deliver promptly to the Borrowers or Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Borrowers or the Administrative Agent) or promptly notify the Borrowers and the Administrative Agent in writing of its legal ineligibility to do so.

(f)      <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (f).

(g)      <u>Treatment of Certain Refunds</u>.  If any Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Indemnified Taxes as to which it has been indemnified pursuant to this Section 2.15 (including by the payment of additional amounts pursuant to this Section 2.15), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.15 with respect

48

to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.15(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.15(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This Section 2.15(g) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Loan Party or any other Person.

(h)     Defined Terms.  For the avoidance of doubt, for purposes of this Section 2.15, the term "applicable law" includes FATCA.

(i)     Issue Price.  The Borrowers and Administrative Agent shall cooperate in good faith to determine the "issue price" (within the meaning of Section 1273 of the Code) of (i) the Loans and (ii) if the Exit Conversion occurs, the loans under the Exit Facility Agreement and, in either case, shall not take any Tax reporting position inconsistent with such determination, except as otherwise required by a Change in Law or pursuant to the good faith resolution of a Tax contest

(j)     Survival.  Each party's obligations under this Section 2.15 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

SECTION 2.16.   Payments Generally; Pro Rata Treatment; Sharing of Set-offs.

(a)     The Borrowers shall make each payment required to be made by the Borrowers hereunder or under any other Loan Document on or prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, on or prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without any defense, setoff, recoupment or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to such account as may be specified by the Administrative Agent; provided that payments pursuant to Sections 2.13, 2.14, 2.15 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  If any payment hereunder or under any other Loan Document shall be due on a day that is not a Business Day, the date for payment shall be

49

extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments under each Loan Document shall be made in dollars.

(b)      If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest, premiums and fees then due hereunder, such funds shall be applied towards payment of the amounts then due hereunder ratably among the parties entitled thereto, in accordance with the amounts then due to such parties.

(c)      If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall notify the Administrative Agent of such fact and shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the amount of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amounts of principal of and accrued interest on their Loans; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (for the avoidance of doubt, as in effect from time to time) or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any Person in accordance with the terms of Section 9.04.  The Borrowers consent to the foregoing and agree, to the extent the Borrowers may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against any Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrowers in the amount of such participation.  For purposes of subclause (b)(i) of the definition of Excluded Taxes, a Lender that acquires a participation pursuant to this Section 2.16(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)      Unless the Administrative Agent shall have received written notice from the Borrowers prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, but shall not be obligated to, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender shall fail to make any payment required to be made by it hereunder to or for the account of the Administrative Agent, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), (i) apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations in respect of such payment until all such unsatisfied obligations have been discharged and/or (ii) hold any such amounts in a segregated account as cash collateral for, and apply any such amounts to, any future payment obligations of such Lender hereunder to or for the account of the Administrative Agent.

SECTION 2.17.   Mitigation Obligations; Replacement of Lenders.

(a)     If any Lender requests compensation under Section 2.13, or if the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or to any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby, jointly and severally, agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment and delegation.

(b)     If (i) any Lender requests compensation under Section 2.13, (ii) the Borrowers are required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or (iii) any Lender has failed to consent to a proposed amendment, waiver, discharge or termination that under Section 9.02 requires the consent of all the Lenders (or all the affected Lenders) and with respect to which the Required Lenders shall have granted their consent, then the Borrowers may, at the Borrowers' sole expense and effort, upon notice to such Lender and the Administrative Agent by the Borrowers, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights (other than its existing rights to payments pursuant to Section 2.13 or 2.15) and obligations under this Agreement and the other Loan Documents (or, in the case of any such assignment and delegation resulting from a failure to provide a consent, all its interests, rights and obligations under this Agreement and the other Loan Documents as a Lender) to an Eligible Assignee that shall assume such obligations (which may be another Lender, if a Lender accepts such assignment and delegation); provided that (A) the Borrowers shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b)(i), which consent shall not unreasonably be withheld, (B) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (in the case of such principal and accrued interest and fees) or the Borrowers (in the case of all other amounts), (C) in the case of any such assignment and delegation resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments and (D) in the case of any such assignment and delegation resulting from the failure to provide a consent, the

51

assignee shall have given such consent and, as a result of such assignment and delegation and any contemporaneous assignments and delegations and consents, the applicable amendment, waiver, discharge or termination can be effected.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver or consent by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation have ceased to apply.  Each party hereto agrees that an assignment and delegation required pursuant to this paragraph may be effected pursuant to an Assignment and Assumption executed by the Borrowers, the Administrative Agent and the assignee and that the Lender required to make such assignment and delegation need not be a party thereto.

SECTION 2.18.    [Reserved].

SECTION 2.19.    [Reserved].

SECTION 2.20.    Joint and Several Liability of the Borrowers.  The Loan Document Obligations of the Borrowers shall be joint and several in nature.  Each Borrower hereby irrevocably and unconditionally agrees that it is jointly and severally liable for all Loan Document Obligations of the Borrowers hereunder and the other Loan Documents, whether now or hereafter existing or due or to become due.  The Loan Document Obligations of the Borrowers under the Loan Documents may be enforced by the Administrative Agent and the Lenders against any Borrower or all Borrowers in any manner or order selected by the Administrative Agent or the Required Lenders in their sole discretion.  Without limiting the foregoing provisions of this Section 2.20, each Borrower acknowledges and agrees that:

(a)      its obligations under this Agreement shall remain enforceable against it even though such obligations may be unenforceable or not allowable against any Borrower during the existence of an insolvency proceeding against any Borrower or otherwise;

(b)      its obligations under this Agreement are independent of the obligations of any other Borrower, and a separate action or actions may be brought and prosecuted against it in respect of such obligations irrespective of whether any action is brought against any other Borrower or any other Borrower is joined in any such action or actions;

(c)      it hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to, any of all of the following: (i) any lack of validity or enforceability of this Agreement or any agreement or instrument relating thereto in respect of any other Borrower; (ii) any change in the time, manner or place of payment of, or in any other term of, all or any of the obligations of any other Borrower under or in respect of this Agreement, or any other amendment or waiver of or any consent to departure from this Agreement, in respect of any other Borrower; (iii) any change, restructuring or termination of the structure or existence of any other Borrower; (iv) the failure of any other person to execute or deliver any other agreement or the release or reduction of liability of any other person with respect to any obligations of the Borrowers under this Agreement; or (v) any other circumstance (including any statute of limitations but other than the Loan Document Obligations having been paid in full) or any existence or reliance on any representation by any other person that might otherwise constitute a defense available to, or a discharge or, any other Borrower;

(d)       its obligations under this Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any such obligations is rescinded or must otherwise be returned by any person upon the insolvency, bankruptcy or reorganization of any other Borrower, all as though such payment had not been made;

(e)       it hereby unconditionally and irrevocably waives any right to revoke its joint and several liability under the Loan Documents and acknowledges that such liability is continuing and applies to all obligations of the Borrowers under the Loan Documents, whether existing now or in the future;

(f)       in any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of the Subsidiary Borrower under this Agreement would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of the any other creditors, on account of the amount of its liability under this Agreement, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Borrower, any Loan Document or any other person be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 2.20(g) and any rights of subrogation, indemnity or reimbursement) that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceedings; and

(g)       it hereby agrees that to the extent that any Borrower shall have paid more than its proportionate share of any payment made hereunder, such Borrower shall be entitled to seek and receive contribution from and against any other Borrower hereunder which has not paid its proportionate share of such payment; provided that the provisions of this Section 2.20(g) shall in no respect limit the obligations and liabilities of any Borrower to the Administrative Agent and the Lenders, and each Borrower shall remain liable to the Administrative Agent and the Lenders for the full amount hereunder; provided, however each Borrower agrees that the foregoing rights of contribution as well as any right of subrogation, indemnity or reimbursement that it may acquire or that may arise against any other Borrower due to any payment or performance made under this Agreement shall in all respects be subordinated and junior in right of payment to, and shall not be exercised by such Borrower until, all Loan Document Obligations have been paid in full.

SECTION 2.21.   Super-Priority Nature of Obligations and Administrative Agent's Liens; Payment of Obligations.

(a)       The priority of Administrative Agent's Liens on the Collateral, claims and other interests shall be as set forth in the Order.

(b)       Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Court.

SECTION 2.22.    <u>Conversion to Exit Facility Agreement</u>.  The Loans shall be repaid in cash in accordance with the terms hereunder; *provided* that, notwithstanding the foregoing, upon the satisfaction or waiver by the Required Lenders of each of the conditions set forth in the "Conditions to Borrowings" section of the Exit Facility Term Sheet, automatically and without any further consent or action required by the Administrative Agent, any Lender, or any other Secured Party, the Loans shall be refinanced with loans under the Exit Facility Agreement in accordance with the Exit Facility Term Sheet (the "<u>Exit Conversion</u>").  Upon the Exit Conversion, (i) the Borrowers (or the entities assuming and/or acquiring directly or indirectly the operations and assets of the Borrowers in the Acceptable Plan, and each Guarantor and each entity assuming the operations and assets of each Guarantor that is a Debtor in the Acceptable Plan, to the extent such Person is required under the Exit Facility Term Sheet to continue to be a guarantor thereunder), shall assume all obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each Loan hereunder shall be continued as and converted to a Loan under the Exit Facility Agreement, (iii) each Lender hereunder shall be a Lender under the Exit Facility Agreement and (iv) this Agreement shall terminate and be superseded and replaced in its entirety by, and deemed amended and restated in its entirety in the form of, the Exit Facility Agreement (with such changes and insertions thereto, as are reasonably satisfactory to the Administrative Agent and the Borrower, incorporated as necessary to make any technical changes necessary to effectuate the intent of this Section 2.22 and to make any changes as required in the Exit Facility Term Sheet, including to increase the facility amount and give effect to any "last out" term loans).  Notwithstanding the foregoing, all obligations of the Borrowers and the Guarantors to the Administrative Agent and the Lenders under this Agreement and any other Loan Document which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect.  Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.22 and as are required to complete the schedules to the Exit Facility Agreement or other agreements contemplated thereby; *provided*, *however*, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the Exit Facility Agreement if and to the extent so provided in the Confirmation Order.  Each Lender hereto hereby agrees that, on the Conversion Date, (i) the Administrative Agent (in its capacity as Administrative Agent under the Exit Facility Agreement) may execute and deliver the Exit Facility Agreement (and any guaranty contemplated thereby) on its own behalf and on behalf of each such Lender and (ii) the Administrative Agent may execute and deliver the security documents contemplated by the Exit Facility Term Sheet. On the Conversion Date, the Administrative Agent shall transfer any amounts remaining in the DIP Accounts to an account designated by the Borrowers.

<div align="center">ARTICLE III</div>

<div align="center">Representations and Warranties</div>

Each Borrower represents and warrants to the Administrative Agent and the Lenders as follows:

<div align="center">54</div>

SECTION 3.01.   Organization; Powers.  The Parent Borrower and each Restricted Subsidiary is duly organized, validly existing and (to the extent the concept is applicable in such jurisdiction and, in the case of any Restricted Subsidiary, except where the failure to be so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect) in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to, subject to the entry of the Order, carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

SECTION 3.02.   Authorization; Enforceability; Benefit to Loan Parties.

(a)   Subject to entry of the Order, the Transactions, insofar as they are to be carried out by each Loan Party, are within such Loan Party's corporate or other organizational powers and have been duly authorized by all necessary corporate or other organizational and, if required, shareholder or other equityholder action.  Subject to entry of the Order, this Agreement has been duly executed and delivered by each Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)   Each Loan Party expects to derive benefit (and its board of directors or other governing body has determined that it may reasonably be expected to derive benefit), directly and indirectly, from (i) successful operations of each of the other Loan Parties and (ii) the credit extended by the Lenders to the Borrowers hereunder.  Each Loan Party has determined that, subject to entry of the Order, the execution, delivery, and performance of this Agreement and any other Loan Documents to be executed by such Loan Party is within its purpose, will be of direct and indirect benefit to such Loan Party, and is in its best interest.

SECTION 3.03.   Governmental Approvals; No Conflicts.  Except for the entry of, and pursuant to the terms of, the Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are (or will so be) in full force and effect, (b) will not violate any applicable law, including any order of any Governmental Authority, (c) will not violate the charter, by-laws or other organizational documents of the Parent Borrower or any Restricted Subsidiary, (d) will not violate or result in a default under any indenture or agreement (including the Pre-Petition ABL Credit Agreement, the ABL Credit Agreement to the extent applicable, the Pre-Petition Credit Agreement or other material instrument binding upon the Parent Borrower or any Restricted Subsidiary or any of their assets) (other than defaults arising solely as a result of the commencement of the Cases), or give rise to a right thereunder to require any payment to be made by the Parent Borrower or any Restricted Subsidiary, and (e) will not result in the creation or imposition of any Lien on any asset of the Parent Borrower or any Restricted Subsidiary, except Liens created pursuant to the Loan Documents or Liens created in connection with the Pre-Petition ABL Credit Agreement, the  ABL Credit Agreement to the extent applicable, or the Pre-Petition Credit Agreement, in the case of clauses (a) (as to the Transactions other than entry

into the Loan Documents), (b) and (d) above, except for a failure to obtain or make, violation or creation, as applicable, which individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.

SECTION 3.04.    Financial Condition; No Material Adverse Change.

(a)    The Borrowers have heretofore furnished to the Lenders (i) the audited consolidated balance sheets and related consolidated statements of operations, comprehensive income, equity and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for the fiscal year ended August 3, 2019, and (B) the unaudited consolidated balance sheets and related consolidated statements of operations, comprehensive income and cash flows of the Parent Borrower and its consolidated Subsidiaries as of and for each of the fiscal quarters and the portions of the fiscal year ended November 2, 2019 and February 1, 2020 .  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

(b)    Since the Petition Date, other than those customarily resulting from the commencement of the Cases and changes set forth in the Parent Borrower's business plan delivered to the Ad Hoc Committee prior to the Petition Date, there has been no event, development or circumstance that has had, or would reasonably be expected to have, a Material Adverse Effect.

SECTION 3.05.    Properties.

(a)    The Parent Borrower and each Restricted Subsidiary has good title to, or valid leasehold interests in, all its tangible property material to its business, except for defects in title that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect and Liens expressly permitted by Section 6.02.

(b)    (i) The Parent Borrower and each Restricted Subsidiary owns, is licensed to use, or otherwise has the right to use all trademarks, service marks, tradenames, trade dress, copyrights, patents, designs and other intellectual property material to its business, and (ii) the conduct of their respective businesses, including the use thereof by the Parent Borrower and the Restricted Subsidiaries in their respective businesses, does not infringe upon the rights of any other Person, except for any such infringements or any such failure to own, license or have the right to use that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(c)    Schedule 3.05 sets forth the address of each real property that is owned in fee by the Loan Parties as of the Effective Date.

SECTION 3.06.    Litigation and Environmental Matters.

(a)    Except for the Disclosed Matters and the Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Borrowers, threatened against the Parent Borrower or any Restricted

56

Subsidiary (i) as to which there is a reasonable likelihood of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents or the Transactions.

(b)    Except for the Disclosed Matters or matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, neither the Parent Borrower nor any Restricted Subsidiary (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability.

SECTION 3.07.    Compliance with Laws and Agreements.

(a)    The Parent Borrower and each Restricted Subsidiary is in compliance with all laws, including all orders of Governmental Authorities, applicable to it or its property and all indentures, agreements and other instruments binding upon it or its property, except any non-compliance arising solely as a result of the commencement of the Cases or where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect (it being agreed that this Section does not apply to any law which is specifically addressed in Section 3.06(b), 3.07(b), 3.08, 3.09, 3.10 or 3.14).  Except for any defaults or events of defaults arising solely as a result of the commencement of the Cases, any defaults or events of defaults arising under the Pre-Petition ABL Credit Agreement or the Pre-Petition Credit Agreement, no Event of Default has occurred and is continuing.

(b)    The Borrowers have implemented and maintain in effect policies and procedures designed to ensure compliance in all material respects by the Parent Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Parent Borrower, its Subsidiaries and their respective officers and employees and to the knowledge of the Borrowers, their respective directors and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects.  None of (a) the Parent Borrower, any Subsidiary or, to the knowledge of the Borrowers, any of their respective directors, officers or employees, or (b) to the knowledge of the Borrowers any agent of the Parent Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No Borrowing, use of proceeds or other transaction contemplated by this Agreement will violate Anti-Corruption Laws or applicable Sanctions.

SECTION 3.08.    Investment Company Status.  No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.09.    Taxes.  The Parent Borrower and each Subsidiary has (a) timely filed or caused to be filed all Tax returns and reports required to have been filed, except to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and (b) paid or caused to be paid all Taxes required to have been paid by it (including in its capacity as withholding agent), except (i) any Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which the

57

Parent Borrower or such Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP or (ii) to the extent that the failure to do so would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  There is no current or proposed tax assessment, deficiency or other claim against the Parent Borrower or any of the Subsidiaries that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10.    ERISA; Labor Matters.

(a)    Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA, and (iii) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable laws. On the Effective Date, the excess of the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of preparing the audited financial statements set forth in the Borrower's most recent Annual Report on Form 10-K), as of the date of the most recent financial statements reflecting such amounts, over the fair market value of the assets of such Plan, if any, could not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except as would not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) there are no strikes, lockouts, slowdowns or any other labor disputes against the Parent Borrower or any Restricted Subsidiary pending or, to the knowledge of the Borrowers, threatened, (ii) the hours worked by and payments made to employees of the Parent Borrower and the Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act of 1938 or any other applicable federal, state, local or foreign law dealing with such matters, (iii) all payments due from the Parent Borrower or any Restricted Subsidiary, or for which any claim may be made against the Parent Borrower or any Restricted Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of the Parent Borrower or such Restricted Subsidiary to the extent required by GAAP and (iv) the consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which the Parent Borrower or any Restricted Subsidiary is bound.

SECTION 3.11.    [Reserved].

SECTION 3.12.    Subsidiaries and Joint Ventures.  Schedule 3.12 sets forth, as of the Effective Date, the name, type of organization and jurisdiction of organization of, and the percentage of each class of Equity Interests owned by the Parent Borrower or any Subsidiary in, (a) each Subsidiary and (b) each joint venture in which the Parent Borrower or any Subsidiary owns any Equity Interests, and identifies each Designated Subsidiary.  All the issued and outstanding Equity Interests in each Subsidiary owned by any Loan Party have been (to the extent such concepts are relevant with respect to such Equity Interests) duly authorized and validly issued and are fully paid and non-assessable (except as such rights may arise under mandatory provisions of applicable statutory law that may not be waived and not as a result of

58

any rights contained in organizational documents).  Except as set forth in Schedule 3.12, as of the Effective Date, there is no existing option, warrant, call, right, commitment or other agreement to which the Parent Borrower or any Subsidiary is a party requiring, and there are no Equity Interests in any Subsidiary outstanding that upon exercise, conversion or exchange would require, the issuance by any Subsidiary of any additional Equity Interests or other securities exercisable for, convertible into, exchangeable for or evidencing the right to subscribe for or purchase any Equity Interests in any Subsidiary.

SECTION 3.13.    Insurance.  Schedule 3.13 sets forth a description of all insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries as of the Effective Date.  As of the Effective Date, all premiums due and payable in respect of such insurance have been paid.  The Borrowers believe that the insurance maintained by or on behalf of the Parent Borrower and the Restricted Subsidiaries is adequate.

SECTION 3.14.    Federal Reserve Regulations.  Neither the Parent Borrower nor any Restricted Subsidiary is principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock.  No part of the proceeds of the Loans will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, in any manner or for any purpose that would entail a violation of Regulations T, U or X of the Board of Governors.

SECTION 3.15.    [Reserved].

SECTION 3.16.    Collateral Matters.

(a)      Subject to the entry of the Order, the Collateral Agreement and the Order are effective to create in favor of the Administrative Agent (for the benefit of the Secured Parties) legal, valid, enforceable and perfected Liens on the Collateral described therein (with such priority as provided for therein).

(b)      Except for the entry of the Order, no filing or other action will be necessary to perfect such Liens.

(c)      The Order is (or will be, as applicable) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid, binding and enforceable perfected security interest in the Collateral (with such priority as provided for in the Order (including, without limitation, with respect to the Carve Out)) without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents except to the extent set forth in such orders.

SECTION 3.17.    Use of Proceeds.  Unless otherwise agreed by the Administrative Agent (acting at the direction of the Required Lenders), the proceeds of the New Money Loans will be deposited into the DIP Funding Account and used in accordance with the terms of the Approved Budget (subject to Permitted Variances) and the terms of the Order or any other order entered into by the Court that is consistent with the RSA, the Order and this Agreement, including, without limitation (i) to pay amounts due to Lenders and the Administrative Agent hereunder and the reasonable and documented professional fees and expenses (including legal,

financial advisor, appraisal and valuation-related fees and expenses) incurred by Lenders and the Administrative Agent, including those incurred in connection with the preparation, negotiation, documentation and court approval of the transactions contemplated hereby (including pursuant to such court approval), (ii) to make adequate protection payments, (iii) to fund the Carve Out, and (iv) to pay administration costs of the Cases and Claims or amounts approved by the Court in the "first day" and "second day" orders or as required under the Bankruptcy Code.  Notwithstanding anything to the contrary herein, the proceeds of the New Money Loans may be used to prepay or repay the ABL Credit Agreement (to the extent applicable) solely to extent provided for in the Approved Budget then in effect at the date of such prepayment or repayment, and in any event in an aggregate amount during the term of this Agreement not to exceed $50,000,000.

SECTION 3.18.   Approved Budget.  The Borrowers have heretofore furnished to the Administrative Agent the initial Approved Budget.  Each Approved Budget was prepared in good faith based upon assumptions the Borrowers believed to be reasonable assumptions on the date of delivery of such Approved Budget.

SECTION 3.19.   Chapter 11 Cases.

(a)     The Cases were commenced on the Petition Date in accordance with applicable laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Order and (ii) the hearing for the entry of the Order. Debtors shall give, on a timely basis as specified in the Order, all notices required to be given to all parties specified in the Order.

(b)     After the entry of the Order, and pursuant to and to the extent permitted in the Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve Out and (ii) the priorities set forth in the Order.

(c)     After the entry of the Order and pursuant to and to the extent provided in the Order, the Loan Document Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral subject, as to priority, only to (i) the Carve Out, (ii) the Liens pursuant to Section 6.02(i) with respect to Indebtedness under the ABL Credit Agreement (to the extent applicable), subject to the terms of such Section 6.02(i) and (iii) to the extent set forth in the Order.

(d)     The Order is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Order.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Order, upon the Maturity Date (whether by acceleration or otherwise) of any of the Loan Document Obligations, to the extent the

LA\4104335.13

Conversion Date has not occurred, the Administrative Agent and Lenders shall be entitled to immediate payment of such Loan Document Obligations and to enforce the remedies provided for hereunder or under applicable laws, without further notice, motion or application to, hearing before, or order from, the Court.

<div align="center">ARTICLE IV</div>

<div align="center">Conditions</div>

SECTION 4.01.   Conditions to Effective Date.  The effectiveness of this Agreement and the obligations of the Lenders to make the Roll-up Loans hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)     The Administrative Agent shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) evidence satisfactory to the Administrative Agent (which may include a facsimile transmission) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Kirkland & Ellis LLP, counsel for the Loan Parties, addressing corporate authority matters and other matters  as the Administrative Agent shall reasonably request, each such opinion to be in form, scope and substance reasonably satisfactory to the Administrative Agent and the Lenders.

(c)     The Administrative Agent shall have received as to each Loan Party such customary documents and certificates as it shall reasonably have requested relating to the organization, existence and good standing of such Loan Party and the authorization of the Loan Documents or the Transactions, all in form and substance reasonably satisfactory to the Administrative Agent.

(d)     (a) The representations and warranties of the Loan Parties set forth in the Loan Documents shall be true and correct (i) in the case of the representations and warranties qualified as to materiality, in all respects and (ii) otherwise, in all material respects, in each case on and as of the Effective Date, except in the case of any such representation and warranty that expressly relates to a prior date, in which case such representation and warranty shall be so true and correct on and as of such prior date and (b) at the time of and immediately after giving effect to the Transactions to occur on the Effective Date, no Event of Default shall have  occurred and be continuing.

(e)     The Administrative Agent shall have received a certificate, dated the Effective Date and signed by the chief financial officer of the Parent Borrower, confirming compliance with the conditions set forth in paragraph (d) of this Section.

(f)     The Lenders and the Administrative Agent shall have received the Approved Budget.

<div align="center">61</div>

(g)     The Administrative Agent, for its benefit and the benefit of each other Secured Party, shall have been granted a perfected lien on the Collateral by the Order on the terms and conditions set forth herein and in the other Loan Documents.

(h)     The Administrative Agent shall have received the results of a search of the UCC (or equivalent) filings made with respect to the Loan Parties in the jurisdictions reasonably requested by the Administrative Agent.

(i)     The Lenders shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" rules and regulations, including the USA Patriot Act, to include a duly executed IRS Form W-9 or such other applicable IRS Form for each Borrower, at least three Business Days prior to the Effective Date to the extent such information was requested at least 10 Business Days prior to the Effective Date.

(j)     The Collateral Agreement each shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(k)     The Administrative Agent shall have received (i) unaudited interim consolidated financial statements of the Parent Borrower for each fiscal month ended after the fiscal quarter ending February 1, 2020 through the end of [  ], 2020 and (ii) unaudited financial statements for the fiscal quarter ended May 2, 2020.

(l)     Since the Petition Date, other than those events or circumstances arising from the commencement of the Cases, there has been no event or circumstance, either individually or in the aggregate, that has or could reasonably be expected to have a Material Adverse Effect.

(m)     (i) the Administrative Agent shall have received drafts of the "first day" pleadings for the Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent; and (ii) all motions, orders (including the "first day" orders and the Cash Management Order) and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall have approved and entered all "first day" orders, including, without limitation, the Cash Management Order.

(n)     No trustee, receiver or examiner with expanded powers shall have been appointed in any of the Chapter 11 Cases.

(o)     The Pre-Petition Agent and the Pre-Petition Lenders shall have each received adequate protection in respect of the Liens securing their respective Pre-Petition Lender Obligations pursuant to the Order.

The Administrative Agent shall notify the Borrowers and the Lenders of the Effective Date, and such notice shall be conclusive and binding.

SECTION 4.02.   Conditions to the New Money Loan.  The obligations of the Lenders to make the New Money Loans hereunder shall not become effective until the date on or after the

Effective Date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)    The Administrative Agent shall have received a written Borrowing Request to include a flow of funds memorandum in form and substance satisfactory to the Administrative Agent and the Lenders.

(b)    The ABL Credit Agreement shall have been duly executed and delivered by each of the parties thereto, and shall be in full force and effect.

(c)    The Intercreditor Acknowledgment shall have been duly executed and delivered by each party thereto, and shall be in full force and effect.

(d)    The Administrative Agent, the Ad Hoc Committee and the Ad Hoc Committee Advisors shall have received all fees and other amounts due and payable on or prior to the Funding Date, including, to the extent invoiced at least two Business Days prior to the Funding Date, payment or reimbursement of all fees and expenses (including fees, charges and disbursements of counsel) required to be paid or reimbursed by any Loan Party under the Commitment Letter or any Loan Document, in each case, payable from the proceeds of the initial funding of the Term Loans.

The Administrative Agent shall notify the Borrowers and the Lenders of the Funding Date, and such notice shall be conclusive and binding.


ARTICLE V

Affirmative Covenants

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 5.01.    Financial Statements and Other Information.  The Borrowers will furnish to the Administrative Agent, on behalf of each Lender and, in the case of clauses (e), (f) and (g), to the Ad Hoc Committee Advisors:

(a)    within 90 days after the end of each fiscal year of the Parent Borrower, its consolidated balance sheet and related consolidated statements of operations, comprehensive income, equity and cash flows as of the end of and for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year,  all certified by a Financial Officer of the Parent Borrower to the effect that such consolidated financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal year on a consolidated basis in accordance with GAAP;

63

(b)      within 45 days after the end of each of the first three fiscal quarters of each fiscal year of the Parent Borrower, its consolidated balance sheet as of the end of such fiscal quarter, the related consolidated statements of operations and comprehensive income for such fiscal quarter and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Parent Borrower as presenting fairly, in all material respects, the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries as of the end of and for such fiscal quarter and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes;

(c)      within 30 days after the end of each of the first two fiscal months of each fiscal quarter of the Company, the consolidated balance sheet and related statements of operations and comprehensive income of the Company as of the end of and for such fiscal month and the then elapsed portion of the fiscal year and the related consolidated statement of cash flows of the Company for the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer of the Company as presenting fairly in all material respects the financial position, results of operations and cash flows of the Company and its consolidated Subsidiaries as of the end of and for such fiscal month and such portion of the fiscal year on a consolidated basis in accordance with GAAP, subject to normal year-end audit adjustments and the absence of footnotes (it being understood and agreed that any adjustments reflected in such monthly financial statements may differ (in part or entirely) from any adjustments reflected in the financial statements delivered in the foregoing clauses (a) or (b));

(d)      concurrently with each delivery of financial statements under clause (a), (b) or (c) above, a completed Compliance Certificate signed by a Financial Officer of the Parent Borrower, (i) certifying, in the case of the financial statements delivered under clause (a), (b) or (c) above, that such financial statements present fairly in all material respects the financial position, results of operations and cash flows of the Parent Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes, (ii) certifying as to whether a Default has occurred and, if a Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (iii) to the extent applicable, setting forth reasonably detailed calculations demonstrating compliance with Section 6.12, (iv) if any change in GAAP or in the application thereof has occurred since the date of the audited financial statements referred to in Section 3.04, specifying the effect of such change on the financial statements accompanying such certificate, and (v) certifying that all notices required to be provided under Section 5.03 and 5.04 have been provided;

(e)      no later than 5:00 p.m. New York City time on the four week anniversary of the Effective Date(or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion), and each fourth (4th) calendar week thereafter, an updated budget consistent with the form and level of detail set forth in the initial Approved Budget,

including the same line-items provided with the initial Approved Budget, and otherwise in form and substance reasonably acceptable to Ad Hoc Committee Advisors in their reasonable discretion.  Upon, and subject to, the approval of any such updated budget by the Ad Hoc Committee Advisors in their reasonable discretion, such supplemented budget shall constitute the then-approved Approved Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Ad Hoc Committee Advisors approve such supplemental budget in their reasonable discretion, the then-current Approved Budget shall remain in effect;

(f)      no later than 5:00 p.m. New York City time on the Thursday of each calendar week (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) commencing on (a) the date that is the third Thursday following the Effective Date, a line-item by line-item report setting forth for each line item in the Approved Budget, in reasonable detail, the actual receipts received and operating disbursements (including any professional fees) made during the prior week then-ended and (b) the date that is the first Thursday following the Effective Date a report setting forth (i) the Liquidity as of the  Friday of the most recently ended calendar week and (ii) the aggregate amount of end of day cash and Cash Equivalents as of the Friday of the most recently ended calendar week of all non-Loan Party Subsidiaries on deposit in or credited to any account maintained by such non-Loan Party Subsidiaries;

(g)      no later than 5:00 p.m. New York City time on the Thursday (or such later time as agreed to in writing (including via e-mail) by the Required Lenders in their sole discretion) of each calendar week commencing on the date that is the second Thursday following the Effective Date, (each such Thursday or later time, a "Variance Report Date"), a line-item by line-item variance report (each, a "Variance Report"),substantially in the form attached hereto as Exhibit J or otherwise as reasonably acceptable to the Required Lenders in their sole discretion, setting forth, in reasonable detail: (x) any variances between actual amounts for each line item in the Approved Budget for the Variance Testing Period versus projected amounts set forth in the applicable Approved Budget for each line item included therein on a cumulative basis for such Variance Testing Period (for the avoidance of doubt, to be prepared by comparing the sum of the four (4) figures for each relevant week for such corresponding line item in the relevant Approved Budget that was in effect in respect of each relevant week at the time), and (y) the computations necessary to determine compliance with Section 6.12, together with a statement from a Financial Officer certifying the information contained in the report.  The Variance Report shall also provide a reasonably detailed explanation for any negative variance in such Variance Report in excess of 15% in actual receipts and any positive variance in such Variance Report in excess of 15% in  actual operating disbursements during the Variance Testing Period (in each case unless the dollar amount corresponding to such percentage variance is less than $1,000,000) as compared to projections for such corresponding line items during the Variance Testing Period as set forth in the Approved Budget;

(h)      (i) to the extent applicable, within 1 Business Day of delivery of a Borrowing Base Certificate (as defined in the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable) to the ABL Agent, copy of such certificate and (ii) a copy of each report or forecast delivered under the ABL Credit Agreement, within 1 Business Day of delivery thereof;

(i)      promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by the Parent Borrower or any Subsidiary with the SEC or with any national securities exchange, or distributed by the Parent Borrower to its shareholders generally, as the case may be;

(j)      [reserved];

(k)      promptly after any written request therefor, evidence of insurance renewals as required under Section 5.08 hereunder in form and substance reasonably acceptable to the Administrative Agent; and

(l)      promptly after any written request therefor, such other information regarding the operations, business affairs and financial condition of the Parent Borrower or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request.

Information required to be delivered pursuant to clause (a), (b) or (i) of this Section shall be deemed to have been delivered if such information, or one or more annual or quarterly reports containing such information, shall have been posted by the Administrative Agent on an IntraLinks or similar site to which the Lenders have been granted access or shall be available on the website of the SEC at http://www.sec.gov.  Information required to be delivered pursuant to this Section may also be delivered by electronic communications pursuant to procedures approved by the Administrative Agent.

SECTION 5.02.    Notices of Material Events.  The Borrowers will furnish to the to the Ad Hoc Committee Advisors and the Administrative Agent (for distribution to the Lenders) written notice promptly upon any Financial Officer, or other officer or employee responsible for compliance with the Loan Documents, of the Borrowers becoming aware of any of the following:

(a)      the occurrence of any Default;

(b)      the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against (other than in connection with the Cases) or affecting the Parent Borrower or any Restricted Subsidiary, or any adverse development in any such pending action, suit or proceeding not previously disclosed in writing by the Borrowers to the Administrative Agent and the Lenders, that in each case would reasonably be expected to result in a Material Adverse Effect or that in any manner questions the validity of any Loan Document;

(c)      the occurrence of an ERISA Event that has resulted, or would reasonably be expected to result, in a Material Adverse Effect;

(d)      (i) as soon as practicable in advance of filing (and to the extent practicable not later than three (3) days prior to the filing thereof) with the Court or delivering (and to the extent practicable not later than three (3) days prior to the delivery thereof) to the Committee appointed in a Case, if any, or to the U.S. Trustee, as the case may be, the Order, all other material proposed orders and pleadings related to (x) the Cases (all of which must be in form and

66

substance reasonably satisfactory to the Required Lenders), (y) the Pre-Petition Credit Agreement and this Agreement and the credit facilities contemplated thereby and/or any sale contemplated in accordance with the Required Milestones and any Plan of Reorganization and/or any disclosure statement related thereto (all of which must be in form and substance reasonably satisfactory to the Administrative Agent), and (ii) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Court or delivered to the Committee appointed in any Case, if any, or to the U.S. Trustee; or

(e)      any other development that has resulted, or would reasonably be expected to result, in a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of a Financial Officer or other executive officer of the Parent Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

SECTION 5.03.    Collateral Obligations; Additional Subsidiaries.

(a) Each Borrower will, and will cause the other applicable Loan Parties to comply with the "Collateral and Guarantee Requirement". If any additional Designated Subsidiary is formed or acquired after the Effective Date (or any Excluded Subsidiary becomes a Designated Subsidiary), the Borrowers will promptly notify the Administrative Agent thereof and will, as promptly as practicable, and in any event within 15 days (or such longer period as the Administrative Agent may agree) after such Designated Subsidiary is formed or acquired (or any Excluded Subsidiary becomes a Designated Subsidiary) cause the Collateral and Guarantee Requirement to be satisfied with respect to such Designated Subsidiary and with respect to any Equity Interests in or Indebtedness of such Designated Subsidiary owned by or on behalf of any Loan Party.

(b) Each of the Loan Parties hereby covenants and agrees that upon the entry of, and subject to, the Order and subject to the Carve Out in all respects, the Loan Document Obligations, pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed DIP Superpriority Claims in the Cases.

(c) The relative priorities of the Liens described in this Section 5.03 with respect to the Collateral shall be as set forth in the Order. In accordance with the Order, all of the Liens described in this Section 5.03 shall be effective and perfected upon entry of the Order, without the necessity of the execution, recordation of filings by the Debtors of security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent, of, or over, any Collateral, as set forth in the Order.

(d) Each Loan Party that is a Debtor hereby confirms and acknowledges that, pursuant to the Order , the Liens in favor of the Administrative Agent on behalf of and for the benefit of the

Secured Parties in all of the Collateral, now existing or hereafter acquired, shall be created and perfected without the recordation or filing in any land records or filing offices of any mortgage, assignment or similar instrument.

SECTION 5.04.    Information Regarding Collateral.

(a)    The Borrowers will furnish to the Administrative Agent promptly (and in any event within 15 days thereof (or such longer period as the Administrative Agent may agree)) written notice of any change in (i) the legal name of any Loan Party, as set forth in its organizational documents, (ii) the jurisdiction of organization or the form of organization of any Loan Party (including as a result of any merger or consolidation), (iii) the location of the chief executive office of any Loan Party or (iv) the organizational identification number, if any, and the Federal Taxpayer Identification Number of such Loan Party, in each case, only with respect to any Loan Party organized under the laws of a jurisdiction that requires such information to be set forth on the face of a UCC financing statement, of such Loan Party.  The Borrowers also agree promptly to notify the Administrative Agent if any material portion of the Collateral is damaged or destroyed.

(b)    If any material assets are acquired by any Loan Party after the Effective Date (other than assets constituting Collateral under the Collateral Documents that become subject to the Lien of the Collateral Documents upon the acquisition thereof), the Borrowers will promptly notify the Administrative Agent thereof and will cause such assets to be subjected to a Lien securing the Loan Document Obligations and will take such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, all at the expense of the Borrowers. It is understood and agreed that, notwithstanding anything to the contrary set forth in this Agreement or in any Collateral Document, the Loan Parties shall not be required to (A) grant leasehold mortgages, (B) obtain landlord lien waivers, estoppels, collateral access agreements or bailee agreements, except to the extent delivered pursuant to the ABL Credit Agreement or related loan documents, (C) enter into Control Agreements in respect of any Excluded Deposit Account, (D) perfect security interests in any assets represented by a certificate of title or (E) enter into any Collateral Documents governed by the law of a jurisdiction other than the United States.

(c)    If, despite the restrictions set forth in Section 6.02, the Company or any Subsidiary shall grant a Lien on any of its assets to secure Indebtedness under the ABL Credit Agreement, the Pre-Petition ABL Credit Agreement and the Secured Obligations are not secured by a Lien on such assets, the Company will (i) promptly notify the Administrative Agent and cause such assets to be subjected to a Lien securing the Secured Obligations and (ii) take, or cause such Subsidiary to take, as the case may be, such actions as shall be necessary or reasonably requested by the Administrative Agent to satisfy the Collateral and Guarantee Requirement, including to grant and perfect such Lien, and to cause such Liens securing Indebtedness under the ABL Credit Agreement thereof and such Liens securing the Secured Obligations to become subject to the Intercreditor Agreement, all at the expense of the Loan Parties.

SECTION 5.05.    Existence; Conduct of Business.  Subject to any required approval by the Court, each Borrower will, and will cause each Restricted Subsidiary to, do or cause to be

LA\4104335.13

done all things reasonably necessary to preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except in the case of clause (ii) where failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; _provided_ that the foregoing shall not prohibit any merger, consolidation, liquidation, dissolution, disposition or other transaction permitted under Section 6.03 or 6.05.

SECTION 5.06.    Payment of Obligations.  To the extent permitted by the Order and the terms thereof, each Borrower will, and will cause each Restricted Subsidiary to, pay or discharge all its material obligations, including material Tax liabilities (whether or not shown on a Tax return), before the same shall become delinquent or in default, subject to the Approved Budget (and the Permitted Variances provided for therein)except where (a) (i) the validity or amount thereof is being contested in good faith by appropriate proceedings, (ii) the Parent Borrower or such Restricted Subsidiary has set aside on its books reserves with respect thereto to the extent required by GAAP and (iii) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation or (b) the failure to make payment would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 5.07.    Maintenance of Properties.  Each Borrower will, and will cause each Restricted Subsidiary to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

SECTION 5.08.    Insurance.  Each Borrower will, and will cause each Restricted Subsidiary to, maintain, with financially sound and reputable insurance companies, insurance in such amounts (with no greater risk retention) and against such risks as are customarily maintained by companies of established repute engaged in the same or similar businesses operating in the same or similar locations. Each such policy of liability or casualty insurance maintained by or on behalf of Loan Parties shall (a) in the case of each liability insurance policy (other than workers' compensation, director and officer liability or other policies in which such endorsements are not customary), name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder and (b) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as a loss payee thereunder, and the Borrowers will use commercially reasonable efforts to have each such policy provide for at least 30 days' (or such shorter number of days as may be agreed to by the Administrative Agent) prior written notice to the Administrative Agent of any cancellation of such policy.

SECTION 5.09.    Books and Records; Inspection and Rights.  Each Borrower will, and will cause each Restricted Subsidiary to, (a) keep proper books of record and account in which full, true and correct (in all material respects) entries in accordance with GAAP and applicable law are made of all dealings and transactions in relation to its business and activities and (b) permit any representatives designated by the Administrative Agent or any Lender (to the extent accompanying the Administrative Agent or any designated representative thereof)

69

(including employees of the Administrative Agent, any Lender or any consultants, accountants, lawyers and appraisers retained by the Administrative Agent), upon reasonable prior notice (but in no event more than once each fiscal year of the Parent Borrower unless an Event of Default has occurred and is continuing), to visit and inspect its properties, to examine and make extracts from its books and records and to discuss its affairs, finances and condition with its officers and, accompanied by one or more such officers or their designees if requested by the Borrowers, independent accountants, all at such reasonable times during normal business hours and as often as reasonably requested.  The Borrowers shall have the right to have a representative present at any and all inspections.

SECTION 5.10.    Compliance with Laws.  Each Borrower will, and will cause each Restricted Subsidiary to, comply with all laws (including Environmental Laws and orders of any Governmental Authority) applicable to it or its property, except (i) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (ii) to the extent subject to the Automatic Stay.

SECTION 5.11.    Bankruptcy Matters.

(a)    cause all proposed (i) "first day" and "second day" (if applicable) orders on a final basis, (ii) orders (other than the Order) related to or affecting the Loans and other Obligations and the Loan Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any Plan of Reorganization and/or any disclosure statement related thereto, (iii) orders concerning the financial condition of the Borrowers or any of their respective Restricted Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (iv) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Court, in each case, proposed by the Loan Parties to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in their reasonable discretion in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders (and with respect to any provision that affects the rights, obligations, liabilities or duties of the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)    comply in a timely manner with their obligations and responsibilities as debtors in possession under the Order; and

(c)    except as otherwise permitted by an Acceptable Plan or this Agreement, provide prior written notice as soon as reasonably practicable to the Required Lenders prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

(d)    deliver to the Administrative Agent all documents required to be delivered to creditors under the RSA, any applicable restructuring support agreement or

70

any case stipulation; <u>provided</u> that the Borrower shall not be required to deliver any such documents provided by any party in interest to the extent that any such document is filed under seal; <u>provided, further</u>, that such documents that are filed under seal, to the extent permitted by applicable law, shall be provided to the advisors to the Administrative Agent on a professional eyes' only basis.

(e)     comply with each of the Required Milestones contained on <u>Schedule 5.11</u> upon the terms and at the times provided for therein.

SECTION 5.12.   <u>Maintenance of Ratings</u>.  The Borrowers will use commercially reasonable efforts to obtain a rating of the credit facilities created hereunder by each of S&P and Moody's within 15 days of the Effective Date, it being understood that there is no obligation to maintain any particular rating at any time.

SECTION 5.13.   <u>[Reserved]</u>.

SECTION 5.14.   <u>[Reserved]</u>.

SECTION 5.15.   <u>Conference Calls</u>.  The Borrowers will hold and participate in:

(a) a monthly conference call for Lenders to discuss financial information delivered pursuant to Section 5.01.  The Borrowers will hold such conference call following the delivery of the required financial information for such month pursuant to Section 5.01(c) and not later than two Business Days from the time the Borrowers are required to deliver the financial information as set forth in Section 5.01(c).

(b) weekly conference calls for the Ad Hoc Committee Advisors to discuss financial information delivered pursuant to Section 5.01(f).

Such monthly and weekly calls will occur as a standing appointment at a time to be mutually agreed upon by the Borrowers and the Lenders or the Ad Hoc Committee Advisors, as applicable.

ARTICLE VI

<u>Negative Covenants</u>

Until the Commitments shall have expired or been terminated, the principal of and interest on each Loan and all premiums and fees payable hereunder shall have been paid in full, each Borrower covenants and agrees with the Lenders that:

SECTION 6.01.   <u>Indebtedness; Certain Equity Securities</u>.

Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Indebtedness, except:

(a)     Indebtedness created under the Loan Documents (including, for the avoidance of doubt, the Carve Out) and the Pre-Petition Loan Documents;

71

LA\4104335.13

(b)        Indebtedness existing on the date hereof and set forth on Schedule 6.01;

(c)        unsecured Indebtedness of the Parent Borrower to any Restricted Subsidiary and of any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) such Indebtedness shall not have been transferred to any Person other than the Parent Borrower or any Restricted Subsidiary, (ii) any such Indebtedness owing by any Loan Party to a Restricted Subsidiary that is not a Loan Party shall be unsecured and subordinated in right of payment to the Loan Document Obligations and the Pre-Petition Lender Obligations and (iii) any such Indebtedness shall be incurred in compliance with Section 6.04;

(d)        Guarantees incurred in compliance with Section 6.04;

(e)        Indebtedness of the Parent Borrower or any Restricted Subsidiary (i) incurred to finance the acquisition, construction or improvement of any fixed or capital assets, including Capital Lease Obligations and Synthetic Lease Obligations, provided that such Indebtedness is incurred prior to or within 270 days after such acquisition or the completion of such construction or improvement and the principal amount of such Indebtedness does not exceed the cost of acquiring, constructing or improving such fixed or capital assets or (ii) assumed in connection with the acquisition of any fixed or capital assets; provided that the aggregate principal amount of Indebtedness permitted by this clause (e) at the time of incurrence thereof shall not exceed $1,000,000;

(f)        Indebtedness in respect of netting services, overdraft protections and deposit and checking accounts, in each case, in the ordinary course of business;

(g)        Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued for the account of the Parent Borrower or any Restricted Subsidiary in the ordinary course of business supporting obligations under workers' compensation, health, disability, unemployment insurance and other social security laws;

(h)        Indebtedness expressly permitted by the Approved Budget (including with respect to any Permitted Variances);

(i)        [reserved];

(j)        Indebtedness under (i) the Pre-Petition ABL Credit Agreement and (ii) if applicable, the ABL Credit Agreement in an aggregate principal amount not to exceed $400,000,000 at any time outstanding;

(k)        Indebtedness of Loan Parties in respect of surety bonds (whether bid, performance, appeal or otherwise) and performance and completion guarantees and other obligations of a like nature, in each case incurred in the ordinary course of business;

(l)        [reserved];

(m)        [reserved];

(n)        [reserved];

(o)      [reserved];

(p)      other unsecured Indebtedness in an aggregate principal amount not to exceed at the time of incurrence thereof $4,000,000;

(q)      Indebtedness consisting of (i) the financing of insurance premiums and (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business;

(r)      obligations under any agreement governing the provision of treasury or cash management services, including deposit accounts, overnight draft, credit cards, debit cards, p-cards (including purchasing cards and commercial cards), funds transfer, automated clearinghouse, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services and other cash management services; and

(s)      Indebtedness in the form of Swap Agreements permitted under Section 6.07.

The accrual of interest, the accretion of accreted value and the payment of interest or dividends in the form of additional Indebtedness or Disqualified Stock, as applicable, the accretion of original issue discount, the accretion of liquidation preference and increases in the amount of Indebtedness outstanding solely as a result of fluctuations in the exchange rate of currencies shall not be deemed to be an incurrence of Indebtedness or Disqualified Stock for purposes of this Section 6.01.

SECTION 6.02.   Liens.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, create, incur, assume or permit to exist any Lien on any asset now owned or hereafter acquired, except:

(a)      (i) Liens granted by the Order (including the Carve Out), (ii) Liens created under the Loan Documents or the Pre-Petition Loan Documents;

(b)      Permitted Encumbrances;

(c)      any Lien on any asset of the Parent Borrower or any Restricted Subsidiary existing on the date hereof and set forth on Schedule 6.02; provided that (i) such Lien shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary and (ii) such Lien shall secure only those obligations that it secures on the date hereof and any extensions, renewals and refinancing thereof that do not increase the outstanding principal amount thereof;

(d)      [reserved];

(e)      Liens on fixed or capital assets acquired, constructed or improved by the Parent Borrower or any Restricted Subsidiary; provided that (i) such Liens secure only Indebtedness permitted by Section 6.01(e) and obligations relating thereto not constituting Indebtedness and (ii) such Liens shall not apply to any other asset of the Parent Borrower or any Restricted Subsidiary (other than the proceeds and products thereof); provided further that in the event purchase money obligations are owed to any Person with respect to financing of more than one

73

purchase of any fixed or capital assets, such Liens may secure all such purchase money obligations and may apply to all such fixed or capital assets financed by such Person;

(f)    in connection with the sale or transfer of any Equity Interests or other assets in a transaction permitted under Section 6.05, customary rights and restrictions contained in agreements relating to such sale or transfer pending the completion thereof, solely to the extent such sale or transfer would have been permitted on the date of the creation of such Lien;

(g)    in the case of (i) any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary or (ii) the Equity Interests in any Person that is not a Restricted Subsidiary, any encumbrance or restriction, including any put and call arrangements, related to Equity Interests in such Restricted Subsidiary or such other Person set forth in the organizational documents of such Restricted Subsidiary or such other Person or any related joint venture, shareholders' or similar agreement, in each case, so long as such encumbrance or restriction is in existence on the Petition Date;

(h)    Liens solely on any cash deposits, escrow arrangements or similar arrangements made by the Parent Borrower or any Restricted Subsidiary in connection with any letter of intent or purchase agreement for a transaction permitted hereunder;

(i)    Liens on the Collateral securing Indebtedness permitted by Section 6.01(j) and obligations relating thereto not constituting Indebtedness; provided that any such Liens are subject to (x) the Order and (y), if such Liens are on assets of the Loan Parties, the Intercreditor Agreement;

(j)    any Lien on assets of any Foreign Subsidiary (other than any Luxembourg IP Subsidiary); provided that such Lien shall secure only Indebtedness of such Foreign Subsidiary permitted by Section 6.01 and obligations relating thereto not constituting Indebtedness;

(k)    other Liens securing Indebtedness or other obligations in an aggregate principal amount at the time of incurrence of such Indebtedness or other obligations not to exceed $1,000,000;

(l)    non-exclusive licenses of intellectual property granted in the ordinary course of business; and

(m)    Liens in favor of the Pre-Petition Lenders as adequate protection granted pursuant to the Orders.

SECTION 6.03.    Fundamental Changes; Business Activities.

(a)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, merge into or consolidate with any other Person, or permit any other Person to merge or consolidate with it, or liquidate or dissolve, except that, if at the time thereof and immediately after giving effect thereto no Default shall have occurred and be continuing, (i) any Restricted Subsidiary may  (x) merge into the Parent Borrower in a transaction in which the Parent Borrower is the surviving entity and (y) merge into the Subsidiary Borrower in a transaction in which the Subsidiary Borrower is the surviving entity, (ii) any Person (other the Parent Borrower or the Subsidiary

74

Borrower) may merge into or consolidate with any Restricted Subsidiary in a transaction in which the surviving entity is a Restricted Subsidiary and, if any party to such merger or consolidation is a Loan Party, a Loan Party, (iii) [reserved] and (iv) any Restricted Subsidiary (other than the Subsidiary Borrower) may liquidate or dissolve if the Borrowers determine in good faith that such liquidation or dissolution is in the best interests of the Borrowers and is not materially disadvantageous to the Lenders; provided that any such merger or consolidation involving a Person that is not a wholly-owned Restricted Subsidiary immediately prior to such merger or consolidation shall not be permitted unless it is also permitted by Section 6.04.

(b)    Neither Borrower will, nor will it permit any of its Restricted Subsidiaries to, engage to any material extent in any business other than businesses of the type conducted by the Parent Borrower and the Restricted Subsidiaries on the date hereof  and businesses reasonably related or complementary thereto.

SECTION 6.04.    Investments, Loans, Advances, Guarantees and Acquisitions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, purchase, hold, acquire (including pursuant to any merger or consolidation), make or otherwise permit to exist any Investment in any other Person, except:

(a)    Investments in cash and Cash Equivalents;

(b)    Investments existing on the date hereof or contractually committed to as of the date hereof and set forth on Schedule 6.04 and any extensions thereof (but not any additions thereto (including any capital contributions) made after the date hereof) ;

(c)    Investments by the Parent Borrower and the Restricted Subsidiaries in Equity Interests in their respective subsidiaries; provided that (i) such subsidiaries are Subsidiaries prior to such Investments, and (ii) in the case of any such Investments by the Loan Parties in, and loans and advances by the Loan Parties to, Restricted Subsidiaries that are not Loan Parties (excluding all such Investments, loans, advances and Guarantees existing on the date hereof and permitted by clause (b) above), (A) the aggregate amount of all such Investments (including loans and advances) permitted pursuant to this clause (c) and pursuant to clauses (d) and (e) below, taken together, shall not exceed $10,000,000 and (B) in each case, all such Investments (including loans and advances) shall be (x) made in the ordinary course of business, (y), solely in connection with the operational and compliance needs of the Parent Borrower and its Restricted Subsidiaries and (z) permitted by the Approved Budget (subject to Permitted Variance);

(d)    loans or advances made by the Parent Borrower to any Restricted Subsidiary or made by any Restricted Subsidiary to the Parent Borrower or any other Restricted Subsidiary; provided that (i) the Indebtedness resulting therefrom is permitted by Section 6.01(c) and (ii) the amount of such loans and advances made by the Loan Parties to Restricted Subsidiaries that are not Loan Parties shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variance);

(e)    Guarantees by the Parent Borrower or any Restricted Subsidiary of Indebtedness or other obligations of the Parent Borrower or any Restricted Subsidiary, solely to the extent (i) arising as a result of any such Person being a joint and several co-applicant with respect to any

letter of credit or letter of guaranty or (ii) of any leases of retail store locations and related obligations arising thereunder, in each case, in the ordinary course of business; provided that the aggregate amount of Indebtedness and other obligations of Restricted Subsidiaries that are not Loan Parties that is Guaranteed by any Loan Party shall be subject to the limitation set forth in clause (c) above and shall be permitted by the Approved Budget (subject to Permitted Variances);

(f)      [reserved];

(g)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(h)      [reserved];

(i)      deposits, prepayments and other credits to suppliers, lessors and landlords made in the ordinary course of business;

(j)      advances by the Parent Borrower or any Restricted Subsidiary to employees in the ordinary course of business consistent with past practices for travel and entertainment expenses, relocation costs and similar purposes;

(k)      [reserved];

(l)      Investments in the form of Swap Agreements permitted under Section 6.07;

(m)      investments constituting deposits described in clauses (c) and (d) of the definition of "Permitted Encumbrances" and endorsements of instruments for collection or deposit in the ordinary course of business;

(n)      other Investments to the extent permitted by and expressly set forth in the Order;

(o)      other Investments in an aggregate amount not to exceed $1,000,000; and

(p)      Investments in respect of actions permitted by Section 6.05(g).

For the purposes of this Section, any unreimbursed payment by the Parent Borrower or any Restricted Subsidiary for goods or services delivered to any Subsidiary shall be deemed to be an Investment in such Subsidiary.

SECTION 6.05.    Asset Sales.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, transfer or otherwise dispose of any asset, including any Equity Interest owned by it, nor will the Parent Borrower permit any Restricted Subsidiary to issue any additional Equity Interests in such Restricted Subsidiary (other than to the Parent Borrower or any other Restricted Subsidiary in compliance with Section 6.04, and other than directors' qualifying shares and other nominal amounts of Equity Interests that are required to be held by other Persons under applicable law) (each of the foregoing, an "Asset Sale"), except:

76

(a)      (i) sales of inventory, (ii) sales, transfers and other dispositions of used, surplus, obsolete or outmoded machinery or equipment and (iii) contributions of merchandise to charitable organizations, to the extent in the ordinary course of business and consistent with past practices, (iv) dispositions of Cash Equivalents and (v) use of cash in accordance with the Approved Budget and pursuant to transactions permitted under this agreement, in each case (other than in the case of clause (iii)) in the ordinary course of business;

(b)      sales, transfers, leases and other dispositions to the Parent Borrower or any Restricted Subsidiary in the ordinary course of business; provided that any such sales, transfers, leases or other dispositions involving a Restricted Subsidiary that is not a Loan Party shall be made in compliance with Sections 6.04 and 6.09;

(c)      the sale or discount of accounts receivable arising in the ordinary course of business, but only in connection with the compromise or collection thereof and not in connection with any financing transaction;

(d)      dispositions of assets subject to any casualty or condemnation proceeding (including in lieu thereof);

(e)      leases or subleases of real property granted by the Parent Borrower or any Restricted Subsidiary to third Persons not interfering in any material respect with the business of the Parent Borrower or any Restricted Subsidiary, including, without limitation, retail store lease assignments and surrenders;

(f)      [reserved];

(g)      in connection with the consolidation of foreign operations of the Parent Borrower and its Subsidiaries, the direct or indirect transfers or other dispositions by any Restricted Subsidiary of any foreign assets or the Equity Interests of a Foreign Subsidiary that is a Restricted Subsidiary to (i) with respect to any Luxembourg IP Subsidiary or any non-Loan Party Restricted Subsidiary with the prior consent of the Required Lenders  and (ii) any other Restricted Subsidiary;

(h)      to the extent prior consent of the Required Lenders is received, the elimination or forgiving of intercompany balances in connection with intercompany restructurings (including dissolutions, liquidations and mergers) between or among the Parent Borrower and its Restricted Subsidiaries;

(i)      other sales, transfers or dispositions pursuant to an order of the Court which sale, transfer or disposition are consistent with the Restructuring Support Agreement and the Approved Budget; and

(j)      Specified Dispositions or dispositions expressly identified and provided for in the Approved Budget; and

(k)      sales, transfers and other dispositions of assets that are not permitted by any other clause of this Section in an aggregate amount equal to a fair market value, as determined by a

Responsible Officer of the Parent Borrower reasonably and acting in good faith, of not more than $1,000,000;

provided that all sales, transfers, leases and other dispositions permitted hereby (other than those permitted by clause (a)(ii), (a)(iii), (b), (c), (d), (g) or (h)) shall be made for fair value.

SECTION 6.06.    Sale/Leaseback Transactions.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction, except to the extent such Sale/Leaseback Transaction is entered into in connection with a Specified Disposition.

SECTION 6.07.    Swap Agreements.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, enter into any Swap Agreement, other than Swap Agreements entered into in the ordinary course of business to hedge or mitigate risks to which the Parent Borrower or a Restricted Subsidiary is exposed in the conduct of its business or the management of its liabilities and not for speculative purposes.

SECTION 6.08.    Restricted Payments; Certain Payments of Indebtedness.

(a)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that:

(i)    the Parent Borrower may declare and pay dividends with respect to its Equity Interests payable solely in additional Equity Interests (other than Disqualified Stock) of the Parent Borrower;

(ii)    any Restricted Subsidiary may declare and pay dividends or make other distributions with respect to its Equity Interests, or make other Restricted Payments in respect of its Equity Interests, in each case ratably to the holders of such Equity Interests (or, if not ratably, on a basis more favorable to the Parent Borrower and the Restricted Subsidiaries);

(iii)    the Parent Borrower may make Restricted Payments pursuant to and in accordance with customary stock option plans or other equity or benefit plans for management or employees of the Parent Borrower and the Restricted Subsidiaries in effect from time to time;

(iv)    Restricted Payments made by any Restricted Subsidiary to another non-Restricted Subsidiary to consummate transactions that would otherwise be permitted by Section 6.04(c);

(v)    the Parent Borrower may make cash payments in lieu of the issuance of fractional shares representing insignificant interests in the Parent Borrower in connection with the exercise of warrants, options or other securities convertible into or exchangeable for shares of common stock in the Parent Borrower;

78

(vi)    Restricted Payments to Parent Borrower on or around and upon the execution and effectiveness of the RSA to pay fees and expenses in accordance therewith;

(vii)    [reserved]; and

(viii)    Restricted Payments made to consummate the transactions permitted by Section 6.05(g).

(b)    Neither Borrower will, nor will it permit any Restricted Subsidiary to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness, except:

(i)    [reserved];

(ii)    [reserved];

(iii)    [reserved];

(iv)    [reserved];

(v)    [reserved];

(vi)    payments to the extent provided for in the Approved Budget (including Permitted Variances thereto) and permitted by the Order, as applicable; and

(vii)    [reserved].

(c)    Neither Borrower will, nor will it permit any of the Restricted Subsidiaries to, amend, modify or change in any manner adverse to the interests of the Lenders any term or condition of any documentation governing Specified Indebtedness; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.09.    Transactions with Affiliates.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, sell, lease, license or otherwise transfer any assets to, or purchase, lease, license or otherwise acquire any assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) transactions on terms and conditions not less favorable to the Parent Borrower or such Restricted Subsidiary than those that would prevail in an arm's-length transaction with unrelated third parties, (b) transactions between or among the Parent Borrower and the Restricted Subsidiaries, (c) any Restricted Payment permitted by Section 6.08 or Investments permitted pursuant to Section 6.04(j), (d) the payment of reasonable fees and compensation to, and the providing of reasonable indemnities on behalf of, directors and officers of the Parent Borrower or any Restricted Subsidiary, as determined by the board of directors of the Parent Borrower in good faith, (e) employment contracts or subscription, put/call arrangements with employees, officers or directors, (f) transactions necessary to make adequate

protection payments on account of secured Pre-Petition Indebtedness pursuant to the Order and (g) the transactions described on Schedule 6.09.

SECTION 6.10.    Restrictive Agreements.

(a) Neither Borrower will, nor will it permit any Restricted Subsidiary to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that restricts or imposes any condition upon (1) the ability of the Parent Borrower or any Restricted Subsidiary to create, incur or permit to exist any Lien upon any of its assets to secure the Loan Document Obligations or (2) the ability of any Restricted Subsidiary to pay dividends or other distributions with respect to its Equity Interests or to make or repay loans or advances to the Parent Borrower or to Guarantee the Loan Agreement; provided that (i) the foregoing shall not apply to (A) restrictions and conditions imposed by law or by any Loan Document, (B) restrictions and conditions existing on the Effective Date identified on Schedule 6.10 (but shall apply to any amendment or modification expanding the scope of any such restriction or condition), (C) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided that such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (D) in the case of any Restricted Subsidiary that is not a wholly-owned Restricted Subsidiary, restrictions and conditions imposed by its organizational documents or any related joint venture or similar agreement, provided that such restrictions and conditions apply only to such Restricted Subsidiary and to any Equity Interests in such Restricted Subsidiary, (E) restrictions and conditions set forth in the Pre-Petition Credit Agreement, Pre-Petition ABL Credit Agreement and, to the extent applicable, the ABL Credit Agreement, (F) restrictions and conditions imposed by agreements relating to Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted under Section 6.01 and (G) restrictions and conditions imposed on cash to secure letters of credit and other segregated deposits that are permitted pursuant to Section 6.02(h), provided that such restrictions and conditions apply only to such Restricted Subsidiaries that are not Loan Parties, (ii) clause (a) of the foregoing shall not apply to (A) restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 6.01(e) if such restrictions or conditions apply only to the assets securing such Indebtedness and (B) customary provisions in leases and other agreements restricting the assignment thereof and (iii) clause (b) of the foregoing shall not apply to restrictions and conditions imposed by agreements relating to Indebtedness of any Restricted Subsidiary in existence at the time such Restricted Subsidiary became a Restricted Subsidiary and otherwise permitted under Section 6.01 (but shall apply to any amendment or modification expanding the scope of, any such restriction or condition), provided that such restrictions and conditions apply only to such Restricted Subsidiary.

(b) Except as permitted pursuant to the terms of this Agreement and the Order or otherwise consented to by the Required Lenders:

(i) Make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Order that is adverse to the Lenders.

(ii) Incur, create, assume or suffer to exist or permit any other superpriority claim which is pari passu with or senior to the DIP Superpriority Claims of the Administrative

Agent, and the Lenders hereunder, except for the Carve Out and, subject to the Intercreditor Agreement, the ABL Credit Agreement to the extent applicable.

SECTION 6.11.   <u>Amendment of Organizational Documents</u>.  Neither Borrower will, nor will it permit any Restricted Subsidiary to, amend, modify or waive any of its rights under its certificate of incorporation, by-laws or other organizational documents, in either case, to the extent such amendment, modification or waiver would be adverse to the rights or interests of the Lenders hereunder or under any other Loan Document; provided that immaterial amendments of an administrative, ministerial or technical nature may be made so long as contemporaneous written notice thereof is provided to the Administrative Agent.

SECTION 6.12.   <u>Financial Covenants</u>

(a)  The Parent Borrower will not permit Liquidity at any time to be less than $100,000,000.

(b) Commencing after the end of the 3rd week following the Effective Date, and solely to the extent that Liquidity is less than $150,000,000, the Parent Borrower will not permit any negative variance between the Actual Net Cash Flow Amount for any Cumulative Four-Week Period and the Budgeted Net Cash Flow Amount for such Cumulative Four-Week Period to be greater than 20%.

(c) The Parent Borrower will not permit the amount of cash and Cash Equivalents of non-Loan Party Subsidiaries as of the end of the day on Friday of each calendar week on deposit in or credited to any account maintained by non-Loan Party Subsidiaries to exceed $45,000,000 in the aggregate for all non-Loan Party Subsidiaries, excluding from such covenant any payments made (or to be made) from the Maurice business segments or entities.

SECTION 6.13.   <u>Accounting Changes</u>.  The Parent Borrower will not make any change in the Parent Borrower's fiscal quarter or fiscal year other than as required pursuant to GAAP.

SECTION 6.14.   <u>Sanctions</u>.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Designated Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by an individual or entity (including any individual or entity participating in the transaction, whether as Lender, Administrative Agent, or otherwise) of Sanctions.

SECTION 6.15.   <u>Anti-Corruption Laws</u>.  The Parent Borrower and its Subsidiaries will not, directly or indirectly, use the proceeds of any Borrowing for any purpose which would breach any Anti-Corruption Laws.

<div align="center">ARTICLE VII</div>

<div align="center">Events of Default</div>

If any of the following events ("<u>Events of Default</u>") shall occur:

<div align="center">81</div>

(a)      the Borrowers shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)      the Borrowers shall fail to pay any interest on any Loan or any fee, premium (including the Redemption Premium, if any) or any other amount (other than an amount referred to in clause (a) of this Article) payable under this Agreement, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of three Business Days;

(c)      any representation, warranty or certification made or deemed made by the Parent Borrower or any Restricted Subsidiary in this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any other Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been materially incorrect when made or deemed made (or, in the case of any representation or warranty qualified by materiality, incorrect);

(d)      the Borrowers shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02(a), 5.03 or 5.05 (with respect to the existence of any Borrower), 5.11 (including the Required Milestones) or in Article VI;

(e)      any Loan Party shall fail to observe or perform any covenant, condition or agreement contained in this Agreement or any other Loan Document (other than those specified in clause (a), (b) or (d) of this Article), and such failure shall continue unremedied for a period of 7 Business Days after receipt of written notice thereof from the Administrative Agent;

(f)      except as a result of commencement of the Cases or entry into this Agreement, and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, the Parent Borrower or any Restricted Subsidiary shall fail to make any payment (whether of principal, interest, termination payment or other payment obligation and regardless of amount) in respect of any Material Indebtedness (other than the Loan Document Obligations) when and as the same shall become due and payable (after giving effect to any applicable grace period);

(g)      except as a result of commencement of the Cases or entry into this Agreement and, to the extent applicable, the ABL Credit Agreement, unless the payment, acceleration and/or the exercise of remedies with respect to any such Indebtedness is stayed by the Court or unless any of the following results from obligations with respect to which the Court prohibits or does not permit any Loan Party from applicable compliance, (i) any event or condition shall occur that results in any Material Indebtedness becoming due, or being terminated or required to be prepaid, repurchased, redeemed or defeased, prior to its scheduled maturity, or that enables or permits (with the giving of notice, if required) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf, or, in the case of any Swap Agreement, the applicable counterparty, to cause any Material Indebtedness to become due, or to terminate or to

require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity; provided that this clause (g) shall not apply to (i) any secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the assets securing such Indebtedness or (ii) any Indebtedness that becomes due as a result of a voluntary refinancing thereof permitted under Section 6.01; provided, further, that no such event under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, shall constitute an Event of Default under this clause (g) until the earliest to occur of (x) 5 days after the date of such Event of Default (during which period such Event of Default is not waived or cured), (y) the acceleration of the Indebtedness under the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, as applicable, and (z) the exercise of remedies by the ABL Agent in respect of a material portion of the ABL Priority Collateral, to the extent applicable;

(h)      [reserved];

(i)      [reserved];

(j)      [reserved];

(k)      except for any order fixing the amount of any Claim in the Cases, one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of such judgment and has not denied coverage) shall be rendered against the Parent Borrower or any Restricted Subsidiary, or any combination thereof, and the same shall remain undischarged for a period of 15 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of the Parent Borrower or any Restricted Subsidiary to enforce any such judgment;

(l)      one or more ERISA Events shall have occurred that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect;

(m)      a Change in Control shall occur;

(n)      any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder, satisfaction in full of all the Loan Document Obligations (other than contingent indemnification claims) or any act or omission by the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party contests in any manner the validity or enforceability of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; and

(o)      any Lien purported to be created under any Collateral Document and the Order shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any material Collateral, with the priority required by the applicable Collateral Document, except (i) as a result of the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents to a Person that is not a Loan Party, (ii) the release thereof as provided in the applicable Collateral Document or Section 9.16 or consented to under Section 9.02, (iii) as a result of the failure of the Administrative Agent to (A) maintain possession of any stock certificates, promissory notes or other instruments delivered to it under the Collateral

Agreement or (B) continue in accordance with applicable law the effectiveness of any UCC financing statement or (iv) as to Collateral constituting real property, to the extent such losses are covered by Lender's title insurance policy and such insurer has not denied coverage;

(p)     the RSA is terminated for any reason, or is modified, amended or waived in any manner materially adverse to the Secured Parties without the prior consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders);

(q)     any Loan Party shall file a motion in the Cases without the express written consent of the Required Lenders (or the Administrative Agent at the direction of the Required Lenders), (i) to obtain additional financing under Section 364(d) of the Bankruptcy Code not otherwise permitted under this Agreement or (ii) except as provided in the Order, as the case may be, to use cash collateral of a Lender under Section 363(c) of the Bankruptcy Code that does not either have the prior written consent of the Required Lenders (or the Administrative Agent acting at the direction of the Required Lenders) or provide for the payment of the Loan Document Obligations in full and in cash upon the incurrence of such additional financing;

(r)     an order with respect to any of the Cases shall be entered by the Court (i) appointing a trustee under Section 1104, (ii) appointing an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code, or (iii) converting the Cases to cases under Chapter 7 of the Bankruptcy Code;

(s)     an order shall be entered by the Court dismissing any of the Cases which does not contain a provision for termination of all Commitments, and payment in full in cash of all Loan Document Obligations upon entry thereof;

(t)     an order with respect to any of the Cases shall be entered by the Court without the express prior written consent of the Required Lenders (and with respect to any provisions that affect the rights or duties of the Administrative Agent, the Administrative Agent), with such consent not to be unreasonably withheld, conditioned or delayed, (i) to revoke, reverse, stay, modify, supplement or amend the Order in a manner adverse to the Lenders and/or the Administrative Agent or (ii) to permit, unless otherwise contemplated by the Order, any administrative expense or any Claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority equal or superior to the administrative priority of the Loan Parties' Claims in respect of the Loan Document Obligations (other than the Carve Out);

(u)     (i) an application for any of the orders described in clause (r) above shall be made by a Loan Party or any such application shall be made by a Person other than the Loan Parties and such application is not contested by the Loan Parties in good faith or the relief requested is not withdrawn, dismissed or denied within forty-five (45) days after the filing or (ii) any Person obtains an order under Section 506(c) of the Bankruptcy Code against the Administrative Agent;

(v)     the entry of an order by the Court terminating or modifying the exclusive right of any Loan Party to file a Plan of Reorganization pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders;

(w)     any Loan Party shall fail to comply with the Order;

LA\4104335.13

(x)    any order by the Court is entered granting any superpriority claim that is pari passu with or senior to those of the Secured Parties or any Lien that is senior to the Liens securing the Loan Document Obligations, other than in accordance with the Order;

(y)    the Court enters an order that is adverse in any material respect, when taken as a whole, to the interests of the Administrative Agent and the Lenders or their respective rights and remedies in their capacities as such under this Agreement or in any of the Cases;

(z)    the Loan Parties or any of their Subsidiaries, or any person claiming by or through the Loan Parties or any of their Subsidiaries, obtain court authorization to commence, or commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against any of the Administrative Agent or the Lenders in each case relating to this Agreement, in each case other than as permitted by the Order;

(aa)    the Court denies confirmation of the Plan, provided, that if the Loan Parties subsequently obtain an order of the Court approving a plan of reorganization that either (i) proposes to repay in full in cash of all Loan Document Obligations under the Term Credit Facility, immediately upon the effectiveness thereof, (ii) is, taken as a whole, in form and substance substantially similar to the Plan of Reorganization or (iii) otherwise is approved by the Required Lenders, an Event of Default shall not occur;

(bb)    The Loan Parties attempts to consummate a sale of substantially all of its assets via a plan of reorganization or a 363 sale without consent of the Required Lenders; or

(cc)    the filing by any of the Loan Parties of a Plan of Reorganization other than an Acceptable Plan;

then, notwithstanding anything in Section 362 of the Bankruptcy Code, but subject to the Order, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrowers, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, (ii) declare the Loans then outstanding to be due and payable in whole, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees, premiums and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, in each case without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers and (iii) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law.

ARTICLE VIII

The Administrative Agent

Each of the Lenders hereby irrevocably appoints the entity named as Administrative Agent in the heading of this Agreement and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the Administrative Agent to take such

actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Parent Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (b) the Administrative Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents), provided that the Administrative Agent shall not be required to take any action that, in its opinion, could expose the Administrative Agent to liability or be contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any debtor relief law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Parent Borrower or any Subsidiary or any other Affiliate thereof that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment). The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (stating that it is a "notice of default") is given to the Administrative Agent by the Borrowers or a Lender, and the Administrative Agent shall

not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (iv) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of Liens on the Collateral or the existence of the Collateral or (vi) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the Administrative Agent.

The Administrative Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof).  The Administrative Agent also shall be entitled to rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender, unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all their duties and exercise their rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the terms of this paragraph, the Administrative Agent may resign at any time, upon thirty days prior notice, from its capacity as such.  In connection with such resignation, the

Administrative Agent shall give notice of its intent to resign to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, with the consent of the Borrower so long as no Event of Default under clauses (a) or (b) of Article VII is continuing, to appoint a successor.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent, which shall be a bank with an office in New York, New York, or an Affiliate of any such bank.  Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents.  The fees payable by the Borrowers to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor.  Notwithstanding the foregoing, in the event no successor Administrative Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its intent to resign, the retiring Administrative Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents, provided that, solely for purposes of maintaining any security interest granted to the Administrative Agent under any Collateral Document for the benefit of the Secured Parties, the retiring Administrative Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Secured Parties and, in the case of any Collateral in the possession of the Administrative Agent, shall continue to hold such Collateral, in each case until such time as a successor Administrative Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring Administrative Agent shall have no duty or obligation to take any further action under any Collateral Document, including any action required to maintain the perfection of any such security interest), and (b) the Required Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, provided that (i) all payments required to be made hereunder or under any other Loan Document to the Administrative Agent for the account of any Person other than the Administrative Agent shall be made directly to such Person and (ii) all notices and other communications required or contemplated to be given or made to the Administrative Agent shall also directly be given or made to each Lender.  Following the effectiveness of the Administrative Agent's resignation from its capacity as such, the provisions of this Article and Section 9.03, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Administrative Agent and in respect of the matters referred to in the proviso under clause (a) above.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent, any other Lender or the Debtors' Investment Banker, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the

Administrative Agent, or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Each Lender, by delivering its signature page to this Agreement and funding its Loans on the Effective Date, or delivering its signature page to an Assignment and Assumption or any other Loan Document pursuant to which it shall become a Lender hereunder, shall be deemed to have acknowledged receipt of, and consented to and approved, each Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the Administrative Agent or the Lenders on the Effective Date.

Except with respect to the exercise of setoff rights of any Lender in accordance with the Loan Documents or with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any Guarantee of the Loan Document Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms thereof.  In the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Administrative Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the Administrative Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Loan Document Obligations as a credit on account of the purchase price for any collateral payable by the Administrative Agent on behalf of the Secured Parties at such sale or other disposition.

The Secured Parties irrevocably authorize the Administrative Agent, at its option and in its discretion, to subordinate or release any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is a Permitted Encumbrance or that is permitted by Section 6.02(d), (e), (g) and (h).  The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

In case of the pendency of any proceeding with respect to any Loan Party under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans, and all other Loan Document Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim under Sections 2.10, 2.11, 2.13, 2.14, 2.15 and 9.03) allowed in such judicial proceeding;

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and

(c)      any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such proceeding is hereby authorized by each Lender and each Secured Party to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders or the other Secured Parties, to pay to the Administrative Agent any amount due to it, in its capacity as the Administrative Agent, under the Loan Documents (including under Section 9.03).

To the extent required by any applicable laws (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.15, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within 10 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Loan Document Obligations.

Notwithstanding anything herein to the contrary, neither the Debtors' Investment Banker nor any Person (if any) named on the cover page of this Agreement for recognition purposes only shall have any duties or obligations under this Agreement or any other Loan Document (except in any such Person's capacity, as and to the extent applicable, as a Lender), but all such Persons shall have the benefit of the indemnities to the extent referenced and provided for hereunder.

Unless otherwise expressly stated or referred to in this Article, the provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and, except solely to the extent of the Borrowers' rights to consent pursuant to and subject to the conditions set

forth in this Article, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Loan Document Obligations provided under the Loan Documents, to have agreed to the provisions of this Article.

<div align="center">ARTICLE IX</div>

<div align="center">Miscellaneous</div>

SECTION 9.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) of this Section), all notices and other communications provided for herein shall be in writing and shall be delivered by e-mail, hand or overnight courier service, or mailed by certified or registered mail, as follows:

(i)    if to the Borrowers:

Ascena Retail Group, Inc.
933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention:  Dan Lamadrid, Executive Vice President and Chief Financial Officer
E-mail: dan.lamadrid@ascenaretail.com

with a copy to:

933 MacArthur Boulevard
Mahwah, New Jersey 07430
Attention: Gary Holland, General Counsel and VP
E-mail: gary.holland@ascenaretail.com

With a copy to:
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
Attention:  David M. Nemecek, P.C.
Email: david.nemecek@kirkland.com

(ii)    if to the Administrative Agent:

Alter Domus (US) LLC
225 W. Washington St., 9th Floor
Chicago, IL 60606
Attention: Legal Department and Hendrik van der Zandt
Email: legal@alterdomus.com and hendrik.vanderzandt@alterdomus.com

<div align="center">91</div>

with a copy to:

Holland & Knight LLP
150 N. Riverside Plaza, Suite 2700
Chicago, IL 60606
Attention: Joshua Spencer
Email: joshua.spencer@hklaw.com

and

Milbank LLP
55 Hudson Yards
New York, New York 10001
Attention:  Evan Fleck
Email: EFleck@milbank.com

(iii)    if to any other Lender, to it at its address or e-mail address set forth in its Administrative Questionnaire.

All such notices and other communications (i) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received and (ii) delivered through electronic communications to the extent provided in paragraph (b) of this Section shall be effective as provided in such paragraph.

(b)    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications (including e-mail and internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices under Article II to any Lender if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Parent Borrower (on behalf of the Loan Parties) may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.  All such notices and other communications (i) sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by return e-mail or other written acknowledgement); provided that if not given during the normal business hours of the recipient, such notice or communication shall be deemed to have been given at the opening of business on the next Business Day for the recipient, and (ii) posted to an internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (b)(i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    Any party hereto may change its address for notices and other communications hereunder by notice to the other parties hereto.

(d)      The Borrowers agree that the Administrative Agent may, but shall not be obligated to, make any Communication by posting such Communication on Debt Domain, Intralinks, Syndtrak or a similar electronic transmission system (the "Platform").  The Platform is provided "as is" and "as available."  Neither the Administrative Agent nor any of its Related Parties warrants, or shall be deemed to warrant, the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the Communications.  No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made, or shall be deemed to be made, by the Administrative Agent or any of its Related Parties in connection with the Communications or the Platform.

SECTION 9.02.    Waivers; Amendments.

(a)      No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  Without limiting the generality of the foregoing, the execution and delivery of this Agreement or the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)      Except as provided in Sections 9.02(c) and 9.19 and except with respect to the Administrative Agent Fee Letter, none of this Agreement, any other Loan Document or any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Borrowers, the Administrative Agent and the Required Lenders and, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that (i) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by the Borrowers and the Administrative Agent to cure any technical error, ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment and (ii) no such agreement shall (A) increase the Commitment of any Lender without the written consent of such Lender, (B) reduce or forgive the principal amount of any Loan or reduce the rate of interest thereon or reduce or forgive any interest or fees or premiums (including any prepayment premiums but excluding for the avoidance of doubt, any mandatory prepayment) payable hereunder without the written consent of each Lender directly affected thereby, (C) postpone the scheduled maturity date of any Loan,

93

or the date of any scheduled payment of the principal amount of any Term Loan under Section 2.08, or any date for the payment of any interest or fees or premium payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby, (D) change Section 2.16(b) or 2.16(c) in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender, (E) change any of the provisions of this Section or the percentage set forth in the definition of the term "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender; provided that, with the consent of the Required Lenders, the provisions of this Section and the definition of the term "Required Lenders" may be amended to include references to any new class of loans created under this Agreement (or to lenders extending such loans) on substantially the same basis as the corresponding references relating to the existing Loans or Lenders, (F) release substantially all of the value of the Guarantees provided by the Guarantors (including, in each case, by limiting liability in respect thereof) created under the Collateral Agreement without the written consent of each Lender (except as expressly provided in Section 9.16 or the Collateral Agreement including any such release by the Administrative Agent in connection with any sale or other disposition of any Subsidiary upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations guaranteed under the Collateral Agreement shall not be deemed to be a release or limitation of any Guarantee, and (G) release all or substantially all the Collateral from the Liens of the Collateral Documents, without the written consent of each Lender (except as expressly provided in Section 9.16 or the applicable Collateral Document (including any such release by the Administrative Agent in connection with any sale or other disposition of the Collateral upon the exercise of remedies under the Collateral Documents), it being understood that an amendment or other modification of the type of obligations secured by the Collateral Documents shall not be deemed to be a release of the Collateral from the Liens of the Collateral Documents); provided further that no such agreement shall amend, modify, extend or otherwise affect the rights or obligations of the Administrative Agent without the prior written consent of the Administrative Agent. Notwithstanding the foregoing, no consent with respect to any amendment, waiver or other modification of this Agreement or any other Loan Document shall be required of, in the case of any amendment, waiver or other modification referred to in clause (ii) of the first proviso of this paragraph, any Lender that receives payment in full of the principal of and interest accrued on each Loan made by, and all other amounts owing to, such Lender or accrued for the account of such Lender under this Agreement and the other Loan Documents at the time such amendment, waiver or other modification becomes effective and whose Commitments terminate by the terms and upon the effectiveness of such amendment, waiver or other modification.

(c)    Notwithstanding anything herein to the contrary, the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Loan Party from any covenant of such Loan Party set forth in this Agreement, the Collateral Agreement or in any other Collateral Document to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement".

(d)    The Administrative Agent may, but shall have no obligation to, with the concurrence of any Lender, execute amendments, waivers or other modifications on behalf of such Lender.  Any amendment, waiver or other modification effected in accordance with this Section 9.02 shall be binding upon each Person that is at the time thereof a Lender and each Person that subsequently becomes a Lender.

(e)    Notwithstanding the foregoing, Exhibit G to this Agreement, the definitions of "Exit Facility Agreement" and "Exit Facility Term Sheet" and Section 2.22 (or any other provision which would result in an amendment, restatement, waiver or modification of any of the foregoing) may be amended, restated, waived or otherwise modified with the prior written consent of the Required Lenders, the Administrative Agent and the Parent Borrower; provided that to the extent such amendment, restatement, waiver or other modification would require the consent of any affected "Lender", all "Lenders" or any other Person (or requisite class of Persons) under the terms of Exhibit G as in effect on the Effective Date, the prior written consent of the corresponding affected Lender, all Lenders or such corresponding Person (or requisite class of Persons) under this Agreement shall be required; provided, further, that the Lenders hereby authorize the Administrative Agent to enter into any amendments to this Agreement and the other Loan Documents as may be necessary, in the reasonable opinion of the Administrative Agent and the Borrower, to give effect to the transaction contemplated by Section 2.22 and such other technical or immaterial amendments as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Parent Borrower in connection therewith.

SECTION 9.03.    Expenses; Indemnity; Damage Waiver.

(a)    The Borrowers shall, jointly and severally, pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee, the Lenders and their respective Affiliates, including the reasonable and documented out-of-pocket fees, charges and disbursements of one primary counsel for the Administrative Agent, and one primary counsel for the Ad Hoc Committee, and if deemed necessary by the Administrative Agent or the Ad Hoc Committee, one local counsel for the Administrative Agent and Ad Hoc Committee, as applicable in each applicable jurisdiction, in connection with the structuring, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof, the Order and any transaction contemplated thereby (whether or not the transactions contemplated hereby or thereby shall be consummated) and any refinancing of the obligations hereunder or any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all reasonable and documented out-of-pocket expenses in connection with the administration of actions related to the Collateral, including any actions taken to perfect or maintain priority of the Administrative Agent's Liens on the Collateral, to maintain any insurance required hereunder, to verify the Collateral, or any audit, inspection, or appraisal related to any Loan Party or the Collateral  and (iii) all out-of-pocket expenses incurred by the Administrative Agent, the Ad Hoc Committee or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this

95

Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    The Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any subagent thereof), and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee"), against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the structuring, arrangement and the syndication of the credit facilities provided for herein, the preparation, execution, enforcement, delivery and administration of this Agreement, the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to this Agreement or the other Loan Documents of their obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on, at, under to or from any property currently or formerly owned or operated by the Parent Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Parent Borrower or any Subsidiary or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether such proceeding is initiated against or by any party to this Agreement, or any Affiliate thereof, by an Indemnitee or any third party or whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (i) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnitee, (ii) are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from a material breach by such Indemnitee of the Loan Documents or (iii) involve a dispute solely among Indemnitees (other than an action involving (i) alleged conduct by any Borrower or any of its Affiliates or (ii) against the Administrative Agent in its capacity as such).  This Section shall not apply to any Taxes (other than Other Taxes or any Taxes that represent losses, claims, damages or related expenses arising from any non-Tax claim).

(c)    Each Lender severally agrees to indemnify and hold harmless the Administrative Agent (or any sub-agent thereof), to the extent that the Administrative Agent (or any sub-agent) shall not have been timely reimbursed by the Borrowers, based on and to the extent of such Lender's pro rata share, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against the Administrative Agent (or any sub-agent thereof) in exercising its powers, rights and remedies or performing its duties hereunder or under the other Loan Documents or otherwise in its capacity as the Administrative Agent (or any sub-agent thereof) in any way relating to or arising out of this Agreement or the other Loan Documents; provided, that no Lender shall be liable to the Administrative Agent (or any sub-agent) for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or any sub-agent's) gross negligence or willful misconduct, as determined by a final, non-appealable judgment of a court of competent

jurisdiction (it being understood and agreed that no action taken in accordance with the directions of the Required Lenders (or such other Lenders as may be required to give such instructions under Article VIII) shall constitute gross negligence or willful misconduct). If any indemnity furnished to the Administrative Agent (or any sub-agent thereof) for any purpose shall, in the opinion of the Administrative Agent (or any sub-agent thereof), be insufficient or become impaired, the Administrative Agent (or any sub-agent ) may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, that in no event shall this sentence require any Lender to indemnify the Administrative Agent (or any sub-agent thereof) against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata share. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the sum of the total outstanding Loans and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Loans have been paid in full in accordance with such Lender's pro rata share immediately prior to the date on which the Loans are paid in full).

(d)    To the extent permitted by applicable law, (i) the Borrowers shall not assert, or permit any of their respective Affiliates or Related Parties to assert, and hereby waives, any claim against any Indemnitee for any damages arising from the use by others of information or other materials obtained through telecommunications, electronic or other information transmission systems (including the internet)and (ii) none of the Borrowers or any Secured Party shall assert, or permit any of their respective Affiliates or Related Parties to assert any claims on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)    All amounts due under this Section shall be payable not later than 10 days after written demand therefor.

SECTION 9.04.    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i)  neither Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by any Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Debtors' Investment Banker (to the extent provided in Article VIII)and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

97

(b)     Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld, conditioned or delayed) of:

(i)     the Borrowers; provided that no consent of Borrowers shall be required (1) for an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund (2) if in connection with the Initial Allocation (as defined in the Commitment Letter) and (3) if an Event of Default has occurred and is continuing, for any other assignment; provided further that, the Borrowers shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 10 Business Days after having received notice thereof.

(ii)     the Administrative Agent; provided that no consent of the Administrative Agent shall be required for an assignment of any Loan to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund.

(iii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, a Related Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and recorded in the Register) shall not be less than $1,000,000 unless each of the Borrowers and the Administrative Agent otherwise consent; provided that no such consent of the Borrowers shall be required (i) if an Event of Default has occurred and is continuing or (ii) in connection with the Initial Allocation (as defined in the Commitment Letter);

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, provided that only one such processing and recordation fee shall be payable in the event of simultaneous assignments from any Lender or its Approved Funds to one or more other Approved Funds of such Lender;

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent all requested "know your customer" documentation, a duly executed IRS Form W-9 or such other applicable IRS Form, and an Administrative Questionnaire in which the assignee designates one or more credit

LA\4104335.13

contacts to whom all syndicate-level information (which may contain MNPI) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable law, including Federal, State and foreign securities laws;

(E)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent, the Ad Hoc Committee Advisors and the Company a signed joinder to the Restructuring Support Agreement; and

(F)     each Lender acknowledges and agrees that the Loans, on the one hand, and the unfunded Commitments on the other hand, shall be held by such Lender in equal percentages and such Loans, on the one hand, and such unfunded Commitments, on the other hand, are "stapled" to each other, and shall be assigned in equal percentages.

(iv)     Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.13, 2.14, 2.15 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 9.04(c).

(v)     The Administrative Agent, acting solely for this purpose as a nonfiduciary agent of the Borrowers, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and records of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrowers and, as to entries pertaining to it, any Lender, at any reasonable time and from time to time upon reasonable prior written notice.

(vi)     Upon receipt by the Administrative Agent of an Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), all other information required under (iii)(D) above and the processing and recordation fee referred to in this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register; provided that

99

the Administrative Agent shall not be required to accept such Assignment and Assumption or so record the information contained therein if the Administrative Agent reasonably believes that such Assignment and Assumption lacks any written consent required by this Section or is otherwise not in proper form, it being acknowledged that the Administrative Agent shall have no duty or obligation (and shall incur no liability) with respect to obtaining (or confirming the receipt) of any such written consent or with respect to the form of (or any defect in) such Assignment and Assumption, any such duty and obligation being solely with the assigning Lender and the assignee.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph, and following such recording, unless otherwise determined by the Administrative Agent (such determination to be made in the sole discretion of the Administrative Agent, which determination may be conditioned on the consent of the assigning Lender and the assignee), shall be effective notwithstanding any defect in the Assignment and Assumption relating thereto.  Each assigning Lender and the assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the Administrative Agent that all written consents required by this Section with respect thereto (other than the consent of the Administrative Agent) have been obtained and that such Assignment and Assumption is otherwise duly completed and in proper form, and each assignee, by its execution and delivery of an Assignment and Assumption, shall be deemed to have represented to the assigning Lender and the Administrative Agent that such assignee is an Eligible Assignee.

(vii)    No such assignment shall be made to the Parent Borrower or any of its Subsidiaries, except as set forth in Section 9.04(e).

(c)     (i) Any Lender may, without the consent of the Borrowers or the Administrative Agent, sell participations to one or more Eligible Assignees ("Participants") in all or a portion of such Lender's rights and obligations under this Agreement; provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under the Loan Documents.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant or requires the approval of all the Lenders.  The Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.13, 2.14 and 2.15 (subject to the requirements and limitations therein, including the requirements under Section 2.15(e) (it being understood that the documentation required under Section 2.15(e) shall be delivered solely to the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; provided that such Participant (x) agrees to be subject to the provisions of Sections 2.16 and 2.17 as if it were an assignee under paragraph (b) of this Section and (y) shall not be entitled to receive any greater payment under Section 2.13 or 2.15, with respect to any participation, than its participating Lender would have been entitled to receive,

except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  Each Lender that sells a participation agrees, at the Borrowers' request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 2.17(b) with respect to any Participant.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.16(c) as though it were a Lender.

(i)        Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain records of the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under this Agreement or any other Loan Document (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments or Loans or its other obligations under this Agreement or any other Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment or Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)        Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(e)        Notwithstanding anything to the contrary contained in this Section 9.04 or any other provision of this Agreement, no Lender shall have the right at any time to sell, assign or transfer all or a portion of the Loans owing to it to the Parent Borrower or any of its Subsidiaries.

SECTION 9.05.    Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent, any Lender or any Affiliate of any of the foregoing may have had notice or knowledge of any Default or incorrect representation or warranty at the time any Loan Document is executed and delivered or any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the

LA\4104335.13

Commitments have not expired or terminated.  The provisions of Sections 2.13, 2.14, 2.15, 2.16(e) and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

SECTION 9.06.    Counterparts; Integration; Effectiveness; Electronic Execution.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging shall be effective as delivery of a manually executed counterpart of this Agreement.  The words "execution," "signed," "signature," "delivery," and words of like import in or relating to any document to be signed in connection with this Agreement and the transactions contemplated hereby or thereby shall be deemed to include Electronic Signatures, deliveries or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature, physical delivery thereof or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

SECTION 9.07.    Severability.  Any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08.    Right of Setoff.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized (notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Court) at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the Loan Document Obligations held by such Lender, irrespective of whether or not such Lender shall have made any demand under the Loan Documents and although such obligations may be unmatured.  The applicable Lender shall notify the Borrowers and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.09.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    Except to the extent superseded by the Bankruptcy Code, this Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    Each party hereto hereby irrevocably and unconditionally submits, for itself and its property, to the non-exclusive jurisdiction of the Court or the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and the Borrowers hereby irrevocably and unconditionally agree that all claims arising out of or relating to this Agreement or any other Loan Document brought by the Borrowers or any of their respective Affiliates shall be brought, and shall be heard and determined in the Court, in such New York State or, to the extent permitted by law, in such Federal court. Each party hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or any of its properties in the courts of any jurisdiction.

(c)    The Borrowers hereby irrevocably and unconditionally waive, to the fullest extent they may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10.    WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11.    Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.12.    Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below) with the same degree of care that it uses to protect its own confidential information, but in no event less than a commercially reasonable degree of care, except that Information may be disclosed (a) to its Related Parties, including accountants, legal counsel and other agents and advisors, it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential, (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable law or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under this Agreement or any other Loan Document or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its Related Parties) to any swap or derivative transaction relating to the Parent Borrower or any Subsidiary or its obligations, (g) on a confidential basis to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein, (h) with the consent of the Borrowers or (i) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender or any Affiliate of any of the foregoing on a non-confidential basis from a source other than the Borrowers; provided that, in the case of clause (c) above, the party disclosing such information shall provide to the Borrowers prior written notice of such disclosure to the extent permitted by applicable law (and to the extent commercially feasible under the circumstances) and shall cooperate with the Borrowers in obtaining a protective order for, or other confidential treatment of, such disclosure.  For the purposes of this Section, "Information" means all information received from the Borrowers relating to the Parent Borrower or any Subsidiary or their businesses or the Collateral.

SECTION 9.13.    Several Obligations; Nonreliance; Violation of Law.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.  Anything contained in this Agreement to the contrary notwithstanding, no Lender shall be obligated to extend credit to the Borrowers in violation of applicable law.

SECTION 9.14.    USA Patriot Act Notice.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the Patriot Act it is required to obtain, verify and record information that identifies such Loan Party, which information includes the name and address of such Loan Party

and other information that will allow such Lender or the Administrative Agent, as applicable, to identify such Loan Party in accordance with such Act.

SECTION 9.15.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.16.    Release of Liens and Guarantees.  A Guarantor (for the avoidance of doubt, other than the Borrowers) shall be released from its obligations under the Loan Documents, and all security interests created by the Collateral Documents in Collateral owned by such Guarantor shall be released, upon the consummation of any transaction permitted by this Agreement as a result of which such Guarantor ceases to be a Restricted Subsidiary (including any voluntary liquidation or dissolution of such Guarantor in accordance with Section 6.03); provided that, if so required by this Agreement, the Required Lenders shall have consented to such transaction and the terms of such consent shall not have provided otherwise.  Upon any sale or other transfer by any Loan Party (other than to a Borrower or any other Loan Party or to any other Subsidiary of the Parent Borrower) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Collateral Document in any Collateral pursuant to Section 9.02, the security interests in such Collateral created by the Collateral Documents shall be automatically released. In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release.  Any execution and delivery of documents pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

SECTION 9.17.    No Fiduciary Relationship.  Each Borrower, on behalf of itself and the Subsidiaries, agrees that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the Parent Borrower, the Subsidiaries and its other Affiliates, on the one hand, and the Administrative Agent, the Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Administrative Agent, the Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.  The Administrative Agent, the Lenders and their Affiliates may be engaged, for their own accounts or the accounts of customers, in a broad range of transactions that involve interests that differ from those of the Parent Borrower, the Subsidiaries and its other Affiliates, and none of the Administrative Agent, the Lenders or their Affiliates has any

105

obligation to disclose any of such interests to the Parent Borrower, the Subsidiaries or its other Affiliates.  To the fullest extent permitted by law, each Borrower hereby waives and releases any claims that it or any of its Affiliates may have against the Administrative Agent, the Lenders and their Affiliates with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

SECTION 9.18.   Non-Public Information.

(a)      Each Lender acknowledges that all information, including requests for waivers and amendments, furnished by a Borrower or the Administrative Agent pursuant to or in connection with, or in the course of administering, this Agreement will be syndicate-level information, which may contain MNPI.  Each Lender represents to the Borrowers and the Administrative Agent that (i) it has developed compliance procedures regarding the use of MNPI and that it will handle MNPI in accordance with such procedures and applicable law, including Federal, state and foreign securities laws, and (ii) it has identified in its Administrative Questionnaire a credit contact who may receive information that may contain MNPI in accordance with its compliance procedures and applicable law, including Federal, state and foreign securities laws.

(b)      The Borrowers and each Lender acknowledge that, if information furnished by the Loan Parties pursuant to or in connection with this Agreement is being distributed by the Administrative Agent through the Platform, (i) the Administrative Agent may post any information that the Borrowers have indicated as containing MNPI solely on that portion of the Platform designated for Private Side Lender Representatives and (ii) if the Borrowers have not indicated whether any information furnished by it pursuant to or in connection with this Agreement contains MNPI, the Administrative Agent reserves the right to post such information solely on that portion of the Platform designated for Private Side Lender Representatives.  The Borrowers agree to clearly designate all information provided to the Administrative Agent by or on behalf of the Borrowers that is suitable to be made available to Public Side Lender Representatives, and the Administrative Agent shall be entitled to rely on any such designation by the Borrowers without liability or responsibility for the independent verification thereof.

SECTION 9.19.   Intercreditor Agreement.  (a) Each of the Lenders and the other Secured Parties acknowledges that obligations of the Loan Parties under the ABL Credit Agreement are secured by Liens on assets of the Loan Parties that constitute Collateral and that the relative Lien priorities and other creditor rights of the Secured Parties and the secured parties under the ABL Credit Agreement will be set forth in the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby acknowledges that it has received a copy of the Intercreditor Agreement.  Each of the Lenders and the other Secured Parties hereby irrevocably authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, the Intercreditor Agreement and any documents relating thereto.

(a)      Each of the Lenders and the other Secured Parties hereby irrevocably (i) consents to the treatment of Liens provided for under the Intercreditor Agreement, including to the subordination of the Liens on the ABL Priority Collateral securing the Loan Document Obligations on the terms set forth in the Intercreditor Agreement, (ii) agrees that, upon the

106

execution and delivery thereof, such Secured Party will be bound by the provisions of the Intercreditor Agreement as if it were a signatory thereto and will take no actions contrary to the provisions of the Intercreditor Agreement, (iii) agrees that no Secured Party shall have any right of action whatsoever against the Administrative Agent as a result of any action taken by the Administrative Agent pursuant to this Section 9.19 or in accordance with the terms of the Intercreditor Agreement, (iv) authorizes and directs the Administrative Agent to carry out the provisions and intent of each such document and (v) authorizes and directs the Administrative Agent to take such actions as shall be required to release Liens on the Collateral in accordance with the terms of the Intercreditor Agreement.

(b)      Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of the Intercreditor Agreement that the Borrowers may from time to time request and that are reasonably acceptable to the Administrative Agent (i) to give effect to any establishment, incurrence, amendment, extension, renewal, refinancing or replacement of any Loan Document Obligations or the Indebtedness under the ABL Credit Agreement to the extent applicable, (ii) to confirm for any party that the Intercreditor Agreement is effective and binding upon the Administrative Agent on behalf of the Secured Parties or (iii) to effect any other amendment, supplement or modification permitted by the terms of the Intercreditor Agreement.

(c)      Each of the Lenders and the other Secured Parties hereby irrevocably further authorizes and directs the Administrative Agent to execute and deliver, in each case on behalf of such Secured Party and without any further consent, authorization or other action by such Secured Party, any amendments, supplements or other modifications of any Collateral Document to add or remove any legend that may be required pursuant to the Intercreditor Agreement.

(d)      The Administrative Agent shall have the benefit of the provisions of Article VIII with respect to all actions taken by it pursuant to this Section or in accordance with the terms of the Intercreditor Agreement to the full extent thereof.

SECTION 9.20.   Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Loan Document or in any related agreement, arrangement or understanding among the parties hereto, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)      the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder that may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)  a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

[Signature pages follow]

LA\4104335.13

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**PARENT BORROWER:**

ASCENA RETAIL GROUP, INC.

By: _____

Name:

Title:

*[Signature Page to the Term Credit Agreement]*

**SUBSIDIARY BORROWER:**

ANNTAYLOR RETAIL, INC.

By: _____

    Name:

    Title:

LA\4104335.13

ALTER DOMUS (US) LLC,
as Administrative Agent,


By: _____
Name:
Title:


*[Signature Page to the Term Credit Agreement]*

**Schedule 2.01**

**Commitments**

| Lender | Commitment |
| --- | --- |
| [   ] | $            [  ],000,000 |
| **Total** | $            [  ],000,000 |

Schedule 5.11
Required Milestones

The Loan Parties shall use their reasonable best efforts to pursue and implement the Restructuring Transactions as defined in, and in accordance with, the RSA and shall, subject to the availability of the Court and as such time periods may be extended by the Required Lenders, achieve the following milestones:

(a)  the Petition Date has not occurred by 11:59 p.m. (Eastern Time) on July 23, 2020;

(b)  the Debtors have not filed the Rent Deferral Motion (as defined in the RSA) with the Court within three (3) calendar days of the Petition Date;

(c)  the Court has not entered the Cash Collateral Order (as defined in the RSA) on an interim basis by the date that is five (5) Business Days after the Petition Date;

(d)  the Court has not entered the DIP Financing Order (as defined in the RSA) on a final basis by the date that is thirty-five (35) calendar days after the Petition Date;

(e)  the Court has not entered the Disclosure Statement Order (as defined in the RSA) by the date that is sixty (60) calendar days after the Petition Date;

(f)  solicitation of the Plan (as defined in the RSA) has not commenced by the date that is seventy (70) calendar days after the Petition Date;

(g)  the Court has not entered the Confirmation Order (as defined in the RSA) by the date that is one hundred ten (110) calendar days after the Petition Date; and

(h)  the Plan Effective Date (as defined in the RSA) has not occurred by the date that is one hundred thirty (130) calendar days after the Petition Date.

**Exhibit B**

See Attached.

**Exit Facility Term Sheet[1]**

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

Loans).  The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

| | |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders).  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**").  <br><br> Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans:  The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

**Voluntary Prepayments:**     The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period.

**Mandatory Prepayments:**     Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement).

**Interest:**     With respect to the First Out Term Loans, at the Parent Borrower's election:

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

**Prepayment Premium**   NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders.

**Guarantees:**   All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or

4

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

"**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

"**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

"**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

5

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

**Security:**

Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:**

The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

| | |
|---|---|
| **Representations and Warranties:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles. |
| **Affirmative Covenants:** | Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time. |
| **Negative Covenants:** | Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and |

"baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket.

**Financial Covenant:**   First Out Term Loans:

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

**Unrestricted Subsidiaries:**   None.

**Events of Default:**   Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights.

**Voting:**   Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions.

11

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

**Governing Law and Forum:**       New York.

## **EXHIBIT D**

**Exit Facility Term Sheet**

**Exit Facility Term Sheet**[1]

| | |
|---|---|
| **Borrowers:** | Reorganized Ascena Retail Group, Inc., a Delaware corporation (the "**Parent Borrower**") and AnnTaylor Retail, Inc., a Florida corporation (the "**Subsidiary Borrower**" and, together with the Parent Borrower, the "**Borrowers**"). |
| **Administrative Agent and Collateral Agent:** | Alter Domus (US) LLC (in its capacity as administrative agent, the "**Administrative Agent**", and in its capacity as collateral agent, the "**Collateral Agent**"). |
| **Lenders:** | Holders of DIP Term Facility Claims will receive First Out Term Loans and, together with other holders of Term Loan Claims, Last Out Term Loans (each as defined below), respectively, as set forth in the Proposed Plan (collectively, the "**Lenders**") |
| **Term Loan Facility:** | First lien senior secured term loan facility in an aggregate original principal amount of $400 million, denominated in US Dollars, consisting of: |

- $311.8 million of first-out term loans (the "**First Out Term Loan Facility**", the loans thereunder, the "**First Out Term Loans**" and the commitments thereunder, the "**First-Out Commitments**") converted in accordance with the Proposed Plan to holders of DIP Term Facility Claims; and

- $88.2 million of last-out term loans (the "**Last Out Term Loan Facility**", the loans thereunder, the "**Last Out Term Loans**" and the commitments thereunder, the "**Last-Out Commitments**") distributed to holders of Term Loan Claims in accordance with the Proposed Plan.

As used herein, "**Term Loan Facility**" means, collectively, the First Out Term Loan Facility and the Last Out Term Loan Facility. "**Commitments**" means, collectively, the First Out Commitments and the Last Out Commitments. "**Term Loans**" means, collectively, the First Out Term Loans and the Last Out Term Loans.

The First Out Term Loans will be "first out" in right of payment priority and the Last Out Term Loans will be "last out" in right of payment priority (in each case, as between the tranches of Term

---

[1] Capitalized terms used but not defined in this Exit Facility Term Sheet have the meanings ascribed to them in the Restructuring Support Agreement, dated as of July 23, 2020 (the "**Restructuring Support Agreement**") to which this Exit Facility Term Sheet is attached or the Proposed Plan attached as Exhibit B to the Restructuring Support Agreement.

Loans).  The First Out Term Loans and Last Out Term Loans shall be secured on a *pari passu* basis by the same lien on the Collateral (as defined below).

| | |
|---|---|
| **Definitive Documentation:** | The definitive documentation for the Term Loan Facility (the "**Definitive Documentation**") shall, except as otherwise set forth herein, be based on the Term Credit Agreement, dated as of August 21, 2015 (as amended, supplemented or otherwise modified prior to the date hereof), by and among Ascena Retail Group, Inc., AnnTaylor Retail, Inc., certain subsidiaries of the Parent Borrower party thereto, Goldman Sachs Bank USA, as the administrative agent and the collateral agent, and certain lenders party thereto from time to time (the "**Prepetition Term Loan Credit Agreement**"), (i) as modified by the terms set forth herein, (ii) subject to modifications to reflect changes in law or accounting standards since the date of such precedent and administrative agency, collateral agency and operational requirements of the Administrative Agent and Collateral Agent and (iii) with such other terms and conditions as may be reasonably agreed between the Borrowers and the Required Consenting Stakeholders; provided that, except as otherwise agreed by the Required Consenting Stakeholders, the Definitive Documentation shall be substantially consistent with the documentation governing the Exit ABL Facility (other than (i) provisions that are specific to asset-based facilities, (ii) the financial covenants applicable thereto, (iii) cross-defaults with respect to the Term Loan Facility and (iv) such other terms mutually agreed between the Borrowers and the Required Consenting Stakeholders).  The Definitive Documentation shall be negotiated in good faith within a reasonable time period to be determined based on the expected date of Bankruptcy Court's entry into the Confirmation Order, with initial drafts of the Definitive Documentation to be prepared by counsel for the Consenting Stakeholders, which is Milbank LLP. This paragraph, collectively, is referred the here as the "**Documentation Principles**". |
| **Maturity Date:** | First Out Term Loans: 4 years after the Effective Date (the "**First Out Maturity Date**"). |
| | Last Out Term Loans: 5 years after the Effective Date (the "**Last Out Maturity Date**"). |
| **Amortization:** | First Out Term Loans: Commencing with the last day of the first full calendar quarter following the Effective Date, the outstanding principal amount of the First Out Term Loans will be payable on each calendar quarter in equal amounts of (i) for each calendar quarter occurring on or prior to the second anniversary of the Effective Date, 1.00% *per annum* and (ii) for each calendar quarter |

thereafter, 3.00% *per annum,* in each case of the original principal amount of the First Out Term Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the First Out Maturity Date, subject to reduction pursuant to the prepayment provisions to be mutually agreed in the Definitive Documentation.

Last Out Term Loans:  The outstanding principal amount of the Last Out Term Loans will be payable on each calendar quarter in equal amounts of 1.00% *per annum* of the original principal amount of the Last Out Term  Loans, with the remaining balance, together with all other amounts owed with respect thereto, payable on the Last Out Maturity Date .

| | |
|---|---|
| **Voluntary Prepayments:** | The Borrowers may make voluntary prepayments of the Term Loans, in each case, other than in connection with a repricing event, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of LIBOR borrowings other than on the last day of the relevant interest period. |
| **Mandatory Prepayments:** | Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles; provided that no prepayment shall be required pursuant to Section 2.09(c) thereof for any Excess Cash Flow (as defined in the Prepetition Term Loan Credit Agreement). |
| **Interest:** | With respect to the First Out Term Loans, at the Parent Borrower's election: |

- ABR (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 10.75% per annum in cash or Adjusted LIBO Rate (defined in a manner substantially similar to the Prepetition Term Loan Credit Agreement) *plus* 11.75% per annum in cash (subject to a 0.00% per annum floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate) .

With respect to the Last Out Term Loans, at the Parent Borrower's election:

- prior to the second anniversary of the Effective Date, ABR *plus* 2.00% *per annum* in cash and 8.00% *per annum* in kind ("**PIK**") or Adjusted LIBO Rate *plus* 2.50% *per annum* in cash and 8.50% PIK, and thereafter, ABR *plus* 10.00% *per annum* in cash or Adjusted LIBO Rate *plus* 11.00% *per annum* in cash

3

(in each case subject to a 0.00% *per annum* floor on ABR and a 1.00% *per annum* floor on the Adjusted LIBO Rate).

**Prepayment Premium**

NC1/106.375%/103.1875%/par, with the Make-Whole Amount payable at an amount equal to the present value of the amount of interest that would have been paid on the principal amount of the Loans to and including the 3.5 year anniversary of the Closing Date (in each case, calculated on the basis of the interest rate with respect to the Loans then in effect, on a quarterly basis and on the basis of actual days elapsed over a year of three hundred sixty-five (365) days). The present value calculation shall be calculated using the discount rate equal to the Treasury Rate as of such repayment or prepayment date or date of required repayment plus fifty (50) basis points. The Prepayment Premium and Make-Whole Amount shall be payable upon any repricing event or acceleration. The Definitive Documentation shall contain a "Momentive" provision satisfactory to the Required Consenting Stakeholders.

**Guarantees:**

All obligations of the Borrowers under the definitive credit agreement for the Term Loan Facility (the "**Exit Credit Agreement**") and the related guarantee and collateral agreement, mortgage agreements and other collateral documents (together with the Exit Credit Agreement, the "**Loan Documents**") (collectively, the "**Borrowers Obligations**") will be unconditionally guaranteed jointly and severally on a senior basis (the "**Guarantees**") by the direct parent of the Borrower and each existing and subsequently acquired or organized direct or indirect Material Domestic Subsidiary, Material Foreign Subsidiary and, notwithstanding anything to the contrary herein, (x) each Luxembourg subsidiary, (y) each guarantor party to the Prepetition Term Loan Credit Agreement and (z) each subsidiary owning material intellectual property (or owning subsidiaries which own material intellectual property) or material real property of the company (the "**Subsidiary Guarantors**", together with the Borrowers, the "**Loan Parties**"); provided that, notwithstanding anything to the contrary herein, (i) the guarantor exclusions shall be limited to (a) immaterial domestic subsidiaries, (b) immaterial foreign subsidiaries (which, for avoidance of doubt, will not include any Luxembourg subsidiaries), (c) bona fide joint ventures with third parties, (d) any subsidiary that is prohibited by applicable law, rule or regulation or by any contractual obligation at the time such person becomes a subsidiary (and not entered into in contemplation of this clause (d) and for so long as such prohibition or restriction remains in effect), as applicable, from granting a guarantee or which would require governmental (including regulatory) consent, approval, license or authorization to provide such guarantee unless such consent, approval, license or

4

authorization has been received, (e) any subsidiary acquired pursuant to an acquisition or other investment permitted by the Definitive Documentation that has assumed, permitted secured indebtedness not incurred in contemplation of such acquisition or other investment and any subsidiary thereof that guarantees such secured indebtedness, in each case to the extent and for so long as such secured and (f) circumstances where the Borrowers and the Administrative Agent reasonably agree that the cost of providing such a guarantee is excessive in relation to the value afforded thereby and (ii) the Definitive Documentation shall not permit any unrestricted subsidiaries.

"**CFC**" shall mean any direct or indirect Foreign Subsidiary of any Borrower that is a "controlled foreign corporation" within the meaning of Section 957 of the Internal Revenue Code of 1986, as amended (the "Code").

"**CFC Holdco**" shall mean any direct or indirect subsidiary of any Borrower, which subsidiary is treated as a disregarded entity for U.S. federal income tax purposes and substantially all of the assets of which consist of the equity interests in and/or indebtedness issued by one or more Foreign Subsidiaries that are CFCs."

"**Material Domestic Subsidiary**" shall be defined to include any subsidiary organized in the U.S. with total assets or EBITDA in excess of 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis; provided, that at no time shall the aggregate total assets or EBITDA of all Material Domestic Subsidiaries, taken together, account for more than 5.0% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis.

"**Material Foreign Subsidiary**" shall be defined to include any Luxembourg subsidiary and any other subsidiary organized in a non-U.S. jurisdiction where the total assets or EBITDA associated with such jurisdiction (in the aggregate for all subsidiaries organized therein) exceeds 2.5% of the total assets or EBITDA of the Parent Borrower and its subsidiaries on a consolidated basis. Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC shall be terminated (and no more than 65% of the voting stock of any Material Foreign Subsidiary shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC to include in income for any year any Section 956 Income that is in excess of the Income Threshold (as defined below).

Notwithstanding the foregoing or anything to the contrary in this term sheet, any guarantee granted by any CFC Holdco shall be terminated (and no more than 65% of the voting stock of any CFC Holdco shall be Collateral) for so long as such guarantee and/or pledge of the additional Collateral shall cause (or is reasonably expected to cause) any U.S. shareholder of such CFC Holdco to include in income for any year an amount (after accounting for any reduction under the rules of Treas. Reg. § 1.956-1 and Section 245A of the Code) under Section 956 of the Code ("**Section 956 Income**") that is in excess of the Income Threshold. The "**Income Threshold**" shall mean, with respect to any CFC Holdco or CFC, as applicable, an amount to be mutually agreed.

"**subsidiary(ies)**" has the meaning assigned to such term in the Pre-Petition Credit Agreement.

**Security:** Subject to the intercreditor agreement described below under "**Intercreditor Agreement**" and other customary limitations and exclusions to be mutually agreed, the Borrowers Obligations and the Guarantees (collectively the "**Secured Obligations**") will be secured on a first priority basis by substantially all assets of the Loan Parties (collectively, the "**Collateral**"); provided that, notwithstanding anything to the contrary set forth herein (i) all cash and cash equivalents held in accounts (other than customary excluded accounts) in the name of any Loan Party shall be subject to account control agreements in favor of the Collateral Agent (or for so long as the Exit ABL Facility and ABL Intercreditor are in effect, in favor of the ABL Agent), (ii) all equity in the Borrowers, all domestic (including immaterial) subsidiaries, all Luxembourg subsidiaries, all foreign subsidiaries and all Material Foreign Subsidiaries shall at all times be included in the Collateral and (iii) all material intellectual property and material real property shall at all times be included in the Collateral. The pledge of, security interest in, and mortgages on, the Collateral granted by each Loan Party shall secure its own respective Secured Obligations.

All of the foregoing described in this section and the "Guarantees" section above, the "**Collateral and Guarantee Requirement**".

**Conditions to Borrowings:** The availability of the Term Loans under the Exit Credit Agreement will be subject solely to satisfaction (or waiver) of the following conditions (the date on which such conditions are satisfied (or waived) being the "**Effective Date**"):

- execution and delivery of the Definitive Documentation to be delivered at closing;

- delivery of promissory notes to the Lenders, if requested at least two (2) Business Days before the Effective Date;

- delivery of board resolutions and organizational documents of the Loan Parties;

- delivery of incumbency/specimen signature certificate of the Loan Parties;

- delivery of customary legal opinions by counsel to the Borrowers;

- there shall not have occurred since the Petition Date any event or condition that has had or would be reasonably expected, either individually or in the aggregate, to have a Material Adverse Effect (for purposes of this condition, defined in a manner based on the Prepetition Term Loan Credit Agreement but including a proviso stating that in determining whether a "Material Adverse Effect" has occurred or exists under clause (a) thereof, the impacts of the chapter 11 cases and of COVID-19 on the assets, business, financial condition or results of operations on the Loan Parties or any of their respective Subsidiaries will be disregarded (provided that this exception shall not apply to the extent that it is materially disproportionately adverse to the Parent Borrower and its Restricted Subsidiaries, taken as a whole, as compared to other companies in the same industry in which the Parent Borrower and its Restricted Subsidiaries operate));

- the Administrative Agent shall have received a certificate (in substantially the same form as the corresponding certificate delivered in connection with the Prepetition Term Loan Credit Agreement) of the chief financial officer (or financial officer in a similar role) of the Parent Borrower, stating that it and its subsidiaries, taken as a whole, as of the Effective Date, are solvent, in each case, after giving effect to the consummation of the Plan;

- all fees due to the Administrative Agent, Collateral Agent and Lenders including advisors to the Consenting Stakeholders, Greenhill & Co. and Milbank LLP, shall have been paid (or shall have been caused to be paid), and all expenses to be paid or reimbursed to the Administrative Agent, Collateral Agent and Lenders that have been invoiced at least three (3) Business Days prior to the

7

Effective Date shall have been paid  (or shall have been caused to be paid);

- the Loan Parties shall have provided the documentation and other information to the Administrative Agent that are required by regulatory authorities under applicable "know-your-customer" rules and regulations, including the Patriot Act, at least three (3) Business Days prior to the Effective Date (or such later date agreed to by the Administrative Agent) to the extent requested ten (10) days prior to the Effective Date;

- the Bankruptcy Court shall have entered (A) the Confirmation Order and (B) one or more orders authorizing and approving the extensions of credit in respect of the Exit Credit Agreement, each in the amounts and on the terms set forth herein, and all transactions contemplated by the Exit Credit Agreement, and, in each case, such orders shall be in full force and effect and shall not have been stayed, reversed, vacated or otherwise modified;

- the Collateral and Guarantee Requirement (excluding certain customary post-closing items to be mutually agreed) shall have been satisfied or waived and the Intercreditor Agreement and the Agreement Among Lenders shall have been executed and delivered and be in full force and effect;

- the effective date under the Plan shall have occurred, or contemporaneous with the conversion of the DIP Term Facility to the Term Loan Facility shall occur, and all conditions precedent thereto as set forth therein shall have been satisfied or waived (including (x) the issuance to (i) the holders of DIP Term Facility Claims of 44.9% of the New Common Stock, subject to dilution from the Management Incentive Plan and (ii) the holders of Term Loan Claims of 55.1% of New Common Stock (subject to reduction for New Common Stock distrusted in accordance with the following clause (y)) and (y) each holder of a Term Loan Claim that is a Required Consenting Stakeholder (including through any of its Related Parties) having received its pro rata share of an amount of New Common Stock equal to $7.5 million, in each case shall have occurred substantially contemporaneously with the closing of the Term Loan Facility);

- the Pre-Petition ABL Credit Agreement shall have been replaced with a new credit agreement providing asset-based

8

lending facilities for working capital and other general corporate purposes of the Borrowers and its subsidiaries on terms and conditions reasonably acceptable to the Required Consenting Stakeholders (any such credit agreement, the "**Exit ABL Credit Agreement**", and the facility in place as of the Effective Date under either the Pre-Petition ABL Credit Agreement or the ABL Credit Agreement, the "**Exit ABL Facility**");

- (i) with respect to Catherine's business segment either completion of a liquidation or consummation of a sale transaction as a going concern to a third party on terms satisfactory to the Required Consenting Stakeholders, and (ii) with respect to the Justice business segment, either completion of a liquidation, consummation of a sale transaction as a going concern to a third party or consummation of a reorganization of the business segment, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders, in each case on or prior to the Effective Date;

- minimum pro forma Liquidity (as defined in the DIP Term Facility), calculated after giving effect to the restructuring transactions and effectiveness of the Plan, of at least $150 million (pro forma for the occurrence of the Effective Date and related transactions, including after taking into account all restructuring expenses (including professional fees) that are paid post emergence and the availability of the Exit ABL Facility and any incurrence of loans thereunder);

- with respect to store leases which are not rejected, aggregate annual cost savings for FY2020 of at least $18 million, calculated in a manner consistent with how "Occupancy Cost Savings" are calculated in the Real Estate Services Agreement dated as of May 1, 2020 by and between A&G Realty Partners, LLC and the Parent Borrower;

- with respect to the Premium segment and Lane Bryant (in aggregate), the number of store closures that shall have occurred prior to the Effective Date shall be consistent with the closures anticipated under the Company's business plan provided to the Ad Hoc Committee Advisors (as determined by the Ad Hoc Committee Advisors in their reasonable discretion) or as otherwise consented to by the Required Consenting Stakeholders;

- all pre-Petition transfers of intellectual property to the LuxCo Entities shall have been unwound and all licensing arrangements with respect thereto shall have been cancelled, in each case on terms reasonably satisfactory to the Required Consenting Stakeholders and all such intellectual property shall be owned and registered in the name of Annco, Inc., unless the Required Consenting Stakeholders and the Company mutually agree that the cost, difficulty, burden or consequences of such transfer and/or cancelation exceeds the practical benefits to the Lenders afforded thereby and cannot be completed in a tax efficient manner;

- the accuracy of representations and warranties in all material respects (without duplication of any materiality qualifier) on the Effective Date (except to the extent any such representation or warranty is stated to relate solely to an earlier date, in which case such representation or warranty shall be true and correct in all material respects (without duplication of any materiality qualifier) as of such earlier date; and

- the absence of the existence of any default or event of default.

**Representations and Warranties:** Substantially similar to the Prepetition Term Loan Credit Agreement, subject to the Documentation Principles.

**Affirmative Covenants:** Usual and customary, subject to the Documentation Principles; provided that (i) financial reporting shall include (a) unaudited monthly internally generated financial statements and "flash reports", together with certain KPI reports for each banner to be agreed (with such KPI report requirement to fall away upon the Parent Borrower and its subsidiaries achieving a consolidated total leverage ratio for four (4) consecutive fiscal quarters of not more than 1.50:1.00, (b) unaudited quarterly (for all four quarters) and audited annual financial statements, (c) quarterly MD&A and (d) an annual budget, (ii) the annual lender call referenced therein shall be revised to quarterly lender calls and (iii) the Parent Borrower shall use commercially reasonable efforts to obtain credit ratings by each of Standard & Poor's Rating Services and Moody's Investors Service, Inc. prior to the Effective Date, it being understood that there shall be no obligation to maintain any particular rating at any time.

**Negative Covenants:** Usual and customary, subject to the Documentation Principles and subject to customary and usual exceptions, qualifications and

10

|  | "baskets" to be mutually agreed and set forth in the Exit Credit Agreement, which shall include a customary cumulative credit basket. |
|---|---|
| **Financial Covenant:** | First Out Term Loans: |

- Total leverage ratio at levels to be agreed amongst the Company and the Initial Consenting Stakeholders, which shall be tested quarterly commencing at the end of the first full fiscal quarter following the Effective Date.

- Minimum liquidity covenant, which shall take into account unrestricted cash and ABL availability (based on borrowing base) at levels to be agreed amongst the Company and the Required Consenting Stakeholders, which shall be maintained at all times.

- All expenses in connection with the Chapter 11 filing shall be added back to the calculation of EBITDA (to be defined in the Definitive Documentation, subject to the Documentation Principles). Component definitions for determining total leverage ratio are to be agreed amongst the Company and the Required Consenting Stakeholders.

Last Out Term Loans: total leverage ratio, subject to a cushion relative to the First Out Term Loan levels that is acceptable to the Company and the Required Consenting Stakeholders.

| **Unrestricted Subsidiaries:** | None. |
|---|---|
| **Events of Default:** | Usual and customary for transactions of this type, subject to the Documentation Principles and to include a full cross-default to the Exit ABL Facility. Defaults in respect of a Financial Covenant shall be subject to customary equity cure rights. |
| **Voting:** | Usual and customary for transactions of this type, subject to the Documentation Principles and the Agreement Among Lenders, but with First Out Lenders and Last Out Lenders voting as a single class; provided that (i) there shall be no limitation on voting by lenders that are affiliates of the Borrowers and (ii) any majority lender vote shall require the affirmative vote of at least two un-affiliated institutions. |

| | |
|---|---|
| **Required Lenders** | Lenders having Term Loans outstanding that, taken together, represent more than 50% of the sum of all Term Loans outstanding at such time. |
| **Intercreditor Agreement:** | Usual and customary for transactions of this type, subject to the Documentation Principles and based on that certain ABL Intercreditor Agreement, dated as of August 21, 2015, among the ABL Agent, the Term Loan Agent, and the other parties thereto, except as otherwise agreed by the Required Consenting Term Loan Lenders. |
| **Agreement Among Lenders:** | To be entered into among the lenders under the First Out Term Loan Facility, the lenders under the Last Out Term Loan Facility and the Parent Borrower or, to be set forth in the Exit Credit Agreement and to provide that, with respect to any amendment, waiver, consent or other action, including the exercise of remedies or the provision of future DIP financings, the Last Out Lenders shall vote in the same manner as the First Out Lenders, other than with respect to amendments, waivers, consents or with respect to certain economic terms which are customarily all-lender votes. |
| **Cost and Yield Protection:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Defaulting Lenders:** | Usual and customary for transactions of this type, subject to the Documentation Principles. |
| **Assignments and Participations:** | Usual and customary for transactions of this type, subject to the Documentation Principles and permitting loan buy-backs and Dutch auctions on customary terms; provided that there shall be no restrictions on holdings by lenders that are affiliates of the Borrowers. |
| **Refinancing, Extension and Replacement Facilities** | Usual and customary provisions providing for the ability to refinance, extend or replace loans or any class of loans under the Term Loan Facility from time to time, in whole or part, with one or more new debt facilities. |
| **Expenses and Indemnification:** | Usual and customary for transactions of this type, subject to the Documentation Principles (including, but limited to, the reasonable fees and expenses of no more than one counsel to the Required Lenders (other than the Administrative Agent), which counsel shall be Milbank LLP, and one counsel to the Administrative Agent and one local counsel for the Required Lenders in each relevant jurisdiction (other than the Administrative Agent) and one local counsel for the Administrative agent in each relevant jurisdiction. |

| | |
|---|---|
| **Governing Law and Forum:** | New York. |

## EXHIBIT E

### Form of Joinder Agreement

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders and agrees to be bound by the terms and conditions thereof and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date hereof.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

## EXHIBIT F

**Provision for Transfer Agreement**

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (the "**Agreement**"),[1] by and among ascena retail group, inc. and its affiliates and subsidiaries bound thereto and the Consenting Stakeholders, including the transferor to the Transferee of any Company Claims/Interests (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions thereof to the extent the Transferor was thereby bound, and shall be deemed a "Consenting Stakeholder" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed herein.

Date Executed:

_____
Name:
Title:
Address:
E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
|---|---|
| ABL Claims | |
| Term Loan Claims | |
| Equity Interests | |
| DIP ABL Facility Claims | |
| Backstop Commitments | |
| DIP Term Facility Claims | |

---

[1]    Capitalized terms used but not otherwise defined herein shall having the meaning given to such terms in the Agreement.

**<u>Exhibit B</u>**

**Corporate Organizational Structure**



Ascena Retail Group, Inc. (Delaware)
Ascena Enterprise Sourcing Limited (Hong Kong)
Charming Shoppes, Inc. (Pennsylvania)
ASNA Plus Fashion, Inc. (Delaware)
C.S.F. Corp. (Delaware)
CCTM, Inc. (Delaware)
PSTM, Inc. (Delaware)
Winks Lane, Inc. (Pennsylvania)
CSGC, Inc. (Ohio)
CSI Industries, Inc. (Delaware)
CS Holdco II Inc. (Delaware)
Sonsi, Inc. (Delaware)
Charming Shoppes of Delaware, Inc. (Pennsylvania)
CSPE, LLC (Pennsylvania)
Lane Bryant, Inc. (Delaware)
Lane Bryant Purchasing Corp. (Ohio)
Lane Bryant of Pennsylvania, Inc. (Pennsylvania)
Lane Bryant #6243, Inc. (Florida)
Lane Bryant Outlet 4106, Inc. (California)
Chestnut Acquisition Sub Inc. (Delaware)
Crosstown Traders, Inc. (Delaware)
Charming Sales Co. One, Inc. (Wisconsin)
Charming Sales Co. Two, Inc. (Wisconsin)
Charming Sales Co. Three, Inc. (Wisconsin)
Charming Sales Co. Four, Inc. (Wisconsin)
Catherines Stores Corporation (Tennessee)
Catherines, Inc. (Delaware)
Catherines #5147, Inc. (Florida)
Catherines #5124, Inc. (Pennsylvania)
Fashion Service LLC (Delaware)
Catalog Seller LLC (Delaware)
Catalog Receivables LLC (Delaware)
Charming Shoppes Receivables Corp. (Delaware)
Spirit of America, Inc. (Delaware)
Fashion Service Fulfillment Corporation (Delaware)
Charming Shoppes Seller, Inc. (Delaware)
Charming Shoppes Street, Inc. (Delaware)
Ascena Retail Holdings, Inc. (Ohio)
Fashion Apparel Sourcing LLC (Ohio)
33.75%
66.25%
.01%
WWRH Coop U.A. (Netherlands)
Worldwide Retail Holdings BV (Netherlands)
69.99%
Ascena Global Sourcing Hong Kong Limited (Hong Kong)
Ascena Global Innovation Center, LLP (India)
Tween Brands Canada Stores Ltd. (Canada)
Ascena Global Sourcing (Shanghai) Ltd (China)
Ascena Global Sourcing Hong Kong Ltd. - Korea Branch Office (Korea)
AGSHK Bangladesh Liaison Office (Bangladesh)
FSHC LLC (Delaware)
Ascena Retail Sourcing India Private Limited (India)
Kirkstone Co., Ltd. (Hong Kong)
Trimoland Limited (Hong Kong)
In process of liquidation
ANN, Inc. (Delaware)
AnnTaylor, Inc. (Delaware)
AnnTaylor Sourcing Far East Limited (Hong Kong)
AnnTaylor of Puerto Rico, Inc. (Puerto Rico)
Ann Canada, Inc. (Canada)
AnnCo,Inc. (Delaware)
AnnTaylor Distribution Services, Inc. (Delaware)
AnnTaylor Loft GP Lux S.à.r.l. (Luxembourg)
0.01%
99.99%
AnnTalyor Loft Borrower Lux SCS (Luxembourg)
AnnTaylor Retail, Inc. (Florida)
ANN Card Services, Inc. (Florida)
Tween Brands, Inc. (Delaware)
Too GC, LLC (Ohio)
Tween Brands Direct Services Inc. (Ohio)
Tween Brands Agency, Inc. (Ohio)
Tween Brands Service Co. (Ohio)
Worldwide Retail Holdings, Inc. (Delaware)
Tween Brands Investment, LLC (Ohio)
Tween Brands Marketing, Inc. (Ohio)
GC Fulfillment, LLC (Delaware)
Etna Retail DC, LLC (Delaware)
Ascena Trade Services, LLC (Delaware)
Duluth Real Estate LLC (Delaware)
ASNA Value Fashion LLC (Delaware)
933 Inspiration LLC (Delaware)
BackingBrands Solutions, LLC (Ohio)
BackingBrands Buying Agent, LLC (Ohio)
DBI Holdings, Inc. (Connecticut)
DBX, Inc. (New York)
DBCM Holdings, LLC (Virginia)
49.55%
Viking Brand Upper Holdings, L.P. (Cayman Islands)
Viking Brand Holdings, L.P. (Cayman Islands)
Maurices Inc. (Delaware)
Maurices Credit Mgmt. Inc. (Virginia)
Maurices Canada Stores Ltd. (Canada)
Key - US Tax Classification
US Corporation
Foreign Corporation
Foreign Disregarded
US LLC Disregarded
Foreign Branch
Foreign Partnership

**<u>Exhibit C</u>**

**Evidentiary Support for First Day Motions[1]**

---

[1] Capitalized terms used but not defined in this **<u>Exhibit C</u>** shall have the meanings ascribed to them in the *Declaration of Carrie W. Teffner, Interim Executive Chair of Ascena Retail Group, Inc. in Support of Debtors' Chapter 11 Proceedings and First Day Motions* or in the applicable First Day Motion.

## <u>Administrative and Procedural Motions</u>

**A.     Debtors' Motion for an Expedited Hearing on "First Day Motions" (the "<u>Expedited Hearing Motion</u>").**

1.      Pursuant to the Expedited Hearing Motion, the Debtors request entry of an order: (a) scheduling an expedited hearing on the Debtors' First Day Motions; and (b) deeming the Debtors' notice of the First Day Hearing to be adequate and appropriate notice under the circumstances.  I believe that expedited relief is essential to maintaining the normal day-to-day operations of the Debtors' business and is necessary to preserve and maximize the value of Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Expedited Hearing Motion should be approved.

**B.     Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

2.      Pursuant to the Joint Administration Motion, the Debtors request entry of an order directing procedural consolidation and joint administration of these chapter 11 cases.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to Ascena without harming the substantive rights of any party in interest.

3.      Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of 64 independent

chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Joint

Administration Motion should be approved.

**C.      Debtors' Motion For Entry of an Order (I) Establishing Certain Notice, Case Management, and Administrative Procedures and (II) Granting Related Relief (the "<u>Case Management Procedures Motion</u>").**

4.        Pursuant to the Case Management Procedures Motion, the Debtors request entry

of an order establishing certain noticing, case management, and administrative procedures

including, among other things:    (a) directing that matters requiring notice under

Bankruptcy Rule 2002(a)(2)–(6) will be served only to individuals and entities identified on a

shortened mailing list and those creditors who, in accordance with Local Rules 2002-1 and

9013-1(M), file with the Court a request that they receive such notice pursuant to

Bankruptcy Rule 2002; (b) allowing electronic service of all documents (except complaints and

summonses) for the 2002 List; (c) directing that all matters be heard at periodic omnibus

hearings to be scheduled in advance by the Court; and (d) granting related relief.

5.        Given the thousands of potential creditors who may file requests for service of

filings and considering the numerous motions and applications to be filed in these chapter 11

cases, approval of the Case Management Procedures will provide significant administrative

convenience and cost savings by reducing the need for emergency hearings and requests for

expedited relief, and will foster consensual resolution of important matters.  Furthermore, the

Debtors' use of electronic service to the 2002 List will undoubtedly reduce the administrative

and financial burden of providing notice to the Debtors' creditors and other parties in interest.

6.        The establishment of the Case Management Procedures will also promote the

efficient and orderly administration of these chapter 11 cases.  Authorizing the Debtors to serve

their documents on a limited mailing matrix will ease the administrative and economic burdens

on the Court and the Debtors' estates.  Authorizing electronic service in these chapter 11 cases

for the 2002 List will also allow for efficient and effective service at a significantly reduced cost to the Debtors' estates and other serving parties. Early notice of Omnibus Hearings to all parties in interest will enable these parties to plan efficiently for the use of hearing time, will avoid the need for numerous hearings within each month, and will lessen the burden on the Court and on the Debtors' estates. Additionally, parties in interest will still have the opportunity to bring true emergency matters before the Court on an expedited basis pursuant to the Local Bankruptcy Rules and the Case Management Procedures. Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Procedures Motion should be approved.

     **D.**     **Debtors' Motion for Entry of an Order (I) Extending Time to File Schedules and Statements of Financial Affairs, (II) Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (III) Authorizing the Debtors to File a Consolidated List of the Debtors' 50 Largest Unsecured Creditors, (IV) Authorizing the Debtors to Redact Certain Personal Identification Information, (V) Waiving the Requirement to File a List of Equity Security Holders, and (VI) Granting Related Relief (the "<u>Creditor Matrix, SOFAs, and Schedules Motion</u>").**

     7.     Pursuant to the Creditor Matrix, SOFAs, and Schedules Motion, the Debtors seek entry of an order:  (a) extending the deadline by which the Debtors must file their Schedules and Statements by 31 days, for a total of 45 days from the Petition Date, without prejudice to the Debtors' ability to request additional extensions for cause shown; (b) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor; (c) authorizing the Debtors to file a consolidated list of the Debtors' 50 largest unsecured creditors in lieu of filing lists for each Debtor; (d) authorizing the Debtors to redact certain personal identification information; and (e) granting related relief.

     8.     ***Schedules and Statements Extension***.  To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' many assets, contracts, and leases across stores located

nationwide.   This information is voluminous and located in numerous places throughout the Debtors' organization.   Although the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously on preparing the Schedules and Statements, resources are strained and limited.   Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors' employees and professionals to assist in efforts to stabilize business operations during the initial postpetition period, I believe that the Debtors likely will not be able to properly and accurately complete the Schedules and Statements within the required time period.   The Debtors therefore request that the Court extend the 14-day period for an additional 31 days, without prejudice to the Debtors' right to request further extensions, for cause shown.

9.      ***Consolidated Creditor Matrix***.   Compiling separate top creditor lists for each individual Debtor would consume an excessive amount of the Debtors' time and resources, and filing a consolidated list would more appropriately reflect the liabilities against the Debtors' operations on an enterprise level.

10.      ***Consolidated List of 50 Largest Creditors***.   The Debtors also request authority to file a single, consolidated list of their 50 largest general unsecured creditors.   It is my understanding that this will help alleviate administrative burdens, costs, and the possibility of duplicative service, and will prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous creditor matrix.

11.      Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix, SOFAs, and Schedules Motion.

**E.      Debtors' Application for Entry of an Order (I) Authorizing the Debtors to Employ and Retain Prime Clerk LLC as Claims and Noticing Agent, and (II) Granting Related Relief (the "Claims and Noticing Agent Application").**

12.      Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order appointing Prime Clerk as Claims and Noticing Agent in the Debtors' chapter 11 cases effective as of the Petition Date to, among other tasks, assume full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases pursuant to the provisions of the Engagement Agreement.

13.      Based on my discussions with Ascena's advisors, I believe that the Debtors' selection of Prime Clerk to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.  Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Prime Clerk's rates are competitive and reasonable given the quality of services and expertise.

14.      The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of noticing, and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent Application.

**Operational Motions**

F.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief ("Cash Management Motion").**

15.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System; (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) continue to perform the Intercompany Transactions consistent with historical practice; and (b) granting related relief.

16.    The Debtors operate a complex Cash Management System. The Cash Management System is typical of multi-store retail operations and comparable to the centralized cash management systems used by other similarly sized companies to manage the cash flow of operating units in a cost-effective, efficient manner.    The Debtors use their Cash Management System in the ordinary course to transfer and distribute funds and to facilitate cash monitoring, forecasting, and reporting.    The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds, including in connection with Intercompany Transactions.    The Debtors' corporate accounting and cash forecasting departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly. The Cash Management System is comprised of approximately 154 Bank Accounts, which are held at 54 Cash Management Banks.

17.    Historically, the Debtors estimate that they pay approximately $300,000 in Bank Fees each month, depending on transaction volume.    The Debtors estimate that approximately

$400,000 in prepetition Bank Fees remains outstanding as of the Petition Date.  The Debtors further estimate that cash collections average approximately $250 million per month, including store cash receipts, credit card receipts, wholesale and licensing revenue, and e-commerce sales. In addition, the Debtors estimate that total disbursements will range between $250 million and $350 million per month during these chapter 11 cases.

18.    In the ordinary course of business, the Debtors maintain business relationships with each other and certain non-Debtor entities resulting in intercompany receivables and payables in the ordinary course of business.  Accordingly, at any given time there may be Intercompany Claims owing by one Debtor to non-Debtor affiliates.  Between the Debtors and the non-Debtor affiliates, Intercompany Claims arise in the ordinary course, primarily related to income taxes or fees charged by certain Debtors or non-Debtor affiliates to other Debtor or non-Debtor affiliates on account of intercompany provisions of goods or services.  Intercompany Claims between the Debtors and the non-Debtors are settled in the ordinary course of dealings and are reflected in the Debtors' books and records.

19.    The Debtors track all fund transfers in their respective accounting system and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors will continue to track postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.  The Debtors respectfully submit that the continued performance of the Intercompany Transactions is in the best interest of the Debtors' estates and their creditors and, therefore, the Debtors should be permitted to continue such performance.

20.     It is my understanding that the relief requested in the Cash Management Motion is essential to the continued operation of the Debtors' business and denial of such relief would severely disrupt, if not cripple, the Debtors' businesses.  Therefore, I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Cash Management Motion.

G.     **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

21.     Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to:  (a) pay all prepetition and postpetition wages, salaries, other compensation, and reimbursable expenses on account of the Employee Compensation and Benefits Programs in the ordinary course of business; and (b) continue to administer the Employee Compensation and Benefits Programs.

22.     The Debtors employ over 9,442 individuals on a full-time basis and 27,393 individuals on a part-time basis.  Approximately 33,832 Employees are paid on an hourly basis, and approximately 3,003 Employees earn a salary.  Approximately ten Employees at one store location are members of a labor force union.[2]  In addition to the Employees, the Debtors also periodically retain specialized individuals as independent contractors, as well as temporary workers paid through third-party administrators, to complete discrete projects sourced periodically from various staffing agencies to fulfill certain duties on a short-term basis.  At this

---

[2]     The Union Employees are members of the Local 338 Chapter of the Retail Wholesale Department Store Union/United Food and Commercial Workers International Union.  The Union Employees work at a store in Green Acres, Valley Stream, NY.  The Debtors are party to collective bargaining agreements with the Union.

time, the Debtors retain approximately 600 Temporary Staff.   The Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

23.    I understand that the Debtors' Employees and Temporary Workers perform a wide variety of functions critical to the Debtors' operations at the Debtors' home office, distribution centers, and stores.   Certain of these individuals are highly trained and have an essential working knowledge of the Debtors' business that cannot be easily replaced.   The remainder of these individuals provide work necessary to continue the Debtors' store-level operations.   Without the continued, uninterrupted services of their Employees and Temporary Workers, the Debtors' reorganization efforts will be threatened.

24.    The vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Thus, Employees will be exposed to significant financial consequences if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business.   Consequently, I believe that the relief requested is necessary and appropriate.

25.    The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected.   The Debtors are seeking authority to pay and honor certain prepetition claims relating to the Employee Compensation and Benefits, including, among other things, wages, salaries, and other compensation; expense reimbursement, including, expenses paid from Employees' personal funds, commuter programs, business vehicle reimbursement and commuter programs, and educational reimbursement; payroll services, federal and state withholding taxes and other amounts withheld (including garnishments, Employees' share of insurance premiums, taxes, 401(k) contributions, and charitable donation contributions); health insurance, including, medical, dental, vision, and disability; retirement

benefits; non-qualified deferred compensation; workers' compensation benefits; paid time off, other paid leave, unpaid leave; life and accidental death and dismemberment insurance; short- and long-term disability coverage; employee assistance; severance; and other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business and as further described in the Wages Motion.

26.    Pursuant to the Wages Motion, the Debtors also seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing bonus programs.    The Debtors believe the Non-Insiders Employee Incentive Programs drive Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

27.    The Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience significant employee turnover and instability at this critical time in these chapter 11 cases.    Additionally, without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.    Such Employees may then elect to seek alternative employment opportunities.

28.    I understand that a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant cost and efforts.    Payment of certain prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of the Employees as the Debtors seek to operate their business in these chapter 11 cases.    Therefore, I believe that the relief requested in the Wages Motion

inures to the benefit of all parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

> **H.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue and Renew Their Insurance Policies and Honor All Obligations In Respect Thereof; and (B) Continue the Surety Bond Program, and (II) Granting Related Relief (the "Insurance Motion").**

29.     Pursuant to the Insurance Motion, the Debtors seek entry of an order: (a) authorizing the Debtors to (i) continue insurance coverage entered into prepetition and satisfy payment of prepetition obligations related thereto in the ordinary course of business and renew, supplement, or purchase insurance coverage in the Debtors' discretion on a postpetition basis, and (ii) continue and renew their surety bond program on an uninterrupted basis; and (b) granting related relief.

30.     In the ordinary course of business, the Debtors maintain 69 Insurance Policies that are administered by various third-party insurance carriers. These Insurance Policies provide coverage for, among other things, the Debtors' commercial property, general liability, automobile liability, workers' compensation, umbrella coverage, excess liability, pollution liability, executive protection, commercial crime, special risk, cyber liability, cargo and marine cargo liability, employers' liability, foreign general liability, business travel, and directors' and officers' liability. The aggregate annual premium on account of the Insurance Policies is approximately $11.52 million.

31.     In addition, the Debtors' contract with Helmsman Management Services LLC and Sedgwick Claims Management Services Inc., third-party claims administrators, for assistance in managing the portfolio of general liability claims asserted against the Debtors. The Debtors estimate that, as of the Petition Date, approximately $54,400 is outstanding on account of prepetition obligations to Helmsman. Accordingly, the Debtors seek authority to pay each of

Sedgwick Claims and Helmsman any amounts owing on account of prepetition claims management services and to continue the claims management services program on a postpetition basis in the ordinary course of business.

32.     I understand that the Debtors obtain the majority of their Insurance Policies through their insurance broker, Marsh.  Marsh assists the Debtors in obtaining comprehensive insurance coverage with respect to the Debtors' commercial property, general liability, automobile liability, workers' compensation, umbrella coverage, excess liability, cargo earthquake and flood, and marine cargo liability.  The Debtors also obtain insurance brokerage services from Aon with respect to the Debtors' cyber insurance policies.  I also understand that CAC Specialty is the exclusive broker of record with respect to the Debtors' D&O Policies.  The Debtors pay CAC Specialty a commission in connection with these services, payable as part of the premiums paid on the D&O Policies.  As of the Petition Date, the Debtors do not believe that they owe any amounts to Marsh, Aon, or CAC Specialty on account of fees, commissions, or any other prepetition obligations.  Nevertheless, out of an abundance of caution, the Debtors seek authority to honor any amounts owed to Marsh, Aon, or CAC Specialty to ensure uninterrupted coverage under their Insurance Policies during the course of these chapter 11 cases.

33.     The Debtors also maintain a Surety Bond Program in the ordinary course of business to fulfill obligations to certain third parties, often utility companies, governmental units or other public agencies, to secure the Debtors' payment or performance of certain obligations. A majority of the Debtors' Surety Bond Program is comprised of utility bonds.  The Debtors also maintain general customs bonds with the United States Customs and Border Protection Agency to assure the Debtors' ability to pay any applicable duties, penalties or obligations, including any anti-dumping duties it may incur with respect to its imports. The Debtors contract with Berkley

to provide the requisite surety bonds, which total approximately $40.8 million.  In addition, as part of the Surety Bond Program, the Debtors are in the process of cancelling certain surety bonds previously issued by Zurich Insurance and replacing them with new surety bonds to be issued by Berkley.  As of the Petition Date, the Debtors estimate that approximately 15 surety bonds with Zurich Insurance recently cancelled, or currently in the process of being cancelled, will be replaced with new surety bonds with Berkley, in the aggregate amount of approximately $275,000.  The Debtors estimate that, as of the Petition Date, approximately $9,000 is owed to Berkley on account of the Surety Bond Program.  Accordingly, the Debtors seek authority to honor any amounts owed to Berkley to ensure the Surety Bond Program remains uninterrupted.

34.    I believe that continuation and renewal of the Insurance Policies and Surety Bond Program is essential to preserving the value of the Debtors' business, properties, and assets. Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the U.S. Trustee.  I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

**I.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees, and (II) Granting Related Relief (the "Taxes Motion").**

35.    Pursuant to the Taxes Motion, the Debtors seek authority for the Debtors to make payment and remittance (or use applicable credits to offset) of certain taxes and fees that accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases.  The Debtors also request that the Court authorize all applicable financial institutions,

when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in the Taxes Motion.

36.      In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, withholding, Foreign, franchise, and property taxes, as well as other business and regulatory fees and occasionally are the subject of audit investigations on account of prior year tax returns. The Debtors estimate that approximately $74.14 million in Taxes and Fees are outstanding as of the Petition Date.  The Debtors' ability to pay the taxes and fees is critical to the Debtors' continued and uninterrupted operations.  The Debtors' failure to pay prepetition taxes and fees as they come due may ultimately increase the amount of priority claims held by authorities against the Debtors' estates to the detriment of the Debtors' general unsecured creditors.

37.      I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Taxes Motion.

**J.    Debtors' Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests, and (IV) Granting Related Relief (the "Utilities Motion").**

38.      Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders:  (a) approving the Debtors' Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the Debtors' proposed procedures for resolving Adequate Assurance Requests; and (d) granting related relief.

39.    In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, propane, telecommunications, water, waste management (including sewer and trash), internet, cable, and other similar services from the Utility Companies.  On average, the Debtors pay approximately $4.8 million each month for third-party Utility Services, calculated as a historical average payment for the twelve-month period ended April 30, 2020.  Accordingly, the Debtors estimate that their cost for Utility Services during the next 30 days (not including any deposits to be paid) will be approximately $4.4 million.  The Debtors estimate the amount currently held as deposits or prepayments with respect to the Utility Companies is approximately $1.17 million.

40.    To provide additional assurance of payment, the Debtors propose to deposit $1.89 million into a segregated account as an Adequate Assurance Deposit, which may be applied to any postpetition defaults in payment to the Utility Companies.   The Adequate Assurance Deposit represents an amount sufficient to cover one half of the Debtors' average monthly cost of Utility Services, calculated as a historical average payment for the twelve-month period ended April 30, 2020, less the amount of Prepetition Deposits held by the Utility Companies..  The Adequate Assurance Deposit will be held by the Debtors, and the Debtors' creditors will have no lien on any Adequate Assurance Deposit to the extent not returned to the Debtors pursuant to the terms set forth in the Order or the Adequate Assurance Account.

41.    In light of the severe consequences to the Debtors' businesses and operations that would result from any interruption in Utility Services, but recognizing the right of the Utility Companies to evaluate the Proposed Adequate Assurance, if a Utility Company believes additional adequate assurance is required, it may request such assurance pursuant to the Adequate Assurance Procedures.

42.     In addition, the Debtors have an agreement with Engie, a company that manages the Debtors' payments owed to some of their Utility Providers.  As of the Petition Date, the Debtors do not believe that they owe any amounts on account of the Service Fees related to the Services Agreement.  Out of an abundance of caution, however, the Debtors seek authority to continue honoring any prepetition obligations to Engie under the Services Agreement.

43.     Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, because the Debtors operate a customer-facing retail enterprise and the Debtors' business depends upon having an ability to maintain open and active stores, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue its operations.  I believe this disruption would adversely impact customer relationships and result in a significant decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**K.     Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Lien Claimants, (B) 503(b)(9) Claimants; (C) Foreign Vendors, and (D) Critical Vendors, (II) Confirming Administrative Expense Priority of Outstanding Orders, and (III) Granting Related Relief (the "<u>All Trade Motion</u>").**

44.     Pursuant to the All Trade Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay Foreign Vendor Claims and Critical Vendor Claims in an aggregate amount not to exceed approximately $50 million on account of prepetition amounts outstanding; (b) authorizing the Debtors to pay 503(b)(9) Claims in an aggregate amount not to exceed approximately $20 million on account of prepetition amounts outstanding; (c) authorizing, but not directing, the Debtors to pay in the ordinary course of business the Lien

17

Claims; (d) confirming the administrative expense priority status of Outstanding Orders; and (e) granting related relief.

45.     ***Lien Vendor Claims.***   The flow of Merchandise from the Debtors' manufacturers to (a) stock the Debtors' domestic brick and mortar stores, (b) fulfill online orders, or (c) fulfill orders of the Debtors' wholesalers (both domestic and foreign) and foreign franchisees, depends on the services provided by, among others, various freight vendors, ocean carriers, truckers, common or contract carriers, customs brokers, and other shipping services providers. Additionally, the Debtors employ various general contractors and vendors to assist with remodels and on-site construction and repairs at the retail stores, including renovation and repair services for ongoing store remodels or deliver various furniture and fixtures for installation in the individual retail stores.  I understand that, in the event the Lien Claims remain unpaid, the Lien Claimants are likely to attempt to assert such possessory liens, and may refuse to deliver or release goods in their possession until their claims are satisfied and their liens redeemed, which would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these chapter 11 cases.  As of the Petition Date, the Debtors owe approximately $10.0 million on account of Lien Claims, approximately $8.0 million of which the Debtors estimate will become due and owing on an interim basis pending entry of the Final Order.

46.     ***503(b)(9) Claims.***   The Debtors have received certain goods from various 503(b)(9) Claimants within the twenty days before the Petition Date.  Many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts.  Rather, the Debtors often obtain supplies on an order-by-order basis.  As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims.  Further, substantially all of the 503(b)(9) Claimants are Foreign Vendors that supply goods, materials, or services to the

Debtors that are crucial to the Debtors' ongoing operations, including Merchandise necessary to stock the shelves and racks in Debtors' stores and fulfill online orders.  In light of certain consequences related to the COVID-19 pandemic, the Debtors have concluded that payment of certain of the 503(b)(9) Claimants outside of the chapter 11 plan process is essential to avoid disruptions to the Debtors' operations.  The Debtors believe that as of the Petition Date, they owe approximately $75.0 million on account of goods delivered within the 20 days immediately preceding the Petition Date.

47.    ***Foreign Vendor Claims.***    Substantially all of the Debtors' Merchandise is manufactured overseas, and the Debtors regularly transact business with a diverse set of Foreign Vendors.  At any given time, the Debtors are engaged with the Foreign Vendors to:  (i) produce goods in accordance with current purchase orders; (ii) ship merchandise to stock the Debtors' retail stores, distribution centers, and fulfill online orders; or (iii) negotiate the terms of future purchase orders.  All of the Foreign Vendors supply Merchandise that is crucial to the Debtors' ongoing operations.  The Debtors generally do not maintain long-term contracts with suppliers and typically transact business on an order-by-order basis.  It is my understanding that the Foreign Vendors may refuse to release Merchandise or other goods for shipment to the United States if they are not paid current.  Further, if the Debtors are unable to honor the payment terms for Merchandise that shipped before the Petition Date, but will not become due and owing until after the Petition Date, the Foreign Vendors are unlikely to complete production on open purchase orders or accept new purchase orders in the future.  As of the Petition Date, the Debtors owe approximately $67.5 million on account of Foreign Vendor Claims.

48.    ***Critical Vendor Claims.***    The Debtors obtain specialized goods, marketing, or technical services with expertise specific to the Debtors' business and infrastructure from a

limited number of highly specialized vendors, service providers, and other businesses. With the assistance of their advisors, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations managers and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable law, regulations, and historical practice to identify certain critical business relationships and suppliers of goods and services that are critical to the Debtors' go-forward business—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, and impair going-concern viability. As of the Petition Date, the Debtors owe approximately $26.0 million on account of Critical Vendor Claims that are not entitled to administrative or other priority status under section 503(b)(9) of the Bankruptcy Code.

49. *Outstanding Orders*. Before the Petition Date and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date. To avoid becoming general unsecured creditors of the Debtors' estates with respect to such goods, I understand that certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition.

50. It is my understanding that the relief requested in the All Trade Motion will allow the Debtors to maintain operational stability and prevent a disruption to the Debtors' supply chain, which could result in a significant loss of operational efficiency, decreases the value of these businesses, and impair stakeholder value at this critical juncture in these chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the All Trade Motion.

L.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief (the "Customer Programs Motion").**

51.    Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing, but not directing, the Debtors to: (a) maintain and administer their Customer Programs and honor certain prepetition obligations related thereto; and (b) granting related relief.

52.    The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their "brand." These programs include refund and exchange programs, loyalty programs, gift card and certificate programs, charity donation programs, and other sale promotions. Accordingly, maintaining the goodwill of their customers is important to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

53.    The Debtors estimate that, of their prepetition obligations under the Customer Programs, approximately $210 million constitutes accrued credits, adjustments, discounts, or other similar obligations owing to their customers, the vast majority of which *do not* entail the expenditure of cash.

54.    I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates. In contrast, if the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and owing to customers, the Debtors risk alienating

21

certain customer constituencies (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects for reorganization and/or maximizing the value of their estate.

55.     I believe that the relief requested herein will pay dividends with respect to the long-term reorganization of their businesses, both in terms of profitability and the engendering of goodwill, especially at this critical time following the filing of the chapter 11 cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**M.      Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors To Assume The Consulting Agreement, (II) Approving Procedures for Store Closing Sales, and (III) Granting Related Relief (the "Store Closing Motion").**

56.     Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to assume the Consulting Agreement, by and between Ascena Retail Group, Inc. and SB360 Capital Partners, LLC; (b) authorizing and approving the continuation of store closing or similar themed sales at the Closing Stores, which commenced prior to the Petition Date, in accordance with the terms of the Sale Guidelines; and (c) granting related relief.

57.     *The Store Closings*.  The Debtors' management team and advisors conducted an extensive store-by-store performance analysis of all existing stores evaluating, among other factors, historical and recent store profitability, historical and recent sales trends, occupancy costs, the geographic market in which each store is located, the mall in which each store is located, the potential to negotiate rent reductions with applicable landlords, and specific operational circumstances related to each store's performance.  The Debtors' management team and advisors have determined that it is appropriate to close and wind down approximately 1,000

22

underperforming brick-and-mortar store locations, and potentially additional stores contingent upon further determination by the Debtors and their advisors.

58.     The Debtors will independently close certain premium brand stores in the United States.  To maximize the value of their estates, the Debtors may need to close additional stores to the extent lease negotiations are unsuccessful.

59.     ***The Consultant Agreement.***  The Debtors selected and engaged the Consultant to manage the Store Closings as well as to sell the Store Closure Assets located in the stores and otherwise prepare the stores for turnover to the applicable landlords on the terms set forth in the Consulting Agreement.  The Consultant's evaluation process included, among other things, a formal request for proposal, equal access to all information provided by the Debtors, diligence provided though a virtual data room, reference calls, standard requirements for the submission or recovery assumptions, forecasts and analysis, and a phone and in-person meetings with the Debtors' management, during which the candidates made a formal proposal.  Based on this extensive evaluation, the Debtors' management, in consultation with the Debtors' advisors, determined that the Consultant provided the best and most competitive proposal.

60.     The Debtors and their advisors determined that the Consultant was the best liquidator to assist with consolidating its store base because of the Consultant's extensive expertise in conducting retail store closing sales, including the orderly liquidation of inventory, furniture, fixtures, equipment, and other assets.

61.     The Debtors' engaged in extensive negotiations with the Consultant regarding the terms and conditions of the Consulting Agreement and I believe that they were conducted in good faith, and at arm's-length.  I also believe that the Debtors' entry into the Consulting

Agreement was a sound exercise of the Debtors' reasonable business judgment and in the best interests of their estates.

62.    It is my understanding that the Consulting Agreement will enable the Debtors to use the logistical capabilities, experience, skills, and resources of the Consultant to effectively and efficiently conduct the Sale and, thus, significantly improve the potential value to be received through the Sale for the benefit of all stakeholders.  I believe the relief requested in the Store Closing Motion is necessary in order to ensure the development and certainty of an orderly process so as to produce the most value for the Debtors' estates.  Value realized in the closing of the Stores will inure to the benefit of the Debtors' estates, which will more than offset any expenses incurred by reason of the assumption of the Consulting Agreement.  Further, the Consultant's fees are based on the results of the Sale, ensuring that the Consultant is incentivized to maximize value for the Debtors' estates.

63.    The relief requested by the Store Closing Motion represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a) and 363(b) of the Bankruptcy Code.  The Debtors and their advisors believe that the Sale Guidelines represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of landlords and other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Store Closing Motion.

**N.    Debtors' Motion For Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock, and (II) Granting Related Relief (the "<u>NOL Motion</u>").**

64.    Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a) approving certain notification and hearing procedures related to certain transfers of Debtor Ascena Retail Group, Inc.'s common stock or any beneficial ownership therein, directing that

any purchase, sale, other transfer of Common Stock in violation of the Procedures shall be null and void *ab initio*; and (b) granting related relief.

65.    I understand that the Debtors possess NOLs and certain other Tax Attributes that are of significant value to the Debtors and their estates because the Debtors can carry forward such Tax Attributes to offset future taxable income, thereby reducing their future aggregate tax obligations.  The NOLs are substantial, and I believe that any termination or limitation of the NOLs including during the first month of these chapter 11 cases could cause significant and irreparable damage to the Debtors' estates and stakeholders.

66.    If no restrictions on trading are imposed as requested in the NOL Motion, such trading or deductions could severely limit or even eliminate the Debtors' ability to utilize the NOLs.  I believe that the loss of these valuable estate assets could lead to significant negative consequences for the Debtors, their estates, their stakeholders, and the overall reorganization process.  I further believe that the Procedures and other relief requested in the NOL Motion are critical for maximizing estate value and will help ensure a meaningful recovery for creditors. Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the NOL Motion.

**O.    Debtors' Motion for Entry of an Order Authorizing (I)  Rejection of Certain Unexpired Leases and (II) Abandonment of Any Personal Property, Effective as of the Rejection Date and (III) Granting Related Relief (the "<u>Lease Rejection Motion</u>").**

67.    Pursuant to the Lease Rejection Motion, the Debtors seek entry of an order authorizing the Debtors to:  (a) reject certain unexpired leases of real property, including any guaranties thereof and any amendments, modifications, or subleases thereto; (b) abandon certain equipment, fixtures, furniture, or other personal property that may be located at the premises and not otherwise transitioned to another store location, both rejection of Leases and abandonment of

Personal Property to be effective as of the applicable Rejection Date; and (c) granting related relief.

68.     The Debtors, with the assistance of their advisors, have determined that certain of their brick-and-mortar retail and outlet stores do not have a place in the Debtors' go-forward business plan.  I understand that, prior to the Petition Date, the Debtors determined in their business judgment to initiate store closings in an attempt to preserve liquidity.  Accordingly, the Debtors, in their reasonable business judgment, seek to the reject the Leases for the Closing Stores that have not expired by the terms of the applicable Lease by the Petition Date, effective as of the applicable Rejection Date.

69.     I understand that the Debtors have determined that the Leases are neither compatible with the Debtors' business needs nor a source of potential value for the Debtors' future operations, creditors, or other parties in interest.  Absent rejection, I believe that the Leases would impose ongoing obligations on the Debtors and their estates that constitute an unnecessary drain on the Debtors' resources.  Further, I understand that the Leases do not have any realizable value in the marketplace.  Accordingly, in an effort to avoid unnecessary postpetition rent and administrative costs, the Debtors have determined that it is in the best interests of their estates to reject the identified Leases, effective as of the Rejection Date.  Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Lease Rejection Motion.

**P.** **Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Foreign Franchise Agreements Effective as of the Petition Date (the "<u>Franchise Agreement Rejection Motion</u>").**

70.     Pursuant to the Franchise Agreement Rejection Motion, the Debtors seek entry of an order authorizing the Debtors to reject certain Agreements and granting related relief.

71.     In the lead up to these chapter 11 cases, the Debtors undertook an initial analysis of their contracts.   As a result of this analysis, the Debtors determined, in their business judgment, that the Agreements identified in the Franchise Agreement Rejection Motion are unnecessary and burdensome to the Debtors' estates and should be rejected immediately.   The Agreements include the Justice Brand Franchise Agreements between Tween Brands Service Co. and multiple parties throughout Mexico, Indonesia, and the Middle East, and the LOFT Brand Franchise Agreements between AnnTaylor, Inc. and several parties in Mexico.

72.     The Debtors undertook a comprehensive review of the Agreements and determined that the "value" is undeniably negative.   Absent rejection, the Agreements impose ongoing obligations on the Debtors and their estates that constitute an unnecessary drain on the Debtors' resources compared to any benefits associates therewith.   The Agreements have no place in the Debtors' go-forward business.   Specifically, the Debtors are obligated to prove certain licensing and development rights that provide no benefits to the estates in light of the planned wind-down of Justice and store portfolio rationalization.

73.     Accordingly, to avoid incurring unnecessary administrative expense claims with respect to the Agreements, the Debtors seek to reject the Agreements effective as of the Petition Date.   Accordingly, on behalf of the Debtors, I respectfully submit the Court should grant the relief requested in the Franchise Agreement Rejection Motion.